**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

__________ District of Delaware
(State)

Case number (*If known*): __________ Chapter 11

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/19

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| | | |
|---|---|---|
| 1. | **Debtor's name** | Elk Petroleum, Inc. |
| 2. | **All other names debtor used in the last 8 years**<br>Include any assumed names, trade names, and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 20-2638606 |
| 4. | **Debtor's address** | **Principal place of business**<br>1700 Lincoln, Suite 2550<br>Number Street<br>Denver CO 80203<br>City State ZIP Code<br>Denver County<br>County<br><br>**Mailing address, if different from principal place of business**<br>Number Street<br>P.O. Box<br>City State ZIP Code<br><br>**Location of principal assets, if different from principal place of business**<br>Number Street<br>City State ZIP Code |
| 5. | **Debtor's website** (URL) | https://elkpet.com |
| 6. | **Type of debtor** | ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>☐ Partnership (excluding LLP)<br>☐ Other. Specify: __________ |

Debtor Elk Petroleum, Inc. Case number (*if known*)
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

2111

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply*:
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ______ When ______ (MM / DD / YYYY) Case number ______

  District ______ When ______ (MM / DD / YYYY) Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☐ No
- ☑ Yes. Debtor See Rider 1 Relationship ______

  District ______ When ______ (MM / DD / YYYY)

  Case number, if known ______

Debtor Elk Petroleum, Inc. Case number (if known)_______________
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _______________

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _______________

**Where is the property?**_______________
Number Street

_______________
_______________ _______ _______
City State ZIP Code

**Is the property insured?**

☐ No
☐ Yes. Insurance agency _______________

Contact name _______________

Phone _______________

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.
☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☑ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor Elk Petroleum, Inc.
Name

Case number (*if known*)

**16. Estimated liabilities**

- [x] $0-$50,000
- [ ] $50,001-$100,000
- [ ] $100,001-$500,000
- [ ] $500,001-$1 million
- [ ] $1,000,001-$10 million
- [ ] $10,000,001-$50 million
- [ ] $50,000,001-$100 million
- [ ] $100,000,001-$500 million
- [ ] $500,000,001-$1 billion
- [ ] $1,000,000,001-$10 billion
- [ ] $10,000,000,001-$50 billion
- [ ] More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 05/22/2019
MM / DD / YYYY

✘ /s/ Scott M. Pinsonnault
Signature of authorized representative of debtor

Scott M. Pinsonnault
Printed name

Title Chief Restructuring Officer

**18. Signature of attorney**

✘ /s/ Matthew P. Ward
Signature of attorney for debtor

Date 05/22/2019
MM / DD / YYYY

Matthew P. Ward
Printed name

Womble Bond Dickinson (US) LLP
Firm name

1313 North Market Street, Suite 1200
Number Street

Wilmington
City

DE
State

19801
ZIP Code

(302) 252-4320
Contact phone

matthew.ward@wbd-us.com
Email address

4471
Bar number

DE
State

Debtor **Elk Petroleum, Inc.** Case number (if known)
Name

Fill in this information to identify your case:

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case Number (*if known*) Chapter 11

☐ Check if this is an amended filing

# FORM 201. VOLUNTARY PETITION

## Pending Bankruptcy Cases Attachment

| | | | | | |
|---|---|---|---|---|---|
| Debtor | **Elk Operating Services, LLC** | | | Relationship to you | Affiliate |
| District | **Delaware** | When | | Case number, if known | |
| Debtor | **Elk Petroleum Aneth, LLC** | | | Relationship to you | Affiliate |
| District | **Delaware** | When | | Case number, if known | |
| Debtor | **Resolute Aneth, LLC** | | | Relationship to you | Affiliate |
| District | **Delaware** | When | | Case number, if known | |

**UNANIMOUS WRITTEN CONSENT**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**ELK PETROLEUM, INC.**
**IN LIEU OF MEETING**

**May 20, 2019**

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the members of the Board of Directors (the "Board") of Elk Petroleum, Inc., a Delaware corporation ("EPI"), in lieu of a special meeting of the Board, the notice and call of which is hereby waived, hereby consent to the adoption of the following resolutions for EPI (including, but not limited to, in its capacity as (i) sole managing member of Elk Operating Services, LLC, a Delaware limited liability company ("Elk Operating Services"), and Elk Petroleum Aneth, LLC, a Delaware limited liability company ("Elk Aneth")) and (ii) as sole managing member of Elk Aneth, the sole managing member of Resolute Aneth, LLC, a Delaware limited liability company ("Resolute" and together with EPI, Elk Operating Services, and Elk Aneth, each a "Company", and collectively the "Companies"), such resolutions to have the same force and effect as if they had been adopted at a formal meeting of the Board duly called and held for the purpose of acting upon proposals to adopt such resolutions:

**WHEREAS**, each of Elk Operating Services, Elk Aneth and Resolute is a direct or indirect wholly-owned subsidiary of EPI;

**WHEREAS**, the Board considered presentations by management and the financial and legal advisors of the Companies regarding the liabilities and liquidity situation of the Companies, the strategic alternatives available, and the effect of the foregoing on such Companies' businesses;

**WHEREAS**, the Board has had the opportunity to consult with management and the financial and legal advisors of each Company and to fully consider each of the strategic alternatives available to such Company;

**WHEREAS**, on May 10, 2019, the Board determined that it was desirable and in the best interests of the Companies, their creditors, and other interested parties to execute, deliver and perform under that certain Restructuring Support Agreement, dated May 10, 2019, by and among the Company, Elk Operating Services, Elk Aneth, Resolute Aneth, and the Supporting Holders (as defined therein) party thereto (the "RSA");

**WHEREAS**, on May 10, 2019, the Company, Elk Operating Services, Elk Aneth, Resolute Aneth, and the Supporting Holders party thereto entered into the RSA;

**WHEREAS**, pursuant to the RSA, the Companies agreed to attempt to implement a voluntary out-of-court financial restructuring consistent with the terms and conditions set forth in the RSA;

**WHEREAS**, pursuant to the RSA, in the event the Companies were unable to implement an out-of-court financial structuring, the Companies would implement a financial restructuring through the commencement of voluntary cases under the provisions of the Bankruptcy Code (as defined below) consistent with the terms and conditions set forth in the RSA;

**WHEREAS**, the Board has determined that, because the Companies are unable to implement an out-of-court financial restructuring, it is desirable and in the best interests of the Companies, their creditors, and other interested parties to file petitions seeking relief under the provisions of the Bankruptcy Code;

**WHEREAS**, pursuant to the direction of the Board, in accordance with the terms of the RSA, the Company's management and advisors engaged in good-faith negotiations with the Supporting Holders over the terms of a Joint Prepackaged Chapter 11 Plan of Reorganization of Elk Petroleum Aneth, LLC and Resolute Aneth, LLC (collectively, the "Plan Proponents") (as may be amended, modified, or supplemented, the "Plan");

**WHEREAS**, the Plan Proponents anticipate commencing solicitation of the Plan on May 21, 2019; and

**WHEREAS**, the Plan Proponents will set a deadline of May 21, 2019, at 11:00 p.m. (EST) for the receipt of votes to accept or reject the Plan.

***Approval of Minutes of Board Meeting Held on May 10, 2019***

**NOW, THEREFORE, BE IT RESOLVED**, that the minutes of the Board meeting held on May 10, 2019, a draft of which has been provided to the Board for review, be approved without amendment, and that Donald Ainscow of Norton Rose Fulbright, who was requested to serve as recording secretary of the meeting, be authorized to sign them.

***Chapter 11 Filing***

**RESOLVED FURTHER**, that, in the event the Companies are unable to implement an out-of-court financial restructuring, the Companies be, and hereby are, authorized and empowered to file or cause to be filed voluntary petitions for relief (such voluntary petitions to be filed by the Companies, individually, a "Chapter 11 Case", and collectively, the "Chapter 11 Cases") under the provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") or other court of competent jurisdiction; and

**RESOLVED FURTHER**, that each officer of a Company (each, an "Authorized Officer" and collectively, the "Authorized Officers"), be, and each of them individually hereby is, authorized, in the name and on behalf of such Company, appointed as such Company's authorized representatives, and in such capacity, acting alone or together, with power of delegation, be, and they hereby are, authorized and empowered to execute and file on behalf of such Company, all petitions, schedules, lists, and other motions, objections, replies, applications, papers, or documents, and to take any and all action that they deem necessary, appropriate, or desirable to obtain such relief, including, without limitation, any action necessary, appropriate, or desirable to maintain the ordinary course operation of such Company's businesses or to assist such Company in the Chapter 11 Cases and in carrying out its duties under the provisions of the Bankruptcy Code.

***Cash Collateral and Adequate Protection***

**RESOLVED FURTHER**, that to the extent applicable to each Company, in the judgment of the Board, it is desirable and in the best interest of such Company, its interest holders, its creditors, and other parties in interest, to obtain the benefits from the use of cash collateral (the "Cash Collateral," as such term is defined in section 363(a) of the Bankruptcy Code), which is security for certain of the Company's

prepetition secured lenders under certain credit facilities by and among the Company, the guarantors party thereto, and the lenders party thereto (the "Prepetition Secured Lenders");

**RESOLVED FURTHER**, that to the extent applicable to each Company, the Authorized Officers be, and hereby are, authorized, directed and empowered in the name of, and on behalf of, such Company to seek approval of the use of cash collateral pursuant to a cash collateral order in interim and final form (a "Cash Collateral Order"), and, to the extent applicable to each Company, any Authorized Officer be, and hereby is, authorized, empowered, and directed to negotiate, execute (under the common seal of the Company, if appropriate), and deliver any and all agreements, instruments, or documents, by or on behalf of the Company, necessary or advisable to implement the Cash Collateral Order, including providing for adequate protection to the Prepetition Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for the use of cash collateral in connection with the Company's Chapter 11 Case, which agreement(s) may require each Company to grant adequate protection and security interests to the Prepetition Secured Lenders and each other agreement, instrument, or document to be executed and delivered in connection therewith, by or on behalf of each Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Officer in his absolute discretion approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof; and

**RESOLVED FURTHER**, that each of the Authorized Officers be, and hereby are, authorized, directed, and empowered in the name of, and on behalf of, each Company to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions, and extensions of the Cash Collateral Order or to do such other things which shall in his/her absolute discretion be necessary, desirable, proper, or advisable to give effect to the foregoing resolutions, which determination shall be conclusively evidenced by his or their execution thereof.

***Debtor-in-Possession Financing***

**RESOLVED FURTHER**, that, in connection with the Chapter 11 Cases, the Board has determined that it would be desirable and in the best interests of the Companies, their creditors and other interested parties to obtain, and the Companies would benefit under, a debtor-in-possession credit facility in a principal amount not to exceed $10 million (or such higher amount as may be agreed between the parties to the RSA), to be evidenced by a debtor-in-possession credit agreement by and among Elk Aneth, as borrower, and the lender parties thereto (the "DIP Credit Agreement") (a draft of which is attached hereto as **Exhibit A**), subject to approval by the Bankruptcy Court, which is necessary, appropriate, desirable, or advisable to the conduct, promotion, and attainment of the business of the Companies (the "DIP Financing");

**RESOLVED FURTHER**, that the execution and delivery of the DIP Credit Agreement and any DIP Financing Documents (as defined below) to which the Companies are a party, the consummation by the Companies of the transactions contemplated thereunder, and the execution, delivery and performance of all other agreements, guarantees, letters, instruments, documents, notices, or certificates constituting exhibits to the DIP Credit Agreement or that may be necessary, appropriate, desirable, or advisable to be executed or delivered pursuant to the DIP Credit Agreement or otherwise related thereto (each, including the DIP Credit Agreement, a "DIP Financing Document" and collectively, the "DIP Financing Documents"), are hereby authorized and approved in all respects, and that any Authorized Officer, acting alone or together, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to execute and deliver the DIP Credit Agreement and any other DIP Financing Document to which such Company is a party, with such changes therein and additions thereto as any such Authorized Officer may deem necessary, appropriate, desirable, or advisable, the execution and delivery of

the DIP Credit Agreement and any such DIP Financing Document with any changes thereto by the relevant Authorized Officer to be conclusive evidence of the approval of such officers and the Board;

**RESOLVED FURTHER**, that (i) the form, terms, provisions, and conditions of (a) the DIP Credit Agreement and (b) any and all of the other DIP Financing Documents, in each case, in substantially the form previously reviewed by the undersigned, (ii) the extensions of credit contemplated by the DIP Credit Agreement and the other DIP Financing Documents, including the borrowing of funds under the DIP Credit Agreement, the use of proceeds of such borrowings to, among other things, provide liquidity for the Companies throughout the Chapter 11 Cases, and (iii) the performance of the obligations under the DIP Credit Agreement and the other DIP Financing Documents, including the guarantees and the payment of all fees and expenses contemplated thereunder, are in each case hereby, in all respects confirmed, ratified, and approved;

**RESOLVED FURTHER**, that each Authorized Officer, acting alone or together, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to cause such Company to negotiate and approve the terms, provisions, and performance of, and to prepare, execute, and deliver the DIP Credit Agreement and any other DIP Financing Document, in the name and on behalf of such Company, and any such other documents, agreements, instruments, and certificates as may be required by the administrative agent thereunder or required by the DIP Credit Agreement or any other DIP Financing Document;

**RESOLVED FURTHER**, that the Companies be, and hereby are, authorized to incur the obligations and to undertake any and all related transactions contemplated under the DIP Credit Agreement and any other DIP Financing Document, including the borrowing of loans, guaranteeing of obligations, granting of security thereunder, and the pledging of collateral;

**RESOLVED FURTHER**, that each Authorized Officer, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to grant security interests in, and liens on, any and all property (including real property) of such Company as collateral pursuant to the DIP Credit Agreement any other DIP Financing Document to secure all of the obligations and liabilities of such Company thereunder, and to authorize, execute, verify, file or deliver all agreements, documents, and instruments in connection with the foregoing;

**RESOLVED FURTHER**, that each Authorized Officer, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to take all such further actions, including, without limitation, to pay all fees and expenses in accordance with the terms of the DIP Credit Agreement and any other DIP Financing Document, which shall be necessary, appropriate, desirable, or advisable to perform such Company's obligations under or in connection with the DIP Credit Agreement or any other DIP Financing Document and the transactions contemplated therein and to carry out fully the intent of the foregoing paragraphs of this resolution;

**RESOLVED FURTHER**, that each Authorized Officer, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to seek authorization to incur the DIP Financing and to seek approval of the use of cash collateral pursuant to a postpetition financing order in interim and final form, and any Authorized Officer be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of each Company, necessary to implement the postpetition financing, including providing for adequate protection to the Prepetition Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for entry into the DIP Financing Documents and the use of cash collateral in connection with each Company's Chapter 11 Case, which agreements may require each Company to grant adequate protection and liens to each Company's Prepetition Secured Lenders and each

other agreement, instrument, or document to be executed and delivered in connection therewith, by or on behalf of each Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Officer approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof; and

**RESOLVED FURTHER**, that each Authorized Officer, be, and each hereby is, authorized and empowered, in the name and on behalf of the applicable Company, to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions, and extensions of the DIP Credit Agreement or any of the DIP Financing Documents, subject to any required approval of the Bankruptcy Court, which shall be necessary, appropriate, desirable, or advisable (such acts to be conclusive evidence of the approval of such officers and the Board).

***Chapter 11 Plan; Solicitation***

**RESOLVED FURTHER**, that in the business judgment of the Board, it is desirable, and in the best interests of the Company, the Plan Proponents, their creditors, and other parties in interest, to have entered into the RSA, including the negotiation and documentation of the Plan and the commencement of the prepackaged solicitation of the Plan and Disclosure Statement (as defined in the Plan), and all exhibits, schedules, attachments, and ancillary documents or agreements related thereto, hereby is, in all respects approved and ratified with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by the Board.

***Retention of Professionals***

**RESOLVED FURTHER**, that each Authorized Officer be, and they hereby are, authorized and directed to employ the law firm of Norton Rose Fulbright US LLP, as general bankruptcy counsel, to represent and assist each Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance such Company's rights and obligations, including filing any motions, objections, replies, applications, or pleadings; and in connection therewith, each of the Authorized Officers, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Norton Rose Fulbright US LLP in accordance with applicable law;

**RESOLVED FURTHER**, that each Authorized Officer be, and they hereby are, authorized and directed to employ the law firm of Womble Bond Dickinson (US) LLP, as local bankruptcy counsel, to represent and assist each Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance such Company's rights and obligations, including filing any motions, objections, replies, applications, or pleadings; and in connection therewith, each of the Authorized Officers, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Womble Bond Dickinson (US) LLP in accordance with applicable law;

**RESOLVED FURTHER**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Ankura Consulting Group, LLC, as restructuring advisor, to represent and assist each Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance each of such Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain Ankura Consulting Group, LLC in accordance with applicable law;

**RESOLVED FURTHER**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Opportune LLP, as valuation analysis advisor, to represent and assist each Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance each of such Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain Opportune LLP in accordance with applicable law;

**RESOLVED FURTHER**, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Bankruptcy Management Solutions, Inc. d/b/a Stretto, as notice, claims, and balloting agent, to represent and assist each Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance such Company's rights and obligations; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Bankruptcy Management Solutions, Inc. d/b/a Stretto in accordance with applicable law; and

**RESOLVED FURTHER**, that each Authorized Officer be, and they hereby are, authorized and directed to employ any other professionals to assist the applicable Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance such Company's rights and obligations; and in connection therewith, each of the Authorized Officers, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of any other professionals as necessary; and

**RESOLVED FURTHER**, that each Authorized Officer be, and they hereby are, with power of delegation, authorized, empowered and directed to execute and file all petitions, schedules, motions, objections, replies, applications, pleadings, lists, and other papers and, in connection therewith,, to employ and retain all assistance by legal counsel, accountants, investment bankers, financial advisors, restructuring advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper or desirable in connection with the Chapter 11 Cases, with a view to the successful prosecution of such case.

***General Authorization and Ratification***

**RESOLVED FURTHER**, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers, each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of each Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in the case as in such officer's or officers' judgment, shall be necessary, advisable, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

**RESOLVED FURTHER**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of each Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of such Company with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution;

**RESOLVED FURTHER**, that each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered to take all actions or to not take any action in the name of each Company with respect to the transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member, managing member, or manager of each direct subsidiary of such Company, in each case, as such Authorized Officer shall deem necessary or desirable in such Authorized Officers' reasonable business judgment as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein;

**RESOLVED FURTHER**, that EPI is directly or indirectly the sole member, general partner, managing member, equivalent manager, or other governing body of any other company or subsidiary (each, a "Controlling Company"), and thus, each Authorized Officer is authorized, empowered and directed to take each of the actions described in these resolutions or any of the actions authorized by these resolutions on behalf of each such applicable Controlling Company; and

**RESOLVED FURTHER**, that the actions taken by this Written Consent shall have the same force and effect as if taken at a meeting of the Board of EPI duly called and constituted pursuant to such Company's bylaws and the applicable laws of the jurisdiction in which such Company is organized.

*****

This Written Consent may be executed in multiple counterparts, each of which will constitute an original, and all of which together will constitute one and the same instrument. A copy of this Written Consent signed and delivered by facsimile transmission will be considered an original, executed consent.

*(Signature page follows.)*

IN WITNESS WHEREOF, each of the undersigned have executed this Written Consent as of the date first set forth above.

BOARD OF DIRECTORS:

David Evans
Director

Eugene Davis
Director

Patrick Bartels
Director

IN WITNESS WHEREOF, each of the undersigned have executed this Written Consent as of the date first set forth above.

BOARD OF DIRECTORS:

______________________________
David Evans
Director

______________________________
Eugene Davis
Director

______________________________
Patrick Bartels
Director

IN WITNESS WHEREOF, each of the undersigned have executed this Written Consent as of the date first set forth above.

BOARD OF DIRECTORS:

______________________________________
David Evans
Director

______________________________________
Eugene Davis
Director

______________________________________
Patrick Bartels
Director

# EXHIBIT A

**DRAFT OF**
**DIP CREDIT AGREEMENT**

**(*See Attached*)**

*NRF 5/19/2019 comments to AGSH&F Draft 5/17/19*

**$[10,000,000]**

**SENIOR SECURED SUPER PRIORITY**

**DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT**

**DATED AS OF**
**[_____], 2019**

**AMONG**

**ELK PETROLEUM ANETH, LLC,**
**AS BORROWER,**

**THE OTHER LOAN PARTIES PARTY HERETO,**

**[_____],**
**AS ADMINISTRATIVE AGENT,**

**AND**

**THE LENDERS PARTY HERETO**

**Table of Contents**

Page

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING MATTERS ..... 1

Section 1.01 Defined Terms ..... 1
Section 1.02 Reserved ..... 24
Section 1.03 Terms Generally; Rules of Construction ..... 24
Section 1.04 Accounting Terms and Determinations; GAAP ..... 24

ARTICLE II THE CREDITS ..... 25

Section 2.01 Commitments ..... 25
Section 2.02 Loans and Borrowings ..... 25
Section 2.03 Requests for Borrowings ..... 26
Section 2.04 Reserved ..... 26
Section 2.05 Funding of Borrowings ..... 26

ARTICLE III PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES ..... 26

Section 3.01 Repayment of Loans ..... 26
Section 3.02 Interest ..... 27
Section 3.03 Reserved ..... 28
Section 3.04 Prepayments ..... 28
Section 3.05 Fees ..... 29

ARTICLE IV PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS ..... 30

Section 4.01 Payments Generally; Pro Rata Treatment; Sharing of Set-offs ..... 30
Section 4.02 Presumption of Payment by the Borrower ..... 31
Section 4.03 Certain Deductions by the Administrative Agent ..... 31
Section 4.04 Disposition of Proceeds ..... 31

ARTICLE V INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY ..... 31

Section 5.01 Increased Costs ..... 31
Section 5.02 Reserved ..... 32
Section 5.03 Taxes ..... 32
Section 5.04 Mitigation Obligations; Designation of Different Lending Office ..... 35

ARTICLE VI CONDITIONS PRECEDENT ..... 36

Section 6.01 Effective Date ..... 36
Section 6.02 Each Borrowing ..... 38

**Table of Contents**
**(continued)**

Page

ARTICLE VII REPRESENTATIONS AND WARRANTIES ........ 39

Section 7.01 Organization; Powers ........ 39
Section 7.02 Authority; Enforceability ........ 39
Section 7.03 Approvals; No Conflicts ........ 39
Section 7.04 Financial Condition; No Material Adverse Change ........ 40
Section 7.05 Litigation ........ 40
Section 7.06 Environmental Matters ........ 41
Section 7.07 Compliance with the Laws and Agreements; No Defaults ........ 42
Section 7.08 Investment Company Act ........ 42
Section 7.09 Taxes ........ 42
Section 7.10 ERISA ........ 43
Section 7.11 Disclosure; No Material Misstatements ........ 43
Section 7.12 Insurance ........ 44
Section 7.13 Restriction on Liens ........ 44
Section 7.14 Subsidiaries ........ 44
Section 7.15 Location of Business and Offices ........ 44
Section 7.16 Properties; Titles, Etc ........ 45
Section 7.17 Maintenance of Oil and Gas Properties ........ 45
Section 7.18 Gas Imbalances, Prepayments ........ 46
Section 7.19 Marketing of Production ........ 46
Section 7.20 Security Instruments ........ 46
Section 7.21 Hedging Agreements ........ 47
Section 7.22 Use of Loans ........ 47
Section 7.23 Reserved ........ 47
Section 7.24 USA PATRIOT; AML Laws; Anti-Corruption Laws and Sanctions ........ 47
Section 7.25 Accounts ........ 48
Section 7.26 Security Interests ........ 48
Section 7.27 Reorganization Matters. ........ 48

ARTICLE VIII AFFIRMATIVE COVENANTS ........ 49

Section 8.01 Financial Statements; Ratings Change; Other Information ........ 49
Section 8.02 Notices of Material Events ........ 54
Section 8.03 Existence; Conduct of Business ........ 54
Section 8.04 Payment of Obligations ........ 54
Section 8.05 Performance of Obligations under Loan Documents ........ 55
Section 8.06 Operation and Maintenance of Properties ........ 55
Section 8.07 Insurance ........ 56
Section 8.08 Books and Records; Inspection Rights ........ 56
Section 8.09 Compliance with Laws ........ 56
Section 8.10 Environmental Matters ........ 56
Section 8.11 Further Assurances ........ 57
Section 8.12 Reserve Reports ........ 58
Section 8.13 Title Information ........ 59
Section 8.14 Reserved ........ 59

**Table of Contents**
**(continued)**


Page

Section 8.15 ERISA Compliance ... 59
Section 8.16 Marketing Activities ... 60
Section 8.17 Reserved ... 60
Section 8.18 [Reserved] ... 60
Section 8.19 VCOC Letters ... 60
Section 8.20 Milestones ... 60
Section 8.21 Cash Management. ... 60

ARTICLE IX NEGATIVE COVENANTS ... 60

Section 9.01 Budget Variance ... 61
Section 9.02 Indebtedness ... 61
Section 9.03 Liens ... 61
Section 9.04 Restricted Payments ... 62
Section 9.05 Investments, Loans and Advances ... 62
Section 9.06 Nature of Business; International Operations ... 63
Section 9.07 Limitation on Leases ... 63
Section 9.08 Proceeds of Loans ... 63
Section 9.09 ERISA Compliance ... 64
Section 9.10 Sale or Discount of Receivables ... 64
Section 9.11 Mergers, Etc ... 64
Section 9.12 Sale of Properties ... 65
Section 9.13 Environmental Matters ... 65
Section 9.14 Transactions with Affiliates ... 65
Section 9.15 Subsidiaries ... 66
Section 9.16 Negative Pledge Agreements; Dividend Restrictions ... 66
Section 9.17 Gas Imbalances, Take-or-Pay or Other Prepayments ... 66
Section 9.18 Hedging Agreements ... 66
Section 9.19 Sale and Leaseback ... 67
Section 9.20 Amendments to Organization Documents, Material Contracts, Fiscal Year End ... 67
Section 9.21 New Accounts ... 67
Section 9.22 Capital Expenditures ... 67
Section 9.23 Prepayment or Modification of Debt ... 67
Section 9.24 No Subsidiaries ... 68

ARTICLE X EVENTS OF DEFAULT; REMEDIES ... 68

Section 10.01 Events of Default ... 68
Section 10.02 Remedies ... 70

ARTICLE XI THE ADMINISTRATIVE AGENT ... 71

Section 11.01 Appointment; Powers ... 71
Section 11.02 Duties and Obligations of Administrative Agent ... 71
Section 11.03 Action by Administrative Agent ... 72

**Table of Contents**
**(continued)**

Page

Section 11.04 Reliance by Administrative Agent ........ 73
Section 11.05 Subagents ........ 73
Section 11.06 Resignation of Administrative Agent ........ 73
Section 11.07 Administrative Agent as Lender ........ 74
Section 11.08 No Reliance ........ 74
Section 11.09 Administrative Agent May File Proofs of Claim ........ 75
Section 11.10 Authority of Administrative Agent to Release Collateral and Liens ........ 75

ARTICLE XII MISCELLANEOUS ........ 76

Section 12.01 Notices ........ 76
Section 12.02 Waivers; Amendments ........ 77
Section 12.03 Expenses, Indemnity; Damage Waiver ........ 78
Section 12.04 Assignments and Participations ........ 81
Section 12.05 Survival; Revival; Reinstatement ........ 84
Section 12.06 Counterparts; Integration; Effectiveness ........ 85
Section 12.07 Severability ........ 85
Section 12.08 Right of Setoff ........ 85
Section 12.09 GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS ........ 86
Section 12.10 Headings ........ 87
Section 12.11 Confidentiality ........ 87
Section 12.12 Interest Rate Limitation ........ 88
Section 12.13 EXCULPATION PROVISIONS ........ 89
Section 12.14 No Third Party Beneficiaries ........ 89
Section 12.15 USA PATRIOT ACT NOTICE ........ 89
Section 12.16 Releases ........ 89
Section 12.17 Acknowledgement and Consent to Bail-In of EEA Financial Institutions 90
Section 12.18 Incorporation of DIP Orders by Reference ........ 90
Section 12.19 Force Majeure ........ 90

ARTICLE XIII COLLATERAL ........ 91

Section 13.01 Grant of Security Interest ........ 91
Section 13.02 Perfection of Security Interest ........ 92
Section 13.03 Right to Cure ........ 93
Section 13.04 The Administrative Agent’s and Lenders’ Rights, Duties, and Liabilities 93
Section 13.05 Rights in Respect of Investment Property ........ 94
Section 13.06 Remedies ........ 94

ARTICLE XIV GUARANTY ........ 97

Section 14.01 Guaranty; Limitation of Liability ........ 97
Section 14.02 Guaranty Absolute ........ 97
Section 14.03 Waivers and Acknowledgments ........ 98
Section 14.04 Subrogation ........ 99

**Table of Contents**
**(continued)**

Page

Section 14.05 Continuing Guaranty; Assignments ........................................................ 100
Section 14.06 Release ..................................................................................................... 100

**ANNEXES, EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Annex I | Commitments |
| | |
| Exhibit A | Form of Note |
| Exhibit B | Form of Borrowing Request |
| Exhibit C | Reserved |
| Exhibit D-1 | Form of Variance Report |
| Exhibit D-2 | Form of Compliance Certificate |
| Exhibit E-1 | Reserved |
| Exhibit E-2 | Reserved |
| Exhibit E-3 | Reserved |
| Exhibit E-4 | Reserved |
| Exhibit F | Form of Assignment and Assumption |
| Exhibit G-1 | Form of U.S. Tax Compliance Certificate (Non-Partnership Foreign Lenders) |
| Exhibit G-2 | Form of U.S. Tax Compliance Certificate (Non-Partnership Foreign Participants) |
| Exhibit G-3 | Form of U.S. Tax Compliance Certificate (Foreign Participant Partnerships) |
| Exhibit G-4 | Form of U.S. Tax Compliance Certificate (Foreign Lender Partnerships) |
| Exhibit H | Form of VCOC Letter |
| Exhibit I | Initial Budget |
| Exhibit J | Interim Order |

| | |
|---|---|
| Schedule 1.01(a) | Security Instruments |
| Schedule 7.04 | Financial Statements |
| Schedule 7.05 | Litigation |
| Schedule 7.06 | Environmental Matters |
| Schedule 7.18 | Gas Imbalances |
| Schedule 7.19 | Marketing Contracts |
| Schedule 7.20 | Jurisdictions for Security Instrument Filings |
| Schedule 7.21 | Hedging Agreements |
| Schedule 7.25 | Accounts |
| Schedule 9.02 | Existing Intercompany Indebtedness |
| Schedule 9.03 | Liens |

**THIS SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** dated as of [_____], 2019, is among: ELK PETROLEUM ANETH, LLC, a limited liability company duly formed and existing under the laws of the State of Delaware (the "Borrower"); each of the other Loan Parties party hereto; each of the Lenders from time to time party hereto; and [_____] ("[_____]"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

**R E C I T A L S**

A. On [_____], 2019 (the "Petition Date"), the Borrower, together with Parent and certain Subsidiaries each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Chapter 11 Cases" under the "Bankruptcy Code") that are being jointly administered in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B. From and after the Petition Date, the Borrower and the Guarantors continues to operate their business and manage its property as a debtors and a debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

C. The Borrower has requested that the Lenders make postpetition loans and advances and provide other financial or credit accommodations to the Borrower, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured delayed draw term loan credit facility to the Borrower, in an aggregate principal amount not to exceed $10,000,000.

D. The Lenders have agreed to make such loans and extensions of credit subject to the terms and conditions of this Agreement.

E. In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01 Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Accounts" means all "accounts" (as such term is defined in the UCC) of the Loan Parties.

"Adequate Protection Superprorityclaims" has the meaning set forth in the applicable DIP Order.

"Administrative Agent" has the meaning assigned to such term in the introductory paragraph hereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super Priority Debtor-in-Possession Term Loan Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated pursuant to the terms hereof.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"AML Laws" means all laws, rules, and regulations of any jurisdiction applicable to any Lender, the Parent, the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to anti-money laundering, including the U.S.A. Patriot Act and equivalent Laws of other applicable jurisdictions.

"Aneth Field" means the business and assets represented by (a) that certain unit as defined by the Bureau of Land Management Unit Agreement dated June 20, 1961 and as described by serial number UTU-068927A (the "Aneth Unit"), (b) that certain unit as defined by the Bureau of Land Management Unit Agreement dated January 1, 1961 and as described by serial number UTU-068930A (the "McElmo Unit"), (c) that certain unit as defined by the Bureau of Land Management Unit Agreement dated May 1, 1961 and as described by serial number UTU-068931A (the "Ratherford Unit") and (d) the "Plant", as defined in the Plant Ownership and Operating Agreement for the Aneth Gas Plan dated December 31, 1986, as amended (the "Aneth Plant").

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent, the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to bribery or corruption, including the Foreign Corrupt Practice Act of 1977 and the UK Bribery Act of 2010, each as may be amended from time to time, and equivalent Laws of other applicable jurisdictions.

"Applicable Margin" means, for any day, with respect to any Loan, [10.00]%.

"Applicable Percentage" means, with respect to any Lender, a percentage equal to a fraction, the numerator of which is such Lender's outstanding principal amount of the Loans and the denominator of which is the aggregate outstanding amount of the Loans of all Lenders.

"Approved Assets" means interests in or to (a) the Running Horse Oil Pipeline, (b) Non-Operated Working Interests in $CO_2$ supply from McElmo Dome $CO_2$ Field, (c) the Red Pepper pipeline, including, in each case, Equity Interests of a Person, the Property of which is composed substantially of Approved Assets.

"Approved Counterparty" means (a) any Lender or any Affiliate thereof and (b) any other Person if such Person or its credit support provider has a long term senior unsecured debt rating of BBB/Baa2 by S&P or Moody's (or their equivalent) or higher.

"Approved Fund" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or investing in commercial bank loans and similar extensions of credit in the ordinary course of its business and any investment fund or asset manager that is administered, advised, sub-advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc. and (b) any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)(i)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Available Draw Commitments" shall mean, as to any Lender, at any time, an amount equal to the then available unfunded Commitment of such Lender.

"Avoidance Actions" has the meaning set forth in the applicable DIP Order.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the introductory paragraph hereto.

"Borrowing" means Loans made on a Borrowing Date.

"Borrowing Date" means the date on which any Loan is made hereunder.

"Borrowing Request" means a written request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed.

"Capital Expenditures" means, for Borrower and its Subsidiaries, all expenditures for fixed or capital assets which, in accordance with GAAP, are required to be capitalized and so shown on the consolidated balance sheet of Borrower and its Subsidiaries; provided, however, that Capital Expenditures shall not in any event include (a) amounts expended with the proceeds of insurance to repair or replace fixed or capital assets that are covered by the insurance policy under which such proceeds are paid, (b) leasehold improvement expenditures for which such Person is reimbursed by the lessor, sublessor or sublessee and (c) trade-ins of existing assets, to the extent of the value given to the trade-in.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve-Out" shall have the meaning set forth in the applicable DIP Order.

"Cash Management Order" means that certain Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems, (B) Honor Certain Prepetition Obligations Related thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (ii) Granting Related Relief filed with the Bankruptcy Court on [__________], 2019 at Docket No. [__], as such order may be amended, supplemented or modified.

"Cash Receipts" means all cash received by or on behalf of the Borrower or any Subsidiary, including without limitation: (a) amounts payable under or in connection with any Oil and Gas Properties; (b) cash representing operating revenue earned or to be earned by the Borrower or any Subsidiary; (c) proceeds from Loans; and (d) any other cash received by or on behalf of the Borrower or any Subsidiary from whatever source (including amounts received in respect of the Liquidation of any Hedging Agreement and amounts received in respect of any Disposition), other than (i) amounts described in the definition of "Excluded Accounts" which are deposited in Excluded Accounts and (ii) liability insurance proceeds required to be paid directly to third parties.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Subsidiaries.

"Change in Control" means (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof), of Equity Interests of the Ultimate Parent representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Ultimate Parent, (ii) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Ultimate Parent by Persons who were neither (A) directors on the date hereof, (B) nominated,

appointed or approved for consideration by shareholders for election by the board of directors of the Borrower nor (C) appointed by directors so nominated, appointed or approved, (iii) the Parent ceases to own directly or indirectly 100% of the Equity Interests in the Borrower or (iv) the Ultimate Parent ceases to Control the Parent or own 100% of the common Equity Interests of the Parent.

"Change in Control Date" has the meaning assigned to such term in Section 3.04(c)(iv).

"Change in Control Offer" has the meaning assigned to such term in Section 3.04(c)(iv).

"Change in Control Offer Acceptance Notice" has the meaning assigned to such term in Section 3.04(c)(iv).

"Change in Law" means the occurrence after the date of this Agreement or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement, of (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 5.01(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith (whether or not having the force of law) or in implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated, issued or implemented.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning set forth in Section 13.01.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I hereto, as such commitment may be modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b), as such amount may be adjusted from time to time in accordance with this Agreement.

"Commitment Fee" has the meaning set forth in Section 3.05(a).

"Committee" means, collectively, if applicable, the official committee of unsecured creditors and any other official committee formed, appointed or approved in any Chapter 11 Case and each of such committees shall be referred to herein as a "Committee".

"Commodity Accounts" means all "commodity accounts" (as such term is defined in the UCC) of the Loan Parties.

"Consolidated Subsidiaries" means, with respect to any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of such Person in accordance with GAAP.

"Consummation Date" means the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly more than 50% of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means a rate per annum equal to two percent (2.00%).

"Deposit Accounts" means all "deposit accounts" (as such term is defined in the UCC) of the Loan Parties.

"DIP Budget means, as applicable, (a) the Initial Budget, or (b) the "Approved Budget" (as that term is defined in the applicable DIP Order) approved and then in effect in accordance with the applicable DIP Order.

"DIP Order" means the Interim Order or Final Order, as applicable.

"Direct Taxes" means any severance, ad valorem, or other direct taxes on Oil and Gas Properties owned by any Loan Party or the production therefrom or the proceeds of such production; provided that federal, state, or local income or franchise taxes shall in no event be considered Direct Taxes.

"Disposition" means, with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, farm-out or other disposition thereof, including, without any limitation, any Casualty Event. The terms "Dispose" and "Disposed of" have meanings correlative thereto.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than

other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Indebtedness or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans or other obligations hereunder outstanding and all of the Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety, the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower or any Subsidiary is conducting, or at any time has conducted, business, or where any Property of the Borrower or any Subsidiary is located, including, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"EOS" means Elk Operating Services, LLC, a Delaware limited liability company.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, including both preferred and common equity, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business under real property leases, operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision or customary deposit account terms (pursuant to a

depository institution's standard documentation that is provided to its customers generally) relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution; provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business (including, for the avoidance of doubt, securing the performance of bonding obligations required by the Navajo Nation and the State of Utah and surety obligations owed to Exxon Mobil Corporation in respect plugging and abandonment obligations in respect of the Credit Parties' Oil and Gas Properties); (h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; (i) the interest of lessors in Property subject to operating leases; (j) Liens arising from precautionary UCC financing statement filings solely as a precautionary measure in connection with operating leases or consignment of goods; and (k) judgment and attachment Liens not giving rise to an Event of Default; provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; provided, further, that (x) Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced (and not stayed) and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens and (y) in no event shall "Excepted Liens" secure Indebtedness for borrowed money (provided that Excepted Liens described in clause (e) of this definition securing Indebtedness for borrowed money pursuant to customary deposit account terms set forth in a depository institution's standard documentation that is provided to its customers generally may exist).

"Excluded Accounts" means (a) segregated Deposit Accounts the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes required to be paid to the IRS or state or local government agencies with respect to employees of the Borrower or any Subsidiary or (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. Sec. 2510.3-102 on behalf of or for the benefit of employees of the Borrower or any Subsidiary, (b) segregated Deposit Accounts constituting (and the balance of which consists solely of funds set aside in connection with) payroll accounts and accounts dedicated to the payment of accrued employee benefits, medical, dental and employee benefits claims to employees of the Borrower or any Subsidiary and (c) the Exxon Escrow Account.

"Excluded Collateral" has the meaning set forth in Section 13.01.

"Excluded Real Property" means the parcels of real property owned on the date hereof and known as (a) 544 N. Harrison St., Cortez, CO 81321 and (b) 85 North 3rd, East Bluff, UT 84512.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) any and all Taxes imposed on (or based on or measured by) such recipient's net income (however denominated) and franchise Taxes imposed by the United States of America (or any political subdivision thereof) or such other jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or incorporated or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any and all branch profits Taxes imposed by the United States of America, (c) in the case of a Lender, U.S. federal withholding Taxes that are imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Lender's failure to comply with Section 5.03(f), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Taxes pursuant to Section 5.03 and (d) any U.S. federal withholding Taxes imposed by FATCA.

"Exit Fee" has the meaning set forth in Section 3.05(b).

"Extraordinary Net Cash Receipts" means any cash received by or paid to or for the account of the Borrower or any Subsidiary not in the ordinary course of business consisting of (a) proceeds of business interruption insurance, (b) payments or proceeds received as a result of the taking of any assets of any Loan Party by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than with respect to reimbursement of third party claims) relating to the Collateral and (d) foreign, United States, state or local tax refunds; in each case, net of reasonable and documented costs and expenses associated therewith, including reasonable and documented legal fees and expenses; provided, however, that Extraordinary Net Cash Receipts shall not include cash receipts to the extent that such funds are received by the Borrower or any Subsidiary in respect of any third party claim against such Person and applied to pay (or reimburse such Person for its prior payment of) such claim plus related costs and expenses.

"Exxon Escrow Account" means U.S. Bank Account No. 793602000 in the names of Exxon Mobil Corporation/Resolute Aneth LLC/Navajo Nation Oil and Gas Company, established pursuant to the Exxon Escrow Agreement and only to the extent that the Exxon Escrow Agreement remains in effect.

"Exxon Escrow Agreement" means that certain Exxon Escrow Agreement, dated April 14, 2006, among Exxon Mobil Corporation, Resolute Aneth, LLC, the Navajo Nation Oil and Gas Company, and U.S. Bank National Association, as escrow agent.

"Facility" means the credit facility described in Article II.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; provided that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Final Order" means an order of the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to the Borrower, Administrative Agent and the Lenders in their sole discretion, authorizing and approving on a final basis, among other things, the borrowings by the Borrower under the Facility.

"Financial Officer" means, for any Person, a chief financial officer, principal accounting officer, treasurer or controller of such Person, or the Chief Restructuring Officer, if any. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"First Day Orders" has the meaning set forth in Section 6.01(p).

"Foreign Lender" means any Lender that is not a United States person, within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.04.

"General and Administrative Costs" means normal and customary expenses and costs incurred in connection with the Oil and Gas Properties of the Borrower and each other Loan Party that are classified as general and administrative costs, including consulting fees, salary, rent, supplies, travel, insurance, accounting, legal, engineering and broker related fees required to manage the affairs of the Loan Parties.

"General Intangibles" means all "general intangibles" (as such term is defined in the UCC) of the Loan Parties.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Subsidiary, any other Loan Party, any of their Properties, the Administrative Agent or any Lender.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guaranteed Obligations" has the meaning set forth in Section 14.01.

"Guarantors" means the Parent, Resolute Aneth, and EOS.

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law and including: (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, asbestos containing materials, polychlorinated biphenyls, or radon.

"Hedge Termination Value" means, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined in accordance with GAAP.

"Hedging Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Hedging Agreement.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Secured Obligations under laws applicable to such

Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired by the Borrower or its Subsidiaries in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature. Unless otherwise indicated herein, each reference to the term "Hydrocarbon Interests" shall mean Hydrocarbon Interests of the Borrower and/or its Subsidiaries, as the context requires.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IFRS" means the International Financial Reporting Standards as in effect from time to time.

"Indebtedness" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and other accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business that are not past due for more than 60 days after the date of invoice or, which are actively being disputed in good faith and adequate reserves in conformity with GAAP have been established on the books of such Person); (d) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP; (e) in respect of Synthetic Leases, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capitalized Lease; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person, provided that, if such Person has not assumed or become liable for the payment of such obligation, the amount of such Indebtedness shall be limited to the lesser of (i) the principal amount of the obligations being secured and (ii) the fair market value of the encumbered Property; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (i) obligations to deliver commodities, goods or services, including Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course

of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment; provided that "Indebtedness" shall not include asset retirement obligations attributable to a period after the Maturity Date. The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower or any Guarantor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 12.03(b).

"Information" has the meaning assigned to such term in Section 12.11.

"Initial Budget" means the Borrower's initial 13-week cash budget approved by the Administrative Agent setting forth projected weekly cash receipts and cash disbursements for the Borrower during the proposed initial 13-week bankruptcy period, attached as Exhibit I.

"Interest Payment Date" means the last Business Day of each month during the term of this Agreement, commencing on the first Business Day in the month following the Effective Date.

"Interim Order" has the meaning set forth in Section 6.01(o).

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business and in amounts included in the DIP Budget (including permitted variances)); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or a discrete set of Properties or assets of the seller of such Properties or assets, other than any Property consisting of equipment, materials or consumables purchased or acquired in the ordinary course of business and in amounts included in the DIP Budget (including permitted variances), or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to

be sold) with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"IRS" means the United States Internal Revenue Service.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.[1]

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including (a) the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and its Subsidiaries shall be deemed to be the owner of any Property which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" means, with respect to any Hedging Agreement, the sale, assignment, novation, acceleration, restructuring, unwind or termination of all or any part of such Hedging Agreement or the creation of an offsetting position against all or any part of such Hedging Agreement. The terms "Liquidated" and "Liquidation" have correlative meanings thereto.

"Loan Documents" means this Agreement, the Notes, and any agreement, instrument or certificate required to be delivered under this Agreement by or on behalf of the Borrower or any Subsidiary.

"Loan Parties" means, collectively, the Borrower and the Guarantors. "Loan Party" means the Borrower or a Guarantor, individually, as the context may require.

"Loans" has the meaning specified for such term in Section 2.01(a).

"LOE" means (a) leasehold operating expenses in the ordinary course of business and consistent with past practices, industry standards and applicable law and (b) other field level or lease level charges for operations in each case with respect to the Oil and Gas Properties of the Loan Parties (excluding Capital Expenditures and General and Administrative Costs).

---

1 Note to draft: To include AB Elk Holdings LLC, AB Co-Invest Elk Holdings LLC, Riverstone Credit Partners - Direct, L.P., Riverstone Credit Partners II - Direct, LP, Riverstone Strategic Credit Partners S, L.P. and Riverstone Strategic Credit Partners A-2 AIV, L.P.

"Majority Lenders" means, at any time, Lenders holding more than fifty percent (50%) of the outstanding aggregate principal amount of the Loans (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Material Adverse Effect" means a material adverse change in, or material adverse effect on, (a) the business, operations, Property, liabilities (actual or contingent), condition or prospects (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole other than any change, event or occurrence, arising individually or in the aggregate, from (i) events leading up to the commencement of the Chapter 11 Cases and (ii) events that would reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, (b) the ability of the Borrower, any of its Subsidiaries or any other Loan Party to perform any of its obligations under any Loan Document to which it is a party, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Administrative Agent or any Lender under any Loan Document.

"Material Indebtedness" means Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $2,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the Hedge Termination Value of such Hedging Agreement.

"Maturity Date" means the earliest of (a) the Scheduled Maturity Date; (b) the Requested Maturity Date, if applicable; (c) the date upon which the Interim Order expires if the Final order has not then been entered; (d) twenty-one (21) days after the Petition Date if the Final Order has not then been entered; (e) the Consummation Date; (f) the closing of any sale of assets, which when taken together with all asset sales completed since the Effective Date, constitutes a sale of all or substantially all of the assets of the Borrower; and (g) the date on which all Loans become due and payable and the Commitments are terminated under the Loan Documents, whether by acceleration or otherwise.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage" means each mortgage, deed of trust or any other document creating and evidencing a Lien on real Property and other Property in favor of the Administrative Agent, for the benefit of the Secured Parties, which shall be in a form reasonably satisfactory to the Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time in accordance with the Loan Documents.

"Mortgaged Property" means any Property owned by the Borrower or any Subsidiary which is subject to a Mortgage.

"Net Cash Proceeds" means, (x) with respect to any Disposition of any Oil and Gas Properties (including any Equity Interests of any Subsidiary owning Oil and Gas Properties) by the Borrower or any Subsidiary or any Casualty Event, the excess, if any, of (i) the sum of cash

and cash equivalents received in connection with such Disposition or Casualty Event, but only as and when so received, over (ii) the sum, without duplication, of (A) the reasonable and documented out-of-pocket costs and expenses incurred by the Borrower or such Subsidiary in connection with such Disposition or Casualty Event, (B) all legal, title and recording tax expense and all federal, state, provincial, foreign and local income Taxes required to be paid in the current fiscal year or subsequent fiscal year as a consequence of such Disposition or Casualty Event, (C) in the case of a Disposition, the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the Property Disposed of in such Disposition and retained by the Borrower or any Subsidiary after such Disposition, (D) cash payments made to satisfy obligations resulting from the Liquidation of any Hedging Agreements in connection with or as a result of any such Disposition of Oil and Gas Properties or Casualty Event, and (E) in the case of any Disposition, any portion of the purchase price from such Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Disposition or otherwise in connection with such Disposition; provided, however, that upon the termination of that escrow, Net Cash Proceeds will be increased by any portion of funds in the escrow that are released to the Borrower or any Subsidiary and (y) with respect to the issuance of any Indebtedness, the cash proceeds received from such issuance of Indebtedness, as the case may be, net of underwriting discounts and commissions and other reasonable and documented costs and expenses associated therewith, including reasonable and documented legal fees and expense.

"Notes" means the promissory notes of the Borrower described in Section 2.02(c) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests; and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires,

towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing. Unless otherwise indicated herein, each reference to the term "Oil and Gas Properties" shall mean Oil and Gas Properties of the Borrower and/or its Subsidiaries, as the context requires.

"Organization Documents" means, (a) with respect to any corporation, the certificate or Articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); (b) with respect to any limited liability company, the certificate or Articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or Articles of formation or organization of such entity.

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document, including any and all liabilities (including interest and penalties and other additions to Taxes) with respect to the foregoing.

"Parent" means Elk Petroleum, Inc., a Delaware corporation.

"Participant" has the meaning set forth in Section 12.04(c).

"Participant Register" has the meaning set forth in Section 12.04(c)(ii).

"Petition Date" is defined in the recitals to this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six (6) calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate.

"Pledged Collateral" has the meaning set forth in Section 13.05.

"Prepetition Indebtedness" means the Indebtedness of the Loan Parties outstanding immediately prior to the Petition Date.

"Prime Rate" means the "U.S. Prime Lending Rate" as published in *The Wall Street Journal*. Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Professional Fees" shall have the meaning set forth in the DIP Order.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible (including cash, securities, accounts, contract rights and Equity Interests or other ownership interests of any Person), whether now in existence or owned or hereafter acquired.

"Proved Reserves" means "Proved Reserves" as defined in the Definitions for Oil and Gas Reserves (in this paragraph, the "Definitions") promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question, "Proved Developed Producing Reserves" means Proved Reserves which are categorized as both "Developed" and "Producing" in the Definitions, "Proved Developed Nonproducing Reserves" means Proved Reserves which are categorized as both "Developed" and "Nonproducing" in the Definitions, "Proved Developed Reserves" means the sum of Proved Developed Producing Reserves and Proved Developed Nonproducing Reserves, and "Proved Undeveloped Reserves" means Proved Reserves which are categorized as "Undeveloped" in the Definitions. "Recipient" means (a) the Administrative Agent or (b) any Lender, as applicable.

"Redemption" means, with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, or defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Indebtedness. "Redeem" has the correlative meaning thereto.

"Register" has the meaning assigned to such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Release" (or "Threatened Release") has the meaning assigned to such terms as specified in CERCLA, as amended; provided, however, that (a) in the event that CERCLA is amended so as to broaden the meaning of the term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of the Borrower or any Subsidiary is located establish a meaning for "release" that is broader than that specified in CERCLA, such broader meaning shall apply.

"Remedial Work" has the meaning assigned to such term in Section 8.10(a).

"Reorganization Plan" means a chapter 11 plan of reorganization of any Loan Party in the Chapter 11 Cases.

"Requested Maturity Date" has the meaning assigned to such term in Section 3.01.

"Reserve Report" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of the dates set forth in Section 8.12(a), the Proved Reserves attributable to the Oil and Gas Properties of the Borrower and its Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions and discount rates consistent with the Administrative Agent's credit criteria and standards at the time.

"Resolute Aneth" means Resolute Aneth, LLC, a Delaware limited liability company.

"Responsible Officer" means, as to any Person, a Chief Executive Officer, the President, any Financial Officer, the Secretary or any Vice President of such Person, or if such Person does not have any such officer, an individual holding such position with a Person directly or indirectly managing its business and affairs. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any of its Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any of its Subsidiaries, and any payment of management or similar fees.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of May 10, 2019, by and among the Parent, the Borrower, Resolute, EOS and the supporting holders identified therein, as the same may from time to time be amended, modified, supplemented or restated pursuant to the terms thereof.

"S&P" means S&P Global Ratings, a division of S&P Global Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), or by the United Nations Security Council, the European Union or any EU member state, or Her Majesty's Treasury, (b) any Person located, operating, organized or

resident in a Sanctioned Country or (c) any Person directly or indirectly owned or controlled by any such Person or Persons.

"Sanctions" means economic or financial sanctions or trade embargoes or restricted measures imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, Australia, the European Union or Her Majesty's Treasury of the United Kingdom or other applicable jurisdictions.

"Scheduled Maturity Date" means the date that is sixty (60) days after the Effective Date.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Obligations" means (a) any and all amounts owing or to be owing (including interest accruing at any post-default rate and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, any of its Subsidiaries or any Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) by the Borrower, any of its Subsidiaries or any Guarantor (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising) to the Administrative Agent or any Lender under any Loan Document and (b) all renewals, restatements, extensions and/or rearrangements of any of the above. Without limitation of the foregoing, the term "Secured Obligations" shall include the unpaid principal of and interest on the Loans (including, without limitation, interest accruing at the then applicable rate provided in this Agreement after the maturity of the Loans and interest accruing at the then applicable rate provided in this Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any of its Subsidiaries, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), reimbursement obligations and unpaid amounts, fees, expenses, indemnities, costs, and all other obligations and liabilities of every nature of the Borrower, any Subsidiary or any Guarantor, whether absolute or contingent, due or to become due, now existing or hereafter arising under this Agreement, the other Loan Documents.

"Secured Parties" means the Administrative Agent and each Lender.

"Securities Accounts" means all "securities accounts" (as such term is defined in the UCC) of the Loan Parties.

"Security Instruments" means each of the agreements, instruments or certificates described or referred to in Schedule 1.01(a), and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Person in connection with, or as security for the payment or performance of the Secured Obligations, the Notes or this Agreement, as such agreements may be amended, modified, supplemented or restated from time to time.

"Sellers" means, collectively, Resolute Energy Corporation, a Delaware corporation, Hicks Acquisition Company I, Inc., a Delaware corporation, and Resolute Natural Resources Company, LLC, a Delaware limited liability company.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing more than 50% of the equity or more than 50% of the ordinary voting power (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) or, in the case of a partnership, any general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Superpriority Claim" means a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income Taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalties and additions to taxes applicable thereto.

"Test Period" means the first rolling four-week period after the Effective Date and each rolling four-week period thereafter.

"Transaction Costs" means all fees and expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions.

"Transactions" means, collectively, (a) with respect to (i) the Borrower, the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of Loans and the use of the proceeds thereof, and the grant of

Liens by the Borrower on the Collateral pursuant to the Security Instruments, (ii) each other Loan Party, the execution, delivery and performance by such Loan Party of each Loan Document to which it is a party, such Loan Party's guaranty of the Secured Obligations pursuant to this Agreement, and the grant of Liens by such Loan Party on the Collateral pursuant to the Security Instruments, and (b) the payment of Transaction Costs.

"Treasury Rate" shall mean, as of any date of determination, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) business days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"UCC" means the Uniform Commercial Code as in effect in the State of New York.

"Ultimate Parent" means Elk Petroleum, Ltd., an Australian company limited by shares.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56), as amended.

"Variance Report" means a report certified by a Responsible Officer of the Borrower in substantially the form of the attached Exhibit D-1, delivered in accordance with Section 8.01(v), showing actual disbursements, actual cash receipts and accrued Professional Fees for the applicable Test Period as of the end of the week immediately preceding the week during which such Variance Report is delivered and the variance (as a percentage) of such amounts from the corresponding anticipated amounts therefor set forth in the applicable DIP Budget.

"VCOC Letter" means a letter in the form of Exhibit H executed by the Borrower in favor of the applicable Lender.

"Wholly-Owned Subsidiary" means any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or are owned by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"Withholding Agent" means the Borrower, any Guarantor or the Administrative Agent.

"Withholding Certificate" has the meaning assigned to such term in Section 5.03(f).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02 Reserved.

Section 1.03 Terms Generally; Rules of Construction. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", and the word "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) except as otherwise provided herein, any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including", (f) unless otherwise specified, any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement and (g) for purposes of determining compliance with any provision of this Agreement which requires a determination of whether a certain action or transaction is included in the DIP Budget, permitted under the DIP Budget, or any other analogous phrase, the projections set forth in the DIP Budget as in effect at the time of the applicable action or transaction shall be used to determine compliance. No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.04 Accounting Terms and Determinations; GAAP. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the financial statements except for changes in which Borrower's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods; provided, further, that if at any time any change in GAAP or interpretation thereof by the independent auditors of the Borrower or its Subsidiaries would require that operating leases entered into in the ordinary course of business be treated in a manner similar to capital leases under GAAP, all financial covenants, requirements and terms in this Agreement shall continue to be calculated or construed as if such change in GAAP had not occurred and no operating lease shall be treated as a Capital Lease for any purpose hereunder.

**ARTICLE II**
**THE CREDITS**

Section 2.01 Commitments. Subject to the terms and conditions of this Agreement, each Lender hereby agrees, severally and not jointly, to make term loans to the Borrower in a principal amount equal to such Lender's Available Draw Commitment (the "Loans"). Each Borrowing shall be in an aggregate principal amount that is (i) no more than $[4,000,000]2 on the date on which the Interim Order is entered and (ii) no more than $[6,000,000] in the aggregate at any time before or on the date on which the Final DIP Order is entered. The aggregate principal amount of all Loans advanced to the Borrower pursuant to this Section 2.01 shall not exceed the Commitments of all Lenders. Amounts paid or prepaid in respect of Loans may not be reborrowed. Upon disbursement of each Loan by a Lender, the amount of the Available Draw Commitment of such Lender shall be reduced by the amount of such Commitment so disbursed.

Section 2.02 Loans and Borrowings.

(a) Borrowings; Several Obligations. The Loans shall be made as part of a Borrowing on the Effective Date consisting of Loans made by the Lenders ratably in accordance with their respective Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b) Reserved.

(c) Notes. Any Lender may request that the Loans made by it be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, in each case, payable to such Lender or its registered assigns in a principal amount equal to the aggregate principal amount of its Loans as in effect on such date, and otherwise duly completed. In the event that the aggregate principal amount of any Lender's Loans increases or decreases for any reason (whether pursuant to Section 12.04(b) or otherwise), upon the request of such Lender, the Borrower shall deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender or its registered assigns in a principal amount equal to the aggregate principal amount of its Loans after giving effect to such increase or decrease, and otherwise duly completed. Borrower's obligation to deliver a Note evidencing Loans for which the Borrower has previously delivered a Note shall be subject to Borrower's receipt of such previously-delivered Note or satisfactory indemnity therefor in Borrower's discretion. The replaced Note shall be deemed cancelled upon delivery from the Borrower to the Lender of such new Note. The date, amount and interest rate of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be recorded by such Lender on a schedule

2 Elk to confirm.

attached to such Note or any continuation thereof or on any separate record maintained by such Lender. Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03 Requests for Borrowings. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by facsimile or e-mail to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower not later than 12:00 noon, New York City time, three (3) Business Days before the date of any Requested Borrowing. Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) the aggregate amount of the requested Borrowing;

(ii) the date of such Borrowing, which shall be a Business Day; and

(iii) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05(a).

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04 Reserved.

Section 2.05 Funding of Borrowings. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Borrower specified in the Borrowing Request. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01 Repayment of Loans.

(a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b) Extension of Maturity Date. Provided there exists no Default or Event of Default, upon written notice to the Administrative Agent (which shall promptly notify the Lenders), the Borrower may at any time no later than ten (10) days prior to the Scheduled Maturity Date, request that the Scheduled Maturity Date be extended for an additional period specified in such notice (such extended date, the "Requested Maturity Date"). At the time of sending such notice, the Borrower (in consultation with the Administrative Agent) shall specify the time period within which each Lender is requested to respond (which shall in no event be less

than five (5) Business Days days from the date of delivery of such notice to the Lenders). Each Lender shall notify the Administrative Agent within such time period whether or not it agrees to extend the Scheduled Maturity Date to the Requested Maturity Date. Any Lender not responding within such time period shall be deemed to have declined to extend the Maturity Date to the Requested Maturity Date. The Administrative Agent shall notify the Borrower and each Lender of the Lenders' responses to each request made hereunder. If Administrative Agent and each of the Lenders consent to the extension of the Scheduled Maturity Date to the Requested Maturity Date, the Scheduled Maturity Date shall automatically, without the need for further action on the part of the Administrative Agent, the Borrower or the Lenders, be extended to the Requested Maturity Date.

Section 3.02 Interest.

(a) Loans. The Loans comprising each Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b) Reserved.

(c) Post-Default Rate. Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, and the Majority Lenders, or the Administrative Agent at the direction of the Majority Lenders, notify the Borrower of their election to charge the default rate, or if any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding, in the case of an Event of Default, and such overdue amount, in the case of a failure to pay amounts when due, shall bear interest, after as well as before judgment, at the Default Rate plus the rate applicable to Loans as provided in Section 3.02(a), but in no event to exceed the Highest Lawful Rate (with such interest to be retroactive to the date of such Event of Default).

(d) Interest Payment Dates. Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Maturity Date; provided that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of a Loan prior to the Maturity Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e) Interest Rate Computations. All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The Alternate Base Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03 Reserved.

Section 3.04 Prepayments.

(a) Optional Prepayments. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, in an amount of not less than $500,000 and integral multiples of $100,000 in excess of that amount or, if less, the entire outstanding principal amount of the Borrowings, subject to prior notice in accordance with Section 3.04(b), and the payment of any amounts required to be paid pursuant to Section 3.04(b) and Section 3.04(d). The Borrower shall have the right at any time and from time to time to request a reduction in Available Draw Commitments subject to prior notice in accordance with Section 3.04(b).

(b) Notice and Terms of Optional Prepayment. The Borrower shall notify the Administrative Agent in writing by facsimile or other electronic transmission of any prepayment hereunder not later than 12:00 noon, New York City time, one (1) Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is conditioned upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied (it being understood that the requirements of Section 5.02 shall apply to any failure of such condition to occur and any such revocation). Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02 and any payments to the extent required by Section 5.02.

(c) Mandatory Prepayments.

(i) Promptly (but in no event later than one (1) Business Day) following the receipt of Net Cash Proceeds by the Borrower or any Subsidiary in respect of any Disposition (other than Dispositions permitted by Section 9.12(a), (b), (d), (e) or (f)), Casualty Event, Liquidation of any Hedging Agreement), the Borrower shall use the Net Cash Proceeds to prepay the Loans.

(ii) Promptly (but in no event later than one (1) Business Day) following the receipt of Extraordinary Net Cash Receipts by the Borrower or any Subsidiary, the Borrower shall use the Extraordinary Net Cash Receipts to prepay the Loans.

(iii) Immediately upon the receipt of Net Cash Proceeds by the Borrower or any Subsidiary in respect of the issuance or incurrence of Indebtedness for borrowed money (other than Indebtedness permitted to be issued pursuant to Section 9.02), the Borrower shall use the Net Cash Proceeds received from such issuance or incurrence of Indebtedness for borrowed money to prepay the Loans.

(iv) To the extent a Change in Control occurs (the date of such Change in Control, the "Change in Control Date"), on any Change in Control Date, the Borrower shall make a written offer to prepay the Loans (the "Change in Control Offer") to the Lenders (with a copy to the Administrative Agent) (provided that if such offer is delivered prior to the occurrence of a Change in Control, the offer may state that the Change in Control Offer is conditioned on the occurrence of such Change in Control) for an aggregate principal amount of all of the Loans, together with any accrued and unpaid interest and any amounts due pursuant to Section 3.04(d). Each Lender may accept all or a portion of its pro rata share of the Change in Control Offer by providing written notice (a "Change in Control Offer Acceptance Notice") to the Administrative Agent and the Borrower no later than 5:00 p.m. ten (10) Business Days after the date of such Lender's receipt of the Change in Control Offer. Each Change in Control Offer Acceptance Notice from a given Lender shall specify the principal amount of the mandatory repayment of Loans to be accepted by such Lender; provided that if such Lender fails to specify the principal amount of the Loans to be accepted, it shall be deemed to have requested a prepayment in full of its Loans. If a Lender fails to deliver a Change in Control Offer Acceptance Notice to the Administrative Agent within the time frame specified above, such failure will be deemed an acceptance of the total amount of such mandatory prepayment of the Loans. The Borrower shall make any prepayments no later than ten (10) Business Days after expiration of the time period for acceptance by Lenders of Change in Control Offers (or, if such ten (10) Business Day period expires prior to the date of the Change in Control, on the date of such Change in Control.

(v) Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to any Borrowings then outstanding.

(vi) Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this Section 3.04(c) shall, in each case, be accompanied by all accrued interest on the amount prepaid together with any additional payments to the extent required by Section 5.02.

(vii) The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 3.04(c), (x) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (y) if such prepayment results from a voluntary event, at least three Business Days prior written notice of such prepayment. Each notice of prepayment shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.

Section 3.05 Fees.

(a) Commitment Fee. On the Effective Date, the Borrower agrees to pay to each Lender a fee (the "Commitment Fee") in an amount equal to 1.00% of such Lender's Commitment in immediately available funds. Such Commitment Fee is fully earned as of the Effective Date and shall be payable on the initial funding of the Loans under this Agreement.

(b) Exit Fee. Each repayment or prepayment of any Loans shall be accompanied by an exit premium of 1.00% (the "Exit Fee") of the principal amount of Loans so repaid or prepaid, whether such prepayment or repayment is optional or mandatory, whether occurring prior to or after an Event of Default or whether occurring upon acceleration or otherwise.

(c) Generally. All such fees shall be paid on the dates due, in immediately available Dollars to the Administrative Agent for distribution promptly, if and as appropriate, among the Lenders or directly to the Lenders, as applicable. Once paid, absent manifest error, none of these fees shall be refundable under any circumstances.

**ARTICLE IV**
**PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS**

Section 4.01 Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a) Payments by the Borrower. The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. Fees, once paid, shall be fully earned and shall not be refundable under any circumstances, absent manifest error. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b) Application of Insufficient Payments. Each payment (including each prepayment) by the Borrower on account of principal and interest on the Loans shall be made to the Administrative Agent for the *pro rata* benefit of the Lenders according to the respective outstanding principal amounts of the Loans then held by the Lenders. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, towards payment of principal and premium then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c) Sharing of Payments by Lenders. If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or

interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall promptly remit such excess amount to the Administrative Agent for the pro rata benefit of the Lenders.

Section 4.02 Presumption of Payment by the Borrower. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03 Certain Deductions by the Administrative Agent. If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 4.02, Section 5.03(d) or Section 12.03(c) then the Administrative Agent may, in its sole discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 4.04 Disposition of Proceeds. The Security Instruments contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Collateral. The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Secured Obligations and other obligations described therein and secured thereby. Notwithstanding the assignment contained in such Security Instruments, for so long as no Event of Default has occurred and is continuing, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

Section 5.01 Increased Costs.

(a) Reserved.

(b) Capital Requirements. If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of

return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) Certificates. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 5.01(b) shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within twenty (20) days after receipt thereof.

(d) Effect of Failure or Delay in Requesting Compensation. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's right to demand such compensation; provided that notice of the demand is made within twelve (12) months of the date on which the condition or event giving rise to compensation first occurs.

Section 5.02 Reserved.

Section 5.03 Taxes.

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes; provided that if an applicable Withholding Agent shall be required under any applicable law (as determined in its good faith discretion) to deduct or withhold any Taxes from such payments, then the applicable Withholding Agent shall be entitled to make such deductions or withholdings, shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and if such Taxes are Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 5.03), the Administrative Agent, Lender or other Recipient (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b) Payment of Other Taxes by the Borrower. Each Loan Party shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Borrower. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, as the case may be, on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder (including

Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any and all reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate from the Administrative Agent (on its own behalf or on behalf of a Lender) or a Lender (with a copy to the Administrative Agent) as to the amount of such payment or liability under this Section 5.03(c) shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 5.03(d).

(e) Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrower or a Guarantor to a Governmental Authority pursuant to this Section 5.03, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f) Withholding Certificates.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement or any other Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than Section 5.03(f)(ii)(A), (ii)(B), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable

judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, to the extent permitted by applicable law,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) each Foreign Lender shall, to the extent that it is legally entitled to do so, deliver to the Borrower and the Administrative Agent, on or prior to the Effective Date (or, in the case of any Foreign Lender that is an assignee of a Lender, on the date such assignee becomes a party to this Agreement) and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) executed copies of IRS Form W-8EXP;

(4) in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "Withholding Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(5) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, IRS Form W-8 EXP, a Withholding Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or

other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a Withholding Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower and Administrative Agent as may be necessary for the Borrower and Administrative Agent to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for the purposes of this Section 5.03(f)(ii)(D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expired or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g) Survival. Each party's obligations under this Section 5.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(h) Defined Terms. For purpose of this Section 5.03, the term "applicable law" includes FATCA.

Section 5.04 Mitigation Obligations; Designation of Different Lending Office. If any Lender requests compensation under Section 5.01, or if any Loan Party is required to indemnify

any Lender or pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01 Effective Date. The obligations of the Lenders to make the Loans on the Effective Date shall not become effective until the Business Day on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a) On the Effective Date, after giving effect to the Transactions, neither the Borrower nor any of its Subsidiaries shall have any Indebtedness for borrowed money other than Indebtedness permitted pursuant to Section 9.02.

(b) The Administrative Agent and the Lenders shall have received all commitment and agency fees (including the Commitment Fee) and all other fees and amounts, due and payable on or prior to the Effective Date, and to the extent invoiced in reasonable detail at least two (2) Business Days prior to the Effective Date, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder (including, without limitation, the costs and expenses for recordation of certain Security Instruments and the reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP, counsel to the Administrative Agent, pursuant to Section 12.03(a)).

(c) The Administrative Agent shall have received from each party hereto, counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such other party.

(d) The Administrative Agent shall have received duly executed Notes payable to each Lender that has requested a Note in a principal amount equal to its Commitment dated as of the Effective Date.

(e) The Administrative Agent shall have received a certificate of a Responsible Officer of the Parent and each Loan Party setting forth (i) resolutions of its members, board of directors, board of managers or other governing body, as applicable, with respect to the authorization of the Parent or such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of the Parent or such Loan Party (A) who are authorized to sign the Loan Documents to which the Parent or such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative

for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized individuals, and (iv) the Organization Documents of the Parent or such Loan Party, certified as being true and complete. The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Parent or such Loan Party to the contrary.

(f) The Administrative Agent shall have received certificates of the appropriate state agencies with respect to the existence, qualification and good standing of the Parent and each Loan Party.

(g) The Administrative Agent shall have received an opinion of Norton Rose Fulbright US LLP, counsel to the Borrower and the Parent, in form and substance reasonably satisfactory to the Administrative Agent.

(h) The Administrative Agent shall have received appropriate UCC search certificates reflecting no prior Liens (other than those being assigned or released on or prior to the Effective Date or Liens permitted by Section 9.03) encumbering the Properties of the Borrower and the Subsidiaries for each of the following jurisdictions: Delaware, Utah and any other jurisdiction reasonably requested by the Administrative Agent.

(i) The Administrative Agent shall have received UCC financing statements naming the Parent and each Loan Party as a debtor, in proper form for filing.

(j) The Administrative Agent shall have received all due diligence information regarding the Loan Parties as it shall have requested including, without limitation, information regarding litigation, tax matters, accounting matters, insurance matters, labor matters, pension liabilities (actual or contingent), real estate leases, material contracts, debt agreements, property ownership, contingent liabilities and other legal matters of the Borrower and its Subsidiaries.

(k) The Administrative Agent shall have received a Borrowing Request and accompanying flow of funds memorandum in accordance with Section 2.03.

(l) As of the Effective Date, after giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

(m) As of the Effective Date, after giving effect to the Transactions, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(n) Each Lender requesting a VCOC Letter shall have received a duly executed copy of a VCOC Letter addressed to such Lender.

(o) The Bankruptcy Court shall have entered an order substantially the form of Exhibit J or with such changes as may be acceptable to the Administrative Agent and the Lenders in their sole discretion, on the one hand, and Borrower, on the other hand (the "Interim Order"), which Interim Order (x) shall have been entered on the docket of the Bankruptcy Court

no later than three (3) Business Days after the Petition Date and (y) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect.

(p) The "first day" orders (including, without limitation, any motions related to the Loan Documents, cash management and any critical vendor or supplier motions, but excluding retention applications), in form, scope and substance reasonably satisfactory to the Lenders and their counsel, on the one hand, and the Borrower, on the other hand, shall have been entered in the Chapter 11 Cases, in each case in form and substance reasonably satisfactory to the Lenders (the "First Day Orders").

(q) The Administrative Agent shall have received such other documents as the Administrative Agent or special counsel to the Administrative Agent may reasonably request.

Section 6.02 Each Borrowing. The obligations of the Lenders to make the Loans on the applicable Borrowing Date shall not become effective until the Business Day on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a) The representations and warranties of the Parent, Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct on and as of the Borrowing Date, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the Effective Date, such representations and warranties shall continue to be true and correct as of such specified earlier date.

(b) The making of the Loans, would not conflict with, or cause any Lender to violate or exceed, any applicable Governmental Requirement, and no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, amendment, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(c) As of the Borrowing Date, after giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

(d) As of the Borrowing Date, after giving effect to the Transactions, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(e) The applicable DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any adverse respect without the consent of the Lenders.

(f) The funding shall not cause the aggregate amount of the Borrowings to exceed the amount then authorized by the applicable DIP Order, as the case may be, and any order modifying, reversing, staying or vacating either such order shall not have been entered.

(g) The funding shall not cause the aggregate amount of the Borrowings to exceed the aggregate amount permitted under the DIP Budget or this Agreement.

The Administrative Agent shall notify the Borrower and the Lenders of the Borrowing Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 6:00 p.m., New York City time, on [_____], 2019 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time). For purposes of determining compliance with the conditions specified in this Section 6.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Borrowing Date specifying its objection thereto.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that, subject in all respects to the entry of the DIP Orders and the First Day Orders and the terms thereto:

Section 7.01 Organization; Powers. Subject to any restriction arising on account of Loan Parties' status as a "debtor" under the Bankruptcy Code and any required approvals of the Bankruptcy Court, each Loan Party is (a) a legal entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted in all material respects, and is qualified to do business in, and (c) is in good standing in, every jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except where failure to have such approvals and qualifications could not reasonably be expected to have a Material Adverse Effect, and in each case, not subject to the automatic stay under the Chapter 11 Cases or executed after the Petition Date.

Section 7.02 Authority; Enforceability. The Transactions are within each Loan Party's corporate, limited partnership, limited liability company or other organizational powers, as applicable, and have been duly authorized by all necessary corporate, limited partnership, limited liability company or other organizational, as applicable, and, if required, shareholder, partner or member action, as applicable (including any action required to be taken by any class of directors of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions). Subject to the entry of the Interim Order (or Final Order, as applicable) and subject thereto, each Loan Document to which a Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03 Approvals; No Conflicts. Except for the entry of the Interim Order (or Final Order, as applicable), the Transactions (a) do not require any consent or approval of,

registration or filing with, or any other action by, any Governmental Authority or any other third Person (including holders of its Equity Interest or any class of directors or managers, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement, and (ii) those Governmental Authority or third party approvals or consents which, if not made or obtained, would not reasonably be expected to have a Material Adverse Effect, (b) will not violate any applicable law or regulation or any Organization Document of any Loan Party or any Subsidiary of the Borrower or any order of any Governmental Authority, except to the extent that such violation would not be reasonably expected to have a Material Adverse Effect, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary of the Borrower or any of their respective Properties, or give rise to a right thereunder to require any payment to be made by such Loan Party or such Subsidiary and (d) will not result in the creation or imposition of any Lien on any Collateral or any other Property of the Borrower or any Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04 Financial Condition; No Material Adverse Change.

(a) The Borrower has heretofore furnished in writing to the Administrative Agent a pro forma consolidated balance sheet and other financial information reflecting the consolidated financial position of the Borrower and its Consolidated Subsidiaries as of the Effective Date, after giving effect to the making of the Loans hereunder, the application of the proceeds thereof and to the Transactions contemplated to occur on the Effective Date, certified by a Responsible Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions. Such financial information presents fairly, in all material respects, the financial position of the Borrower and its Consolidated Subsidiaries on the Effective Date.

(b) Since May 10, 2019, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(c) Except as set forth on Schedule 7.04, neither the Borrower nor any Subsidiary has on the date hereof any Material Indebtedness (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments.

Section 7.05 Litigation. Except as set forth on Schedule 7.05 and the Chapter 11 Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting the Borrower or its Subsidiaries or their Properties (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve any Loan Document or the Transactions.

Section 7.06 Environmental Matters. Except for such matters as set forth on Schedule 7.06:

(a) the Properties are in compliance with all applicable Environmental Laws in all material respects, the Borrower and the Subsidiaries have operated the Properties in compliance with all applicable Environmental Laws in all material respects, and to the knowledge of the Borrower, the Properties were operated in compliance with applicable Environmental Laws prior to the acquisition by the Borrower in all material respects;

(b) the Borrower and the Subsidiaries have obtained all Environmental Permits required for their respective operations and each of their Properties, except as would not reasonably be expected to result in a Material Adverse Effect, with all such Environmental Permits being currently in full force and effect, and none of Borrower or the Subsidiaries has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied;

(c) there are no claims, demands, suits, orders, inquiries, investigations, requests for information or proceedings concerning any material violation of, or any material liability or obligation (including as a potentially responsible party) under, any applicable Environmental Law that is pending or, to the Borrower's knowledge, threatened against the Borrower or any Subsidiary or any of their respective Properties or as a result of any operations at such Properties, and to the Borrower's knowledge, there are no conditions or circumstances that would be reasonably expected to result in the receipt of such claims, demands, suits, orders, inquires, investigations, requests for information or proceedings;

(d) none of the Properties of the Borrower or any Subsidiary contain or have contained any: (i) regulated underground storage tanks, other than certain vehicle refueling facilities; (ii) friable asbestos-containing materials; (iii) landfills or dumps; or (iv) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(e) Except as would not reasonably be expected to result in a Material Adverse Effect, there has been no Release or, to the Borrower's knowledge, threatened Release, of Hazardous Materials at, on, under or from the Borrower's or any Subsidiary's Properties, there are no investigations, remediations, abatements, removals, or monitorings of Hazardous Materials required under applicable Environmental Laws at such Properties and, to the knowledge of the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property;

(f) neither the Borrower nor any Subsidiary has received any written notice asserting an alleged material liability or material obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite the Borrower's or any Subsidiary's Properties and, to the Borrower's knowledge, there

are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice;

(g) there has been no exposure of any Person or property to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Borrower's or the Subsidiaries' Properties that would reasonably be expected to form the basis for a claim for material damages or compensation against the Borrower or any Subsidiary and, to the Borrower's knowledge, there are no conditions or circumstances that would reasonably be expected to result in the receipt of notice regarding such exposure; and

(h) the Borrower and the Subsidiaries have provided to the Lenders complete and correct copies of all environmental site assessment reports, investigations, studies, analyses, and correspondence addressing potentially material environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) that are in any of the Borrower's or the Subsidiaries' possession or control and relating to their respective Properties or operations thereon.

Section 7.07 Compliance with the Laws and Agreements; No Defaults.

(a) Except as permitted by an order of the Bankruptcy Court, each of the Borrower and each Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, in each case except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b) Neither the Borrower nor any Subsidiary is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Borrower or a Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Indebtedness is outstanding or by which the Borrower or any Subsidiary or any of their Properties is bound.

(c) No Default or Event of Default has occurred and is continuing.

Section 7.08 Investment Company Act. Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09 Taxes. Each of the Borrower and its Subsidiaries has timely (taking into account any valid extensions) filed or caused to be filed all income and other material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate. No Tax Lien has

been filed and, to the knowledge of the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10 ERISA.

(a) The Borrower, the Subsidiaries and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

(b) Each Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(c) Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no act, omission or transaction has occurred in respect of a Plan which could result in imposition on the Borrower, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (A) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of Section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (B) breach of fiduciary duty liability damages under Section 409 of ERISA, and (ii) full payment when due has been made of all amounts which the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan.

(d) Neither the Borrower, the Subsidiaries nor any ERISA Affiliate sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in Section 3(1) of ERISA, including any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower, a Subsidiary or any ERISA Affiliate in its sole discretion at any time without any material liability to the Borrower, any Subsidiary, or any ERISA Affiliate.

(e) Neither the Borrower, the Subsidiaries nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code.

Section 7.11 Disclosure; No Material Misstatements. Each of the Parent, the Borrower and each Subsidiary has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or similar restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it with respect to the Borrower and the Subsidiaries, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower or any Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (taken as a whole and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared

in good faith based upon assumptions believed to be reasonable at the time. There is no fact peculiar to the Borrower or any Subsidiary (as opposed to other participants in their industries generally) that has not been disclosed to the Administrative Agent prior to the Effective Date which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Subsidiary prior to, or on, the date hereof in connection with the transactions contemplated hereby. There are no statements or conclusions in any Reserve Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties, prices and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12 Insurance. The Borrower has, and has caused all of its Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Subsidiaries. The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as lender loss payee with respect to Property loss insurance.

Section 7.13 Restriction on Liens. Neither the Borrower nor any of the Subsidiaries is a party to any material agreement or arrangement (other than Capital Leases creating Liens permitted by Section 9.03(c), but only on the Property subject of such Capital Lease), or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or in respect of their Properties to secure the Secured Obligations and the Loan Documents.

Section 7.14 Subsidiaries. Except as disclosed in writing to the Administrative Agent from time to time (which shall promptly furnish a copy to the Lenders) after the Effective Date, the Borrower has no Subsidiaries other than Resolute Aneth, LLC and EOS, it being understood that EOS is not a Subsidiary on the Effective Date. Each Subsidiary is a Wholly-Owned Subsidiary. The Borrower has no Foreign Subsidiaries.

Section 7.15 Location of Business and Offices. The Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Elk Petroleum Aneth, LLC; and the organizational identification number of the Borrower in its jurisdiction of organization is 6525257 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(n) in accordance with Section 12.01). The Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(n) and Section 12.01(c)).

Section 7.16 Properties; Titles, Etc.

(a) Each of the Borrower and the Subsidiaries has (i) good and defensible title to its respective Oil and Gas Properties evaluated in the most recently delivered Reserve Report, or the right to use its respective Oil and Gas Properties, and (ii) good title to all of their personal Properties, or the right to use its personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03(a), (b) and (d). After giving full effect to the Excepted Liens, the Borrower or the Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Oil and Gas Properties does not in any material respect obligate the Borrower or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Oil and Gas Property in an amount in excess of the working interest of each Oil and Gas Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Subsidiary's net revenue interest in such Oil and Gas Property.

(b) All leases and agreements necessary for the conduct of the business of the Borrower and the Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or any event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, except in each case as would not reasonably be expected to have a Material Adverse Effect.

(c) The rights and Properties presently owned, leased or licensed by the Borrower and the Subsidiaries including all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Subsidiaries to conduct their business in all material respects in the same manner as their business has been conducted prior to the date hereof.

(d) All of the Properties of the Borrower and the Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition (ordinary wear and tear excepted) and are maintained in accordance with prudent business standards.

(e) The Borrower and each Subsidiary owns, or possesses the right to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower and its Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17 Maintenance of Oil and Gas Properties. Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas

Properties of the Borrower and its Subsidiaries (and Oil and Gas Properties unitized therewith) have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Borrower or any Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the vertical wells comprising a part of such Oil and Gas Properties of the Borrower and its Subsidiaries (or Oil and Gas Properties unitized therewith) is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, such Oil and Gas Properties (or in the case of wells located on Oil and Gas Properties unitized therewith, such unitized Oil and Gas Properties). All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Subsidiaries that are necessary to conduct normal operations are being maintained in a condition reasonably adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of its Subsidiaries, in a manner consistent with the Borrower's or its Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18 Gas Imbalances, Prepayments. Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(b), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Subsidiaries to deliver Hydrocarbons produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding 500,000 mcf of gas (on an mcf equivalent basis) in the aggregate.

Section 7.19 Marketing of Production. Except for contracts in effect on the date hereof and listed on Schedule 7.19, and hereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Borrower's or its Subsidiaries' Hydrocarbons (including calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date of such contract.

Section 7.20 Security Instruments.

(a) Valid Liens. Each Security Instrument delivered pursuant to Section 8.11 and Section 8.14(a), upon execution and delivery thereof, is effective to create in favor of the

Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Collateral thereunder, and when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Governmental Requirements, such Security Instruments will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case with no other Liens except for applicable Excepted Liens and other Liens permitted by Section 9.03 and in each case prior and superior in right to any other person, other than Liens permitted by such Mortgage and Excepted Liens and other Liens permitted by Section 9.03.

Section 7.21 Hedging Agreements. Schedule 7.21, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(f), as of the date of such report, sets forth, a true and complete list of all Hedging Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements (other than the Loan Documents) relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.22 Use of Loans. The proceeds of the Loans shall be used on the Effective Date in accordance with the DIP Orders. Notwithstanding anything to the contrary herein or elsewhere, neither this Agreement nor any other Loan Document shall restrict the payment of Professional Fees benefitting from the Carve-Out. The Borrower and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation U or X of the Board). No part of the proceeds of any Loan will be used by any Loan Party for any purpose which violates the provisions of Regulations U or X of the Board.

Section 7.23 Reserved.

Section 7.24 USA PATRIOT; AML Laws; Anti-Corruption Laws and Sanctions. Each of the Parent and the Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Parent, the Borrower, their Subsidiaries and their respective directors, officers, employees and agents with the USA PATRIOT Act, Anti-Corruption Laws, applicable AML Laws and Sanctions. None of (a) the Parent, the Borrower, any Guarantor, any Subsidiary or any of their respective directors or officers, or, to the knowledge of the Parent, the Borrower, any of their respective employees or Affiliates, or (b) to the knowledge of the Parent, the Borrower, any agent of the Parent, the Borrower, any Guarantor, or any Subsidiary or other Affiliate that will act in any capacity in connection with or benefit from the credit facility established hereby, (i) is a Sanctioned Person, or (ii) is in violation of AML Laws, Anti-Corruption Laws, or Sanctions. No Borrowing, use of proceeds or other transaction contemplated by this Agreement will cause a violation of AML Laws, Anti-Corruption Laws or Sanctions by any Person participating in the transactions contemplated by this Agreement, whether as lender, borrower, guarantor, agent, or otherwise. Neither the Borrower nor any of its Subsidiaries, nor the the Parent or any Guarantor, or, to the knowledge of such the Parent and Borrower, any other Affiliate has engaged in or intends to engage in any dealings or transactions with, or for the benefit of, any Sanctioned Person in violation of Sanctions or with or in any Sanctioned Country.

Section 7.25 Accounts. Schedule 7.25 (as amended or supplemented from time to time with the prior written consent of the Administrative Agent) lists all Deposit Accounts, Securities Accounts and Commodity Accounts maintained by or for the benefit of the Borrower or any Subsidiary.

Section 7.26 Security Interests.

(a) This Agreement and the other Loan Documents, upon execution and delivery thereof by the parties thereto and entry of the DIP Order (and subject to the terms therein), will create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Effective Date by entry of the DIP Orders with respect to each Loan Party and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral, securing all the Secured Obligations, other than the Carve-Out and as otherwise set forth in the applicable DIP Order. The Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders.

(b) Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Secured Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and their estates and all proceeds thereof, including, without limitation, and subject to entry of the Final Order, any proceeds of Avoidance Actions, subject, as to priority, only to the Carve-Out and as otherwise set forth in the applicable DIP Order.

Section 7.27 Reorganization Matters.

(a) The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof and the proper notice of (x) the motion seeking approval of the Loan Documents and the Interim Order and, as applicable, the Final Order, (y) the hearing for the approval of the Interim Order, and (z) when applicable, the hearing for the approval of the Final Order will be given; provided that the Borrower shall

give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b) The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended in an adverse manner without the Majority Lenders' consent.

(c) Each DIP Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Loan Parties delivered to the Administrative Agent were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projection.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full, the Borrower covenants and agrees with the Lenders and the Administrative Agent that:

Section 8.01 Financial Statements; Ratings Change; Other Information. The Borrower will furnish to the Administrative Agent and each Lender:

(a) Annual Financial Statements. As soon as available, but in any event in accordance with applicable law and not later than ninety (90) days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by BDO East Coast Partnership or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification, exception or explanatory paragraph as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries (if any), and (if applicable) on a consolidated basis, in accordance with GAAP consistently applied; provided that so long as the Ultimate Parent is listed in Australia, the Borrower may provide the financials required by this Section 8.01(a) in accordance with IFRS together with a reconciliation to GAAP.

(b) Quarterly Financial Statements. As soon as available, but in any event in accordance with then applicable law and not later than sixty (60) days after the end of each of the four fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending December 31, 2017, its unaudited consolidated (if applicable) balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet,

as of the end of) the previous fiscal year, all certified by one of its Responsible Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries, on a consolidated basis, in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; provided that so long as the Ultimate Parent is listed in Australia, the Borrower may provide the financials required by this Section 8.01(b) in accordance with IFRS together with a reconciliation to GAAP.

(c) Compliance Certificate. Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Responsible Officer in substantially the form of Exhibit D-2 hereto (a) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (b) stating whether any change in GAAP or in the application thereof has occurred since the Effective Date, and if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d) Certificate of Accounting Firm — Defaults. Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines).

(e) Certificate of Responsible Officer — Consolidating Information. If at any time that the Borrower has any Subsidiaries and all of such Subsidiaries of the Borrower are not Consolidated Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Responsible Officer of the Borrower setting forth consolidating spreadsheets that show all Consolidated Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Borrower.

(f) Certificate of Responsible Officer — Hedging Agreements. Concurrently with any delivery of a Reserve Report pursuant to Section 8.12, a certificate of a Responsible Officer of the Borrower, in form and substance satisfactory to the Administrative Agent, (i) setting forth as of the effective date of such Reserve Report, a true and complete list of all Hedging Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements (other than the Loan Documents) relating thereto not listed on Schedule 7.21, any margin required or supplied under any credit support document, and the counterparty to each such agreement and (ii) demonstrating compliance with Section 8.18(b) as of such effective date.

(g) Certificate of Insurer — Insurance Coverage. Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance reasonably satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(h) Other Accounting Reports. Promptly upon receipt thereof, a copy of each other report or letter (except standard and customary correspondence) submitted to the Borrower or any of its Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Subsidiary, and a copy of any response by, or on behalf of, the Borrower or any such Subsidiary to such letter or report.

(i) SEC and Other Filings. Promptly after the same become publicly available, notice of the public availability of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary thereof with the SEC, or with any national or foreign securities exchange.

(j) Notices Under Material Instruments. Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(k) Lists of Purchasers. Concurrently with the delivery of any Reserve Report to the Administrative Agent pursuant to Section 8.12, a list of those Persons whose cumulative purchases from the Borrower or any Subsidiary of Hydrocarbons produced from operated Oil and Gas Properties during the six months immediately preceding the date of such Reserve Report equal in the aggregate at least 75% of the total Hydrocarbons produced from operated Oil and Gas Properties purchased from the Borrower or any Subsidiary during such period.

(l) Notice of Sales of Oil and Gas Properties and Liquidation of Hedging Agreements. In the event the Borrower or any Subsidiary intends to sell, transfer, assign or otherwise Dispose of any Oil and Gas Properties or any Equity Interests in any Subsidiary in accordance with Section 9.12, other than any equipment, materials or consumables Disposed of in the ordinary course of business to the extent permitted by this Agreement, prior written notice (and in any event not less than five Business Days' prior notice) of such Disposition, the price thereof and the anticipated date of closing and any other details thereof requested by the Administrative Agent or any Lender. In the event that the Borrower or any Subsidiary receives any notice of early termination of any Hedging Agreement to which it is a party from any of its counterparties, or any Hedging Agreement to which the Borrower or any Subsidiary is a party is Liquidated, prompt written notice of the receipt of such early termination notice or such Liquidation, as the case may be, together with a reasonably detailed description or explanation thereof and any other details thereof requested by the Administrative Agent or any Lender.

(m) Notice of Casualty Events. Prompt written notice, and in any event within three (3) Business Days, of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event, in each case with a fair market value in excess of $1,000,000.

(n) Information Regarding Loan Parties. Prompt written notice (and in any event at least thirty (30) days prior thereto, or such shorter time as the Administrative Agent may agree in its sole discretion) of any change (i) in any Loan Party's corporate, limited liability company or limited partnership name or in any trade name used to identify such Person in the

conduct of its business or in the ownership of its Properties, (ii) in the location of any Loan Party's chief executive office or principal place of business, (iii) in any Loan Party's ownership, entity type or jurisdiction in which such Person is incorporated or formed, (iv) in any Loan Party's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in any Loan Party's United States federal taxpayer identification number.

(o) Production Report, Lease Operating Statements and Lease Acquisition Report. Within sixty (60) days after the end of each fiscal quarter, a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month and a lease acquisition report including a schedule of Oil and Gas Properties acquired by the Loan Parties during the previous fiscal quarter, lease acquisition costs, title information and certificate that such Oil and Gas Properties are Mortgaged Properties and demonstrating compliance with Section 8.14(a).

(p) Notices of Certain Changes. Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or Articles of incorporation, by-laws, any preferred stock designation or any other Organization Document of the Borrower or any Subsidiary thereof.

(q) Annual Budget and Forecast. By July 31st of each fiscal year, a report, in a form reasonably satisfactory to the Administrative Agent, prepared by or on behalf of the Borrower detailing on a monthly basis (i) the projected production of Hydrocarbons by the Borrower and the Subsidiaries and the assumptions used in calculating such projections, (ii) an annual operating budget for the Borrower and the Subsidiaries for such fiscal year, (iii) the projected capital expenditures to be incurred by the Borrower and the Subsidiaries, with a breakdown of those capital expenditures to be used for the development of Proved Undeveloped Reserves of the Borrower and the Subsidiaries, and the assumptions used in calculating such projections, and (iv) such other information as may be reasonably requested by the Administrative Agent.

(r) Oil and Gas Properties. Within sixty (60) days after the end of each calendar month, a report in detail acceptable to the Administrative Agent with respect to the Oil and Gas Properties of each Loan Party during such month:

(i) setting forth as to each well being drilled, completed, reworked or other similar procedures, the actual versus estimated cost breakdown (for all activities, including dry hole and completion activities) for such well;

(ii) describing by well and field the net quantities of oil, gas, natural gas liquids, and water produced (and the quantities of water injected);

(iii) describing by well and field the quantities of oil, gas and natural gas liquids sold during such month out of production from any Loan Party's Oil and Gas

Properties and calculating the average sales prices of such oil, natural gas, and natural gas liquids;

(iv) specifying any leasehold operating expenses, overhead charges, gathering costs, transportation costs, and other costs with respect to any Loan Party's Oil and Gas Properties of the kind chargeable as direct charges or overhead under the Aneth Unit accounting procedures in effect on the date hereof;

(v) setting forth the amount of Taxes on each Loan Party's Oil and Gas Properties during such month and the amount of royalties paid with respect to such Oil and Gas Properties during such month; and

(vi) attaching thereto all drill site opinions or division order opinions prepared by or for any operator of any Oil and Gas Properties to the extent not previously delivered.

(s) Other Requested Information. Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower and its Subsidiaries (including any Plan) or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

(t) Lender Calls. Each calendar week after the delivery of the Variance Report required to be delivered pursuant to Section 8.01(v) or as otherwise reasonably requested by the Majority Lenders, the Borrower shall cause its senior management, including the Chief Restructuring Officer, if any, and its financial advisors to participate in a conference call with the Administrative Agent and the Lenders, who are subject to a confidentiality agreement reasonably acceptable to the Borrower, and Lenders' advisors during which the Borrower's senior management and financial advisors shall review the DIP Budget, the Variance Reports, any other reports related to the DIP Budget or Loan Documents, the financial condition, performance and business affairs of the Loan Parties and any other matters as the Administrative Agent or Lenders may reasonably request.

(u) Reserved.

(v) Variance Reports. Deliver, in accordance with the applicable DIP Order, to the Administrative Agent for further distribution to each Lender and the advisors to the Lenders a Variance Report for the applicable Test Period as of the end of the immediately preceding calendar week.

(w) DIP Budget. Deliver, in accordance with the applicable DIP Order, to the Administrative Agent for further distribution to each Lender and the advisors to the Lenders an updated forecast of the information contained in the Initial DIP Budget setting forth on a weekly basis for the next thirteen (13) weeks (commencing with the calendar week immediately following the week in which such update is delivered) and a written set of supporting assumptions.

(x) Reports filed with the Bankruptcy Court. Deliver to the Administrative Agent for further distribution to each Lender and the advisors to the Lenders copies of (i) [daily cash balance reports of the Loan Parties in accordance with the DIP Orders]3 and (ii) all monthly reports, projections, or other written information respecting each of the Loan Parties' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) Committee.

Section 8.02 Notices of Material Events. To the extent the same is not otherwise notified to the Administrative Agent in connection with proper notices and filings with the Bankruptcy Court, the Borrower will furnish to the Administrative Agent (for distribution to each Lender and the advisors to the Lenders) prompt written notice of the following:

(a) the occurrence of any Default;

(b) the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any of its Subsidiaries not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(c) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03 Existence; Conduct of Business. The Borrower will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect (a) its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties are located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.11.

Section 8.04 Payment of Obligations. In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, the Borrower will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities of the

3 Note to draft: Subject to confirmation.

Borrower and all of its Subsidiaries, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has established on its books adequate reserves with respect thereto in accordance with GAAP or IFRS with a reconciliation to GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or sale by a Governmental Authority of any Property of the Borrower or any Subsidiary, in each case, unless subject to the automatic stay under the Chapter 11 Cases, and in each case subject to rejection of agreements in accordance with the Bankruptcy Code.

Section 8.05 Performance of Obligations under Loan Documents. The Borrower will repay the Loans according to the terms thereof, and the Borrower will, and will cause its Subsidiaries to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including this Agreement, at the time or times and in the manner specified.

Section 8.06 Operation and Maintenance of Properties. The Borrower, at its own expense, will, and will cause each Subsidiary to:

(a) operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in material compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of such Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b) preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted), in accordance with good and customary oilfield operating practice, all of its Oil and Gas Properties and other Properties material to the conduct of its business in light of the business needs of the Loan Parties, including all equipment, machinery and facilities, unless such Oil and Gas Properties or other Properties are sold, assigned or transferred in a Disposition permitted by Section 9.12;

(c) promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will otherwise use commercially reasonable efforts to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder;

(d) promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties; and

(e) cause each Affiliate of the Borrower which operates any of the Borrower's or its Subsidiaries' Oil and Gas Properties to subordinate, pursuant to agreements in form and substance satisfactory to the Administrative Agent, any operators' Liens or other Liens in favor of such Affiliate in respect of such Oil and Gas Properties to the Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

To the extent the Borrower is not the operator of any Oil and Gas Property, the Borrower shall use commercially reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07 Insurance. The Borrower will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations. The lender loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will endeavor to give at least thirty (30) days' prior notice of any cancellation to the Administrative Agent.

Section 8.08 Books and Records; Inspection Rights. The Borrower will, and will cause each Subsidiary to, keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP or IFRS with a reconciliation to GAAP are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that such visitation and examination shall be at Borrower's expense at most once in any calendar year while no Event of Default has occurred and is continuing.

Section 8.09 Compliance with Laws. Except as expressly permitted by any applicable Governmental Authority (including any order of the Bankruptcy Court), the Borrower will, and will cause each Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except (other than with respect to Anti-Corruption Laws, applicable AML Laws and Sanctions) where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions.

Section 8.10 Environmental Matters.

(a) The Borrower shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not Release or threaten to Release, and shall cause each Subsidiary not to Release or threaten to Release, any Hazardous Material on, under,

about or from any of the Borrower's or its Subsidiaries' Properties or any other property offsite the Property to the extent caused by the Borrower's or any of its Subsidiaries' operations except in compliance with applicable Environmental Laws, the Release or threatened Release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or its Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Material on, under, about or from any of the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; (v) conduct, and cause its Subsidiaries to conduct, their respective operations and businesses in a manner that will not expose any Property or Person to Hazardous Materials that could reasonably be expected to form the basis for a claim for damages or compensation; and (vi) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its Subsidiaries' obligations under this Section 8.10 are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b) The Borrower will promptly, but in no event later than ten (10) Business Days after the Borrower obtains knowledge thereof, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any Person against the Borrower or its Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws if the Borrower could reasonably anticipate that such action will result in liability (whether individually or in the aggregate) in excess of $500,000, not fully covered by insurance, subject to normal deductibles.

(c) The Borrower will, and will cause each Subsidiary to, provide environmental assessments, audits and tests in accordance with the most current version of the American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11 Further Assurances.

(a) The Borrower at its sole expense will, and will cause each Loan Party to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with or accomplish

the conditions precedent, covenants and agreements of the Borrower or any Subsidiary, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the Collateral intended as security for the Secured Obligations, or to correct any omissions in the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, in connection therewith.

(b) Each Loan Party hereby authorizes the Administrative Agent to file one or more financing or continuation statements against such Loan Party, and amendments thereto, relative to all or any part of the Collateral without the signature of such Loan Party where permitted by law. A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering such Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. The Borrower acknowledges and agrees that any financing statement may describe the Collateral as "all assets" of the applicable Loan Party (or words of similar effect as may be required by the Administrative Agent).

Section 8.12 <u>Reserve Reports</u>.

(a) On or before February 28th, [May 31st]4, August 31st and November 30th of each year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Loan Parties as of the immediately preceding December 31st, March 31st, June 30th and September 30th. The Reserve Report as of June 30th of each year shall be prepared by one or more Approved Petroleum Engineers that have completed an independent engineering evaluation of the reserves attributable to the Loan Parties Oil and Gas Properties and the other Reserve Reports shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the more recently delivered June 30th Reserve Report.

(b) With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer of the Borrower certifying on behalf of the Borrower that in all material respects: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct (provided that projections concerning volumes attributable to the Oil and Gas Properties evaluated in such Reserve Report and related prices and production and cost estimates and any other forward-looking information contained in such Reserve Report are necessarily based upon professional opinions, estimates and projections and such opinions, estimates and projections may not ultimately prove accurate), (ii) the Borrower or its Subsidiaries own good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by <u>Section 9.03</u>, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas

4 Elk to confirm whether this will be available.

Properties evaluated in such Reserve Report which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties to which proved reserves are attributable have been sold (other than Hydrocarbons sold in the ordinary course of business) since the date of the last certificate delivered pursuant to this Section 8.12(b) except as set forth on an exhibit to the certificate, which certificate shall list all of such Oil and Gas Properties sold (other than Hydrocarbons sold in the ordinary course of business) and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report.

(c) Concurrently with delivery of each Reserve Report pursuant to this Section 8.12, the Borrower shall also deliver to the Administrative Agent the reserve database and such other supporting materials as the Administrative Agent may request (including any PHD Win database) used to prepare such Reserve Report and permit the Administrative Agent, to the extent requested by the Administrative Agent, to audit such database and other supporting materials.

Section 8.13 Title Information.

(a) On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), the Borrower will deliver to the Administrative Agent title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information as determined in its reasonable discretion.

(b) If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within sixty (60) days of notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, take any of the following actions (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information or (ii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information as determined in its reasonable discretion.

Section 8.14 Reserved.

Section 8.15 ERISA Compliance. The Borrower will promptly furnish and will cause the Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan or any trust

created thereunder, and (ii) immediately upon becoming aware of the occurrence of any "prohibited transaction," as described in Section 406 of ERISA or in Section 4975 of the Code, in connection with any Plan or any trust created thereunder, a written notice signed by the President or any other Responsible Officer, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto.

Section 8.16 Marketing Activities. The Borrower will not, and will not permit any of its Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their Proved Reserves during the period of such contract and (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from Proved Reserves of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Subsidiaries that the Borrower or one of its Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business.

Section 8.17 Reserved.

Section 8.18 [Reserved].

Section 8.19 VCOC Letters. To the extent requested by any Lender, the Borrower shall deliver a duly executed VCOC Letter, substantially in the form of Exhibit H, promptly following such request.

Section 8.20 Milestones. The Borrower shall comply with the milestones set forth in paragraph 26 of the Interim Order.

Section 8.21 Cash Management.

(a) The Loan Parties shall maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order without any amendments, modifications or waivers that are materially adverse to the Lenders.

(b) Notwithstanding the foregoing, the Majority Lenders may require that the Loan Parties use commercially reasonable efforts to ensure that all deposit accounts and securities accounts, which are not subject to a control agreement on account of Prepetition Indebtedness (other than Excluded Accounts), are made subject to control agreements, in form and substance reasonably satisfactory to the Majority Lenders and the Administrative Agent, which establish "control" (as defined in UCC) in favor of the Administrative Agent for the benefit of the Secured Parties.

## ARTICLE IX
## NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan

Documents have been paid in full, the Borrower covenants and agrees with the Lenders and the Administrative Agent that:

Section 9.01 Budget Variance. The Borrower shall comply with paragraph 4(b) of the Interim Order.

Section 9.02 Indebtedness. The Borrower will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Indebtedness, except:

(a) the Secured Obligations arising under the Loan Documents or any guaranty of or suretyship arrangement for the Secured Obligations arising under the Loan Documents;

(b) [reserved];

(c) Indebtedness associated with worker's compensation claims, bonds or surety obligations required by Governmental Requirements or unaffiliated third parties or otherwise in the ordinary course of business in connection with the operation of the Oil and Gas Properties (including, for the avoidance of doubt, bonding obligations required by the Navajo Nation and the State of Utah and surety obligations owed to Exxon Mobil Corporation in respect plugging and abandonment obligations in respect of the Credit Parties' Oil and Gas Properties);

(d) Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(e) intercompany Indebtedness between the Borrower and any Subsidiary or between Subsidiaries to the extent permitted by Section 9.05(f); provided that such Indebtedness is not held, assigned, transferred, negotiated or pledged to any Person other than the Borrower or one of its Wholly-Owned Subsidiaries that is a Guarantor;

(f) endorsements of negotiable instruments for collection in the ordinary course of business;

(g) Prepetition Indebtedness existing on the date hereof and described on Schedule 9.02;[5]

(h) Guarantees of Indebtedness otherwise permitted hereunder; and

(i) Indebtedness under Hedging Agreements permitted hereunder.

Section 9.03 Liens. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

---

5 Note to draft: Schedule to include existing Term Loan and Revolver.

(a) Liens securing the payment of any Secured Obligations pursuant to the Security Instruments;

(b) Excepted Liens;

(c) Liens granted pursuant to the DIP Order or any other order of the Bankruptcy Court; and

(d) the Carve-Out.

Section 9.04 Restricted Payments. The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to the holders of its Equity Interests or make any distribution of its Property to its Equity Interest holders, except:

(a) the Borrower may declare and pay distributions with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock); and

(b) Subsidiaries of the Borrower may declare and pay dividends ratably with respect to their Equity Interests.

Section 9.05 Investments, Loans and Advances. The Borrower will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures permitted hereunder in the ordinary course of business consistent with past practice) any Property from any Person, except that the foregoing restriction shall not apply to:

(a) accounts receivable arising in the ordinary course of business (including any instrument evidencing the same and any instrument, security or other asset acquired through bona fide collection efforts with respect to the same);

(b) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one (1) year from the date of creation thereof;

(c) commercial paper maturing within one (1) year from the date of creation thereof rated in the highest grade by S&P or Moody's;

(d) deposits maturing within one (1) year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively;

(e) deposits in money market funds investing exclusively in Investments described in Section 9.05(b), Section 9.05(c) or Section 9.05(d);

(f) Investments (i) made by the Borrower in or to any Person that prior to such Investment is a Guarantor and (ii) made by any Subsidiary in or to the Borrower or any other Person that prior to such Investment is a Guarantor;

(g) Guarantees permitted pursuant to Section 9.02;

(h) Investments pursuant to Hedging Agreements otherwise permitted under this Agreement;

(i) advances in the nature of expenses paid on behalf of counterparties to any operating agreement made in any Loan Party's capacity as an operator in accordance with the terms and conditions of such operating agreement, which advances and operating agreements are usual and customary in the oil and gas business; and

(j) Investments to the extent included in the DIP Budget (including permitted variances).

Section 9.06 Nature of Business; International Operations. The Borrower will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company. The Borrower will not, and will not permit any of its Subsidiaries to, (a) acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States or (b) form or acquire any Foreign Subsidiaries.

Section 9.07 Limitation on Leases. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases, compressor leases, leases of Hydrocarbon Interests and leases of drilling rigs), under leases or lease agreements which would cause the aggregate amount of all payments made by the Borrower and the Subsidiaries pursuant to all such leases or lease agreements, including any residual payments at the end of any lease, to exceed $[1,000,000] in any period of twelve (12) consecutive calendar months during the life of such leases.

Section 9.08 Proceeds of Loans. The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.22. Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect. If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U or Regulation X of the Board, as the case may be.

The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees, Affiliates and agents shall not use, directly or indirectly, the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, other Affiliate, joint venture partner or other Person, (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or involving any goods originating in or with a Sanctioned Person or Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

Section 9.09 ERISA Compliance. The Borrower will not, and will not permit any Subsidiary to, at any time:

(a) engage in, or permit any ERISA Affiliate to engage in, in respect of any Plan, any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of Section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code;

(b) fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto; or

(c) contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to (i) any employee welfare benefit plan, as defined in Section 3(1) of ERISA, including any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability, or (ii) any employee pension benefit plan, as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code.

Section 9.10 Sale or Discount of Receivables. Except for receivables obtained by the Borrower or any Subsidiary out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Borrower will not, and will not permit any Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.11 Mergers, Etc. The Borrower will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation") or liquidate or dissolve, except that

any Subsidiary may participate in a consolidation with the Borrower (provided that the Borrower shall be the continuing or surviving Person) or any other Subsidiary (provided that the surviving Person shall be a Wholly-Owned Subsidiary).

Section 9.12 Sale of Properties. The Borrower will not, and will not permit any of its Subsidiaries to, sell, assign, farm-out, convey or otherwise transfer or Dispose of any Property except for: (a) the sale of Hydrocarbons in the ordinary course of business; (b) the sale or transfer of equipment that is no longer necessary for the business of the Borrower or such Subsidiary or is replaced by equipment of at least comparable value and use; (c) sales or other Dispositions (including Casualty Events) of Oil and Gas Properties or any interest therein or Subsidiaries owning Oil and Gas Properties or Liquidations of Hedging Agreements in respect of commodities; provided that, in the case of this clause (c), (i) the consideration received in respect of such sale or other Disposition shall be 100% cash consideration, (ii) the consideration received in respect of such sale or other Disposition shall be equal to or greater than the fair market value of the Oil and Gas Property, interest therein or Subsidiary subject of such sale or other Disposition (as reasonably determined by the governing body of the Borrower and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to that effect), (iii) the Borrower shall have made all mandatory prepayments required pursuant to Section 3.04(c) in connection with such Disposition, (iv) if any such sale or other Disposition is of a Subsidiary owning Oil and Gas Properties, such sale or other Disposition shall include all the Equity Interests of such Subsidiary, (v) the Borrower shall have prepaid the Loans to the extent required under Section 3.04, (vi) the aggregate value of the Oil and Gas Properties Disposed of or Hedging Agreements Liquidated in the applicable transaction or series of related transactions does not exceed $1,000,000 when aggregated with all other Dispositions since the Effective Date; (d) issuance of Equity Interests by any Subsidiary to the Borrower; (e) Dispositions to the Borrower or any Subsidiary that is a Guarantor; (f) Dispositions permitted by Section 9.10; (g) Dispositions resulting from any taking or condemnation of any Property of the Borrower or any Subsidiary by any Governmental Authority or any assets subject to a casualty; and (h) Casualty Events.

Section 9.13 Environmental Matters. The Borrower will not, and will not permit any Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations, Release or threatened Release, exposure, or Remedial Work could reasonably be expected to have a Material Adverse Effect.

Section 9.14 Transactions with Affiliates. The Borrower will not, and will not permit any Subsidiary to, enter into any transaction, including any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than transactions between the Borrower and any Guarantor and transactions between Guarantors) except (a) such transactions as are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate and (b) any Restricted Payment permitted by Section 9.04; provided that the Borrower's and Subsidiaries' expenditures pursuant to transactions with any Affiliates (other than

transactions between the Borrower and any Guarantor and transactions between Guarantors) shall not exceed (x) $250,000 for any individual transaction or series of related transactions and (y) $500,000 in the aggregate for all such transactions during the trailing twelve-month period.

Section 9.15 Subsidiaries. The Borrower will not, and will not permit any Subsidiary to, create or acquire any additional Subsidiary. The Borrower shall not, and shall not permit any Subsidiary to, Dispose of any Equity Interests in any Subsidiary except in compliance with Section 9.12. Neither the Borrower nor any Subsidiary shall have (a) any Foreign Subsidiaries or (b) any Subsidiary that is not a Wholly-Owned Subsidiary.

Section 9.16 Negative Pledge Agreements; Dividend Restrictions. The Borrower will not, and will not permit the Parent with respect to the Equity Interests in the Borrower or any Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than the Loan Documents) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Lenders or restricts any Subsidiary from paying dividends or making distributions to the Borrower or any other Subsidiary, or which requires the consent of or notice to other Persons in connection therewith.

Section 9.17 Gas Imbalances, Take-or-Pay or Other Prepayments. The Borrower will not, and will not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 500,000 mcf of gas (on an mcf equivalent basis) in the aggregate.

Section 9.18 Hedging Agreements. The Borrower will not, and will not permit any Subsidiary to, enter into any Hedging Agreements with any Person other than (a) Hedging Agreements listed on Schedule 7.21; (b) Hedging Agreements in respect of commodities (i) with an Approved Counterparty, (ii) with a tenor not to exceed sixty (60) months, and (iii) except in the case of put options purchased by the Borrower and its Subsidiaries, the notional volumes for which (when aggregated with other commodity Hedging Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Hedging Agreements and other than put options purchased by the Borrower and its Subsidiaries) do not exceed, as of the date such Hedging Agreement is executed, (A) 90% of the reasonably anticipated projected production from Proved Developed Producing Reserves evaluated in the most recently delivered Reserve Report for each 12-month period of the first thirty-six (36) months during the period which such Hedging Agreement is in effect and (B) 75% of the reasonably anticipated projected production from Proved Developed Producing Reserves evaluated in the most recently delivered Reserve Report for each 12-month period of the next twenty-four (24) months during the period which such Hedging Agreement is in effect, for each of crude oil and natural gas, calculated separately; and (c) Hedging Agreements in respect of interest rates with an Approved Counterparty, as follows: (i) Hedging Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated with all other Hedging Agreements of the Borrower and its Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 50% of the then outstanding principal amount of the Borrower’s Indebtedness for borrowed money which bears interest at a fixed rate and (ii) Hedging

Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated with all other Hedging Agreements of the Borrower and its Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 75% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a floating rate. In no event shall any Hedging Agreement contain any requirement, agreement or covenant for the Borrower or any Subsidiary to post collateral or margin to secure their obligations under such Hedging Agreement or to cover market exposures. In no event shall the Borrower or any Subsidiary Liquidate any Hedging Agreement if the Hedge Termination Value of such Hedging Agreement, when aggregated with all other Hedging Agreements Liquidated during the previous twelve (12) months, would exceed $500,000.

Section 9.19 Sale and Leaseback. The Borrower shall not, and shall not permit any Subsidiary to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any Property, whether now owned or hereafter acquired, and thereafter rent or lease such Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred.

Section 9.20 Amendments to Organization Documents, Material Contracts, Fiscal Year End.

(a) The Borrower shall not, and shall not permit any of its Subsidiaries to, amend or otherwise modify (or permit to be amended or modified) its Organization Documents in a manner that would be adverse to the Lenders in any material respect.

(b) The Borrower shall not, and shall not permit any of its Subsidiaries to, change the last day of its fiscal year from June 30 of each year, or the last days of the first three fiscal quarters in each of its fiscal years from September 30, December 31 or March 31 of each year, respectively.

Section 9.21 New Accounts. Without the prior written consent of the Administrative Agent, the Borrower will not, and will not permit any Subsidiary to, open or otherwise establish, or deposit, credit or otherwise transfer any Cash Receipts, securities, financial assets or any other property into, any Deposit Account, Securities Account or Commodity Account other than any Deposit Account, Securities Account and Commodity Account over which the Administrative Agent has a perfected first priority Lien for the benefit of the Secured Parties.

Section 9.22 Capital Expenditures. The Borrower will not, and will not permit any of its Subsidiaries to, make or become legally obligated to make any Capital Expenditures in any fiscal year on Oil and Gas Properties located outside the Aneth Field or Approved Assets.

Section 9.23 Prepayment or Modification of Debt. Except as otherwise allowed pursuant to the DIP Orders or the First Day Orders (including any orders of the Bankruptcy Court approving any of the First Day Orders on a final basis), (i) (x) make any payment or prepayment or redemption or acquisition for value or any cancellation or other retirement of any Prepetition Indebtedness or other obligations arising prior to the Petition Date of any Loan Party in excess of $[100,000] in the aggregate during the term of this Agreement or (y) file a motion or other pleading or support a motion or other pleading filed by any other Person requesting the

foregoing unless the relief sought under such motion or pleading is expressly conditioned on obtaining the consent of the Majority Lenders), (ii) pay any interest on any Prepetition Indebtedness of any Loan Party (whether in cash, in kind securities or otherwise) or (iii) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection) on property of the Loan Parties. In addition, no Loan Party shall permit any of its Subsidiaries to make any payment, redemption or acquisition on behalf of such Loan Party which such Loan Party is prohibited from making under the provisions of this Section 9.23.

Section 9.24 No Subsidiaries. No Loan Party shall form or acquire any Subsidiary, except that the Borrower may acquire EOS.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01 Events of Default. One or more of the following events shall constitute an "Event of Default":

(a) The Borrower shall fail to pay any principal, premium (if any) of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

(b) The Borrower shall fail to pay any interest, fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable and failure to pay shall continue unremedied for a period of three (3) Business Days.

(c) Any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary of the Borrower in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect when made or deemed made.

(d) The Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.01, Section 8.02, Section 8.03, Section 8.12, Section 8.13, Section 8.15, Section 8.18, Section 8.20, Section 8.21 or Article IX.

(e) Any Loan Party or any Subsidiary of the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and other than Section 8.13 hereof, and such failure shall continue unremedied for a period of thirty (30) days following the earlier to occur of (i) any Loan Party's knowledge of such failure or (ii) receipt of written notice thereof.

(f) (i) The Borrower or any Subsidiary of the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable, after taking any applicable

grace periods into account, (ii) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the redemption thereof or any offer to redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Subsidiary to make an offer in respect thereof, and, with respect to the events or conditions described in subsections (i) and (ii) above, the applicable Borrower or Subsidiary has not obtained a waiver, standstill agreement, forbearnce, or other similar agreement or arrangement from the holder of such Material Indebtedness or other applicable party within five (5) Business Days of the occurrence of any such event or condition.

(g) An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary thereof or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary thereof or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for thirty (30) days without being challenged by the Borrower or Subsidiary, as applicable, or an order or decree approving or ordering any of the foregoing shall be entered.

(h) The Borrower or any Subsidiary thereof shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 10.01(g), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary thereof or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing, in each case, other than with respect to or in connection with the Chapter 11 Cases.

(i) The Restructuring Support Agreement shall be terminated.

(j) (i) One or more judgments for the payment of money in an aggregate amount in excess of $[500,000] (in excess of insurance) which is not stayed by the Chapter 11 Cases or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Borrower or any Subsidiary thereof or any combination thereof, in each case other than a judgment which is (x) discharged within thirty (30) days, (y) the execution of which is effectively stayed within thirty (30) days and no action is legally taken by a judgment creditor or judgment creditors to attach or levy upon any assets of the Borrower or any Subsidiary thereof to enforce any such judgment, or (z) otherwise fully cash collateralized, fully bonded or fully covered by insurance from an insurer that is rated at least “A” by A.M. Best Company and such

insurer has been notified of, and has not disputed the claim made for the payment of, the amount of such judgment.

(k) The Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Loan Party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any material part of the Collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or a Loan Party shall so state in writing.

(l) A Change in Control shall occur.

(m) The occurrence of any Event of Default (as defined in the Interim Order).

(i)

(n) an order of the Bankruptcy Court shall be entered pursuant to section 363(k) of the Bankruptcy Code limiting the ability of the Lenders, either individually or together with one or more Lenders, to credit bid the full amount of their claims in the Chapter 11 Cases in connection with any asset sale process or plan sponsorship process or any sale of assets (in whole or part) by any Loan Party, including without limitation sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

Section 10.02 Remedies.

(a) In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, but subject to the terms and conditions of the DIP Orders, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon, and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b) In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c) All proceeds realized from the liquidation or other disposition of Collateral or otherwise, and any amounts received on account of the Secured Obligations, received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:

(i) *first*, to payment or reimbursement of that portion of the Secured Obligations constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii) *second*, pro rata to payment or reimbursement of that portion of the Secured Obligations constituting fees, expenses and indemnities payable to the Lenders;

(iii) *third*, pro rata to payment of accrued interest on the Loans;

(iv) *fourth*, pro rata to payment of principal outstanding on the Loans;

(v) *fifth*, pro rata to any other Secured Obligations; and

(vi) *sixth*, any excess, after all of the Secured Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01 Appointment; Powers. Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article (excluding Section 11.10) are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any Guarantor shall have rights as a third-party beneficiary of any of such provisions (other than in respect of Sections 11.01, 11.06 and 11.09). Each of the Lenders, by its execution hereof, authorizes and directs the Administrative Agent to execute and deliver the Security Instruments, binding the Lenders to the terms thereof. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to negotiate, enforce or the settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Majority Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. It is understood and agreed that the use of the term “agent” herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 11.02 Duties and Obligations of Administrative Agent. The Administrative Agent shall have no duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term “agent” herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative

Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall have no duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their Subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of any Loan Party or any Subsidiary of the Borrower or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein. For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03 Action by Administrative Agent. The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders. If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to

such Default as it shall deem advisable in the best interests of the Lenders. In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower and the Lenders hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05 Subagents. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 11.06 Resignation of Administrative Agent. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 11.06, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Majority Lenders shall have the right, in consultation with the Borrower (so long as no Event of Default is continuing) such consent not to be unreasonably withheld or delayed, to appoint a successor. If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the

retiring Administrative Agent gives notice of its resignation (the "Resignation Effective Date"), then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Administrative Agent is appointed as provided for above. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Section 11.07 Administrative Agent as Lender. The Person serving as the Administrative Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

Section 11.08 No Reliance. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder. The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its respective

Affiliates. In this regard, each Lender acknowledges that [_____] acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document. Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09 Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party or any Subsidiary of the Borrower, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 12.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10 Authority of Administrative Agent to Release Collateral and Liens. Each Lender hereby authorizes the Administrative Agent to (a) release any Collateral that is permitted to be sold or released and to release any Guarantor pursuant to the terms of the Loan Documents and (b) release any Subsidiary from its Guaranty if such Subsidiary is the subject of a Disposition permitted hereunder. Each Lender hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any Disposition of Property to the extent such Disposition is

permitted by the terms of Section 9.12 or is otherwise authorized by the terms of the Loan Documents.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 Notices.

(a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic communication, as follows:

(i) if to any Loan Party, to it at the following: and

Elk Petroleum Aneth, LLC
Attention: [_____]
[address]
[_____]
Phone: [_____]
Fax: [_____]
Email: [_____]

(ii) if to the Administrative Agent, to it at the following:

[_____]
Attention: [_____]
[_____]
[_____]
Phone: [_____]
Email: [_____]

with a copy (which shall not constitute notice) to:

[_____]
[_____]
[_____]
Attention: [_____]
Phone: [_____]
Fax: [_____]

(iii) if to any other Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article

II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c) Any party hereto may change its address, facsimile number or email address for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d) Chapter 11 Cases. Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Administrative Agent and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent and the Lenders pursuant to the Bankruptcy Code.

Section 12.02 Waivers; Amendments.

(a) No failure on the part of the Administrative Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b) Neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an

agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall (i) increase the Commitment or the outstanding aggregate principal amount of the Loans of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Secured Obligations hereunder or under any other Loan Document, without the written consent of each Lender affected thereby, provided that the Majority Lenders may waive interest accrued pursuant to Section 3.02(c), (iii) postpone the scheduled date of payment or prepayment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or any other Secured Obligations hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Maturity Date without the written consent of each Lender affected thereby, (iv) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) waive or amend Section 3.04(c), Section 6.01, Section 8.14 or change the definition of the terms "Domestic Subsidiary", "Foreign Subsidiary" or "Subsidiary", without the written consent of each Lender, (vi) release any Guarantor (except as set forth in Section 11.10 or Section 14.06), release all or substantially all of the Collateral (other than as provided in Section 11.10), without the written consent of each Lender, (vii) modify the terms of Section 10.02(c) without the written consent of each Lender adversely affected thereby, or (viii) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, (a) any supplement to Schedule 7.25 (Accounts) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders, (b) any Security Instrument may be supplemented to add additional collateral or join additional Persons as Guarantors with the consent of the Administrative Agent, and (c) the Borrower and the Administrative Agent may amend this Agreement or any other Loan Document without the consent of the Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

Section 12.03 Expenses, Indemnity; Damage Waiver. Subject to the provisions of the applicable DIP Order:

(a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel, and other outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental audits and surveys and appraisals, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders

with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, assessments and other similar charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT, EACH ARRANGER AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE (PROVIDED THAT COUNSEL SHALL BE LIMITED TO (X) ONE (1) COUNSEL TO SUCH INDEMNITEES, TAKEN AS A WHOLE, ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION AND ONE (1) REGULATORY COUNSEL TO ALL SUCH INDEMNITEES WITH RESPECT TO A RELEVANT REGULATORY MATTER, TAKEN AS A WHOLE AND (Y), SOLELY IN THE EVENT OF A CONFLICT OF INTEREST, ONE (1) ADDITIONAL COUNSEL (AND, IF NECESSARY, ONE (1) REGULATORY COUNSEL AND ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION OR FOR EACH MATTER) TO EACH GROUP OF SIMILARLY SITUATED AFFECTED INDEMNITEES), INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (ii) THE FAILURE OF ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR OR ANY OTHER LOAN PARTY SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (v) THE OPERATIONS OF THE BUSINESS OF THE LOAN PARTIES, THE SUBSIDIARIES OF THE BORROWER BY SUCH LOAN PARTIES AND SUBSIDIARIES, (vi) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS,

(vii) ANY ENVIRONMENTAL LAW APPLICABLE TO ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER OR ANY OF THEIR PROPERTIES, INCLUDING THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON ANY OF THEIR PROPERTIES, (viii) THE BREACH OR NON-COMPLIANCE BY ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (ix) THE PAST OWNERSHIP BY ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER OR ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (x) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xi) ANY LIABILITY ARISING UNDER ENVIRONMENTAL LAWS RELATED IN ANY WAY TO ANY LOAN PARTY OR ANY SUBSIDIARY OF THE BORROWER, OR (xii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiii) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE (X) DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) RESULT FROM A CLAIM BROUGHT BY THE BORROWER OR ANY OTHER LOAN PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF THE BORROWER OR SUCH LOAN PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. THIS SECTION 12.03(B) SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under Section 12.03(a) or (b), but without affecting such payment obligations of the Borrower, each Lender severally agrees to pay to the Administrative Agent, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d) To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or the use of the proceeds thereof.

(e) All amounts due under this Section 12.03 shall be payable not later than ten (10) Business Days after demand therefor.

Section 12.04 Assignments and Participations.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04 and (iii) no Lender may assign to the Borrower or an Affiliate of the Borrower all or any portion of such Lender's rights and obligations under this Agreement or all or any portion of its Commitments or the Loans owing to it hereunder nor may the Borrower or an Affiliate of the Borrower make any offer to purchase any Commitments or Loans hereunder. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender (or an Affiliate or Approved Fund of a Lender) immediately prior to giving effect to such assignment.

(i) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which fee shall not apply to an assignment to a Lender, an Affiliate of a Lender or an Approved Fund);

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(E) no such assignment shall be made to the Borrower, any Affiliate of the Borrower, or a natural person; and

(F) the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof.

(ii) Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto (which, for the avoidance of doubt, shall be the date of recordation in the Register) and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this

Section 12.04(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iii) The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, the Commitment of and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender for all purposes of this Agreement, notwithstanding notice or anything in any Loan Document to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower and each Lender.

(iv) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this Section 12.04(b).

(c) (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (D) the provisions of Section 12.04(b)(iv) and the final sentence of Section 12.04(b)(v) shall apply as if the Participant were a Lender and the sale of the participation was an assignment. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 12.02(b) that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (subject to the requirements and

limitations therein, including the requirements under Section 5.03(f) (it being understood that the documentation required under Section 5.03(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 4.01(c) as though it were a Lender.

(i) Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this Section 12.04(d) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e) Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05 Survival; Revival; Reinstatement.

(a) All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any

accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and so long as the Commitments have not expired or terminated. The provisions of Section 5.01, Section 5.02, Section 5.03, Article XI and Section 12.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b) To the extent that any payments on the Secured Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06 Counterparts; Integration; Effectiveness.

(a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

**(b)** This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c) Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07 Severability. Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof;

and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08 Right of Setoff. If an Event of Default shall have occurred and be continuing, subject to the DIP Orders and First Day Orders, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including obligations under Hedging Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Subsidiary against any of and all the obligations of the Borrower or any Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. Subject to the DIP Orders and First Day Orders, the rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09 GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a) THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CHOICE OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.

(b) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED UNDER APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c) EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH COPIES ARE DEPOSITED IN THE MAIL. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d) EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iii) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 12.09.

Section 12.10 Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11 Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Hedging Agreement relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower. For the purposes of

this Section 12.11, "Information" means all information received from any Loan Party relating to the Borrower and its Subsidiaries and their businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party; provided that, in the case of information received from any Loan Party after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

Section 12.12 Interest Rate Limitation. It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Secured Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower). All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise

payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then, to the extent permitted by applicable law, the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.

Section 12.13 EXCULPATION PROVISIONS. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 No Third Party Beneficiaries. This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans hereunder are solely for the benefit of the Borrower, and no other Person (including any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent or any Lender for any reason whatsoever. There are no third party beneficiaries.

Section 12.15 USA PATRIOT ACT NOTICE. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow such Lender to identify the Borrower and the Guarantors in accordance with the USA PATRIOT Act.

Section 12.16 Releases. Upon payment in full of the Secured Obligations, the Administrative Agent, at the written request and expense of the Borrower, will promptly release, reassign and transfer the Collateral to the Loan Parties. If any of the Collateral shall be Disposed of by any Loan Party, or if a Subsidiary is Disposed of, in either case in a transaction permitted

by the Credit Agreement, then the Administrative Agent, at the request and sole expense of such Loan Party, shall promptly (but in any event within ten (10) Business Days of receipt by the Administrative Agent of a written notice from a Loan Party with respect to such Disposition) execute and deliver to such Loan Party all releases or other documents reasonably necessary or desirable for the release of the Liens created by the Security Instruments on such Collateral or all Collateral owned by such Subsidiary and, if such Disposition is of a Subsidiary, to release such Subsidiary from its Guaranty.

Section 12.17 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 12.18 Incorporation of DIP Orders by Reference. Each of the Loan Parties, the Administrative Agent and the Lenders agrees that any reference contained herein to (i) the Interim Order shall include all terms, conditions and provisions of such Interim Order and that the Interim Order is incorporated herein for all purposes and (ii) the Final Order shall include all terms, conditions and provisions of such Final Order and that the Final Order is incorporated herein for all purposes. To the extent there is any conflict or inconsistency between the terms of any of the Loan Documents and the terms of either the Interim Order or the Final Order, the terms of the Interim Order or the Final Order, as applicable, shall govern.

Section 12.19 Force Majeure. In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services, it being understood that the

Administrative Agent shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

## ARTICLE XIII
## COLLATERAL

Section 13.01 Grant of Security Interest. As security for all Secured Obligations, each Loan Party hereby collaterally assigns and grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing first priority (subject to the Carve-Out and as otherwise set forth in the applicable DIP Order) security interest in all property and assets of such Loan Party, whether now owned or existing or hereafter acquired or arising, regardless of where located, including the following:

(i) all Accounts;

(ii) all contract rights;

(iii) all chattel paper;

(iv) all documents;

(v) all instruments;

(vi) all supporting obligations and letter-of-credit rights;

(vii) all General Intangibles (including payment intangibles, intercompany accounts, intellectual property and software);

(viii) all inventory and other goods;

(ix) all motor vehicles, equipment and fixtures;

(x) all Investment Property, financial assets and all securities accounts;

(xi) all money, cash, cash equivalents, securities, and other property of any kind;

(xii) all deposit accounts;

(xiii) all notes, and all documents of title;

(xiv) all books, records and other property related to or referring to any of the foregoing, including books, records, account ledgers, data processing records, computer software and other property, and General Intangibles at any time evidencing or relating to any of the foregoing;

(xv) all commercial tort claims;

(xvi) all real property owned or leased by such Loan Party;

(xvii) all other personal property of such Loan Party, including, subject to entry of the Final Order, proceeds from any Avoidance Actions (but not the actions thereunder); and

(xviii) all accessions to, substitutions for, and replacements, products and proceeds of any of the foregoing, including, but not limited to, dividends or distributions on Investment Property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

All of the foregoing is herein collectively referred to as the "Collateral"; provided that the Collateral shall exclude Excluded Collateral. Notwithstanding anything herein to the contrary, in no event shall the Collateral (or any component term thereof) include or be deemed to include (i) any contracts, instruments, licenses, license agreements or other documents (or any rights thereunder), to the extent (and only to the extent) that the grant of a security interest would (A) constitute a violation of a restriction in favor of, or requires a consent not obtained prior to the Effective Date of, a third party on such grant, (B) give any other party to such contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (C) violates any law or requires the consent not obtained prior to the Effective Date of any Governmental Authority; *provided* that the limitation set forth in this clause (i) above shall not affect, limit, restrict or impair the grant by a Loan Party of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code; (ii) any direct or indirect interest in any capital stock of any joint venture, partnership or other entity if and for so long as the grant of such security interest or Lien shall constitute a default under or termination pursuant to the terms of the joint venture agreement, partnership agreement or other organizational documents of, or contract or other agreement of (or covering or purporting to cover the assets of) such joint venture, partnership or entity or its direct or indirect parent, or require the payment of a fee, penalty or similar increased costs or result in the loss of economic benefit or the abandonment or invalidation of such Loan Party's or any Subsidiary's interest in such capital stock or shall otherwise adversely impact such joint venture, partnership or other entity; *provided* that the limitation set forth in this clause (ii) above shall not affect, limit, restrict or impair the grant by a Loan Party of a security interest pursuant to this Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant (whether applicable to such Loan Party or to any parent company or Person owned by such Loan Party) is rendered ineffective by any applicable law, including the UCC or the United States Bankruptcy Code; (iii) any application to register any trademark or service mark prior to the filing under applicable law of a verified statement of use (or the equivalent) for such trademark or service mark to the extent the creation of a security interest therein or the grant of a mortgage thereon would void or invalidate such trademark or service mark; (iv) Excluded Accounts; and (v) Avoidance Actions (provided, for the avoidance of doubt, that proceeds of Avoidance Actions shall be Collateral upon entry of the Final Order) (collectively, "Excluded Collateral"); *provided*, *further*, that any such security interest and Lien shall attach immediately and automatically after any such disqualifying condition specified in clauses (i), (ii), and (iii) of this paragraph shall cease to exist.

Section 13.02 Perfection of Security Interest.

(a) Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, to the fullest extent permitted by applicable law, the Administrative Agent may file or authorize the filing of one or more financing statements disclosing the Liens under the Facility on the Collateral.

(b) In the event that a motion for dismissal from any of the Chapter 11 Cases is filed with respect to any Subsidiary and equity interests of such Subsidiary are owned by a Loan Party, and to the extent the capital stock of such Subsidiary is in certificated form, such Loan Party shall promptly deliver all certificates or instruments at any time representing or evidencing such capital stock in such Subsidiary to the Administrative Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance sufficient to transfer such instruments to the Administrative Agent (or otherwise reasonably satisfactory to the Administrative Agent). The Administrative Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Administrative Agent or its nominee any capital stock in such wholly-owned Subsidiary. In addition, the Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing capital stock of such Subsidiaries for certificates or instruments of smaller or larger denominations during the continuance of an Event of Default.

Section 13.03 Right to Cure. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent shall have the right to (but not the obligation to), at the written direction of the Majority Lenders (accompanied by sufficient funds to pay any such amounts) and upon ten (10) days' notice to the applicable Loan Party, pay any amount or do any act required of any Loan Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Advances) in order to preserve, protect, maintain, or enforce the Secured Obligations, the Collateral, or the Liens under the Facility therein, and which any Loan Party fails to pay or do, including payment of any judgment against any Loan Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral; *provided* that the Administrative Agent shall not pay any amount being diligently contested by appropriate proceedings. All payments that the Administrative Agent or any Lender makes under this Section 10.13 and all out-of-pocket costs and reasonable expenses that the Administrative Agent pays or incurs in connection with any reasonable action taken by it hereunder shall be considered part of the Secured Obligations. Any payment made or other action taken by the Administrative Agent under this Section 10.13 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

Section 13.04 The Administrative Agent's and Lenders' Rights, Duties, and Liabilities. The Loan Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral. The Secured Obligations shall not be affected by any failure of the Secured Parties to take any steps to perfect the Liens under the Facility or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Loan Party from any of the Secured Obligations. Nothing in this Agreement shall be interpreted as giving the Administrative Agent responsibility for or any duty concerning the validity, perfection,

priority or enforceability of the Liens granted hereunder or giving the Administrative Agent any obligation to take any action to procure or maintain such validity, perfection, priority or enforceability, including, without limitation, any duty to file any financing statements, amendments, continuation statements or other documents to perfect or maintain the perfection of the security interest granted hereunder.

Section 13.05 Rights in Respect of Investment Property. During the existence of an Event of Default, subject to any order of the Bankruptcy Court (including the DIP Orders), (i) the Administrative Agent at the direction of the Majority Lenders may, upon written notice to the relevant Loan Party, transfer or register in the name of the Administrative Agent or any of its nominees, for the benefit of the Secured Parties, any or all of the Collateral consisting of Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies and claims of any Loan Party with respect thereto (as used in this Section 13.05 collectively, the "Pledged Collateral") held by the Administrative Agent hereunder, and the Administrative Agent or its nominee may thereafter, after written notice to the applicable Loan Party, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Administrative Agent of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to exercise any of the aforesaid rights, privileges or options, and the Administrative Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under applicable law, after the Administrative Agent's giving of the notice specified in clause (i) of this Section 13.05, all rights of any Loan Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Administrative Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions (provided that any such Pledged Collateral the Administrative Agent shall collect shall promptly be returned to each applicable Loan Party after such Event of Default is cured or waived to the extent such Pledged Collateral was not applied to repay the Secured Obligations), and (iii) each Loan Party shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies and other instruments that the Administrative Agent or a Lender may reasonably request for the purpose of enabling the Administrative Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this Section 13.05 and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this Section 13.05.

Section 13.06 Remedies.

(a) Each Loan Party recognizes that the Administrative Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof. Each Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by applicable law, the Administrative Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so. Each Loan Party further agrees to do or cause to be done, to the extent that such Loan Party may do so under applicable law, all such other acts and things as the Administrative Agent may reasonably request to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all applicable laws at the Loan Parties' expense. Each Loan Party further agrees that a breach of any of the covenants contained in this Section 13.06(a) will cause irreparable injury to the Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 13.06(a) shall be specifically enforceable against such Loan Party, and each Loan Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Loan Party's failure to perform such covenants will not cause irreparable injury to the Secured Parties or (ii) the Secured Parties have an adequate remedy at law in respect of such breach. Each Loan Party further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Secured Parties by reason of a breach of any of the covenants contained in this Section 13.06(a) and, consequently, agrees that, if such Loan Party shall breach any of such covenants and the Secured Parties shall sue for damages for such breach, such Loan Party shall pay to the Administrative Agent, for the benefit of the Secured Parties, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Administrative Agent shall demand compliance with this Section 13.06(a).

(b) Subject to the terms of the DIP Orders, if an Event of Default has occurred and is continuing, the Administrative Agent shall have for the benefit of the Secured Parties, in addition to all other rights of the Secured Parties, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Administrative Agent shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Loan Party's premises at any time, at no cost to the Secured Parties, or remove any part of it to such other place or places as the Administrative Agent may desire, or the Loan Parties shall, upon the Administrative Agent's or the Majority Lender's demand, at the Loan Parties' cost, assemble the Collateral and make it available to the

Administrative Agent at a place reasonably convenient to the Administrative Agent; (ii) exercise of set-off rights on cash collateral or deposits (other than, for the avoidance of doubt, with respect to Excluded Accounts); (iii) sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion, and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Loan Party with respect to the Collateral, whether in the name of such Loan Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Administrative Agent under the Loan Documents, and (v) take any other reasonable actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Loan Parties. Promptly following written demand from the Administrative Agent, the applicable Loan Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Administrative Agent, for the benefit of and on behalf of the Secured Parties, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Loan Party and the performance of such Loan Party thereunder and, in such event, without further notice or demand and at such Loan Party's sole cost and expense, the Administrative Agent, for the benefit of and on behalf of the Secured Parties, may exercise all rights of such Loan Party arising under such agreements. Without in any way requiring notice to be given in the following manner, each Loan Party agrees that any notice by the Administrative Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Loan Party if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Loan Parties' address specified in or pursuant to Section 12.01. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Secured Obligations until the Administrative Agent or the Lenders receive payment, and if the buyer defaults in payment, the Administrative Agent may resell the Collateral. In the event the Administrative Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives (to the extent permitted by applicable law): (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Administrative Agent retain possession and not dispose of any Collateral until after trial or final judgment. Each Loan Party agrees that the Administrative Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. The Administrative Agent is hereby granted a license or other right to use, without charge, each Loan Party's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and each such Loan Party's

rights under all licenses and all franchise agreements shall inure to the Administrative Agent's benefit for such purpose. The Administrative Agent will return any excess to the applicable Loan Party and the Loan Parties shall remain liable for any deficiency. The proceeds of any sale shall be applied as required pursuant to Section 10.02(c) hereof.

(c) Notwithstanding anything herein to the contrary, (i) neither the Administrative Agent nor any Lender shall take any action under this Section 13.06 (or similar provisions of any Loan Document) except after compliance with any applicable requirements set forth in the DIP Orders and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Administrative Agent on account of the Secured Obligations, from the Loan Parties and/or all amounts with respect to the proceeds of any Collateral shall be (subject to the proviso below) promptly disbursed by the Administrative Agent as required pursuant to Section 10.02(c) hereof.

## ARTICLE XIV
## GUARANTY

Section 14.01 Guaranty; Limitation of Liability.

(a) Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Secured Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Secured Obligations being the "Guaranteed Obligations"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel to the extent reimbursable pursuant to Section 12.03 but excluding allocated costs of in-house counsel) incurred by the Administrative Agent in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to the Administrative Agent or any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, winding-up or similar proceeding involving such other Loan Party.

(b) Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Administrative Agent or any Lender under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Administrative Agent and the Lenders under or in respect of the Loan Documents.

Section 14.02 Guaranty Absolute. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or any Lender with respect thereto. The Secured Obligations of each Guarantor under or in respect of this Guaranty are independent of the

Guaranteed Obligations or any other Secured Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a) any lack of validity or enforceability of any provision under this Agreement, any Loan Document or any agreement or instrument relating thereto;

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Secured Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c) any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d) any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Secured Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party;

(e) any change, restructuring or termination of the corporate structure or existence of any Loan Party;

(f) any failure of the Administrative Agent or any Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Administrative Agent or such Lender, as the case may be (each Guarantor waiving any duty on the part of the Administrative Agent and the Lenders to disclose such information);

(g) the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations; or

(h) any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, in its capacity as a guarantor or surety (other than payment or performance).

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent or any Lender or any other Person, for whatever reason, all as though such payment had not been made.

Section 14.03 Waivers and Acknowledgments.

(d) Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(e) Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Administrative Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Secured Obligations of such Guarantor hereunder.

(f) Each Guarantor acknowledges that the Administrative Agent may, to the extent permitted by applicable law and the DIP Orders, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by applicable law) any defense to the recovery by the Administrative Agent and the Lenders against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by applicable law.

(g) Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Administrative Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by the Administrative Agent or such Lender, as the case may be.

(h) Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 14.02 and this Section 14.03 are knowingly made in contemplation of such benefits.

Section 14.04 Subrogation. Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Administrative Agent or any Lender against the Borrower or any other Loan Party, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any other Loan Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under

this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and the Commitments shall have expired or been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Administrative Agent and the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make payment to the Administrative Agent of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and (iii) the Maturity Date shall have occurred, the Administrative Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

Section 14.05 Continuing Guaranty; Assignments. This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and the termination or expiration of all Commitments, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Lenders and their respective successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, any Eligible Assignee that has been assigned or transferred all or any portion of a Lender's Advances, Commitments or rights and obligations under this Agreement in accordance with Section 12.04, shall thereupon become vested with all the benefits granted to such transferring Lender under this Guaranty. No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Majority Lenders, except as otherwise permitted hereby.

Section 14.06 Release.

(a) A Loan Party shall automatically be released from its obligations hereunder and the security interest in the Collateral of such Loan Party shall be automatically released as it relates to the Secured Obligations, upon the consummation of any transaction permitted under this Agreement as a result of which such Loan Party ceases to be a Loan Party.

(b) The security interest granted hereby in any Collateral shall automatically and without further action be released upon (i) any Disposition of such Collateral in a transaction not prohibited by this Agreement and (ii) the effectiveness of any written consent to the release of the security interest granted hereby in such Collateral pursuant to Section 13.01 of this Agreement. Any such release in connection with any sale, transfer or other disposition of such Collateral shall result in such Collateral being sold, transferred or disposed of, as applicable, free and clear of the Lien and security interest created hereby.

(c) In connection with any termination or release pursuant to paragraph (a) or (b), so long as the Borrower shall have provided the Administrative Agent and Lenders such certifications or documents as the Administrative Agent or the Majority Lenders shall reasonably request, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.

**[SIGNATURES BEGIN NEXT PAGE]**

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:

**ELK PETROLEUM ANETH, LLC,**
a Delaware limited liability company

By: ________________________________
Name:
Title:

LOAN PARTIES:

**RESOLUTE ANETH, LLC,**
a Delaware limited liability company,
as a Guarantor

By: ________________________________
Name:
Title:

**[ELK OPERATING SERVICES, LLC,**
a Delaware limited liability company,
as a Guarantor]

By: ________________________________
Name:
Title:

**[ELK PETROLEUM, INC.,**
a Delaware corporation,
as the Parent and a Guarantor]

By: ________________________________
Name:
Title:

ADMINISTRATIVE AGENT:

[_____],
as Administrative Agent

By: ________________________________
Name:
Title:

LENDERS:

[_____], as a Lender
By: [_____]

By: ________________________________
Name:
Title:

**Fill in this information to identify the case and this filing:**

Debtor Name Elk Petroleum, Inc.

United States Bankruptcy Court for the: ______________________ District of Delaware (State)

Case number (*If known*): ______________________

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors 12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* ____
- ☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☒ Other document that requires a declaration Certification of Creditor Matrix, Corporate Ownership Statement, List of Equity Holders

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 05/22/2019
MM / DD / YYYY

✘ /s/ Scott M. Pinsonnault
Signature of individual signing on behalf of debtor

Scott M. Pinsonnault
Printed name

Chief Restructuring Officer
Position or relationship to debtor

**Fill in this information to identify the case:**

Debtor Name Elk Petroleum, Inc.

United States Bankruptcy Court for the: ________________ District of Delaware (State)

Case number *(If known)*: ____________________

☐ Check if this is an amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims on a Consolidated Basis and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.**

| | **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and email address of creditor contact** | **Nature of the claim** (for example, trade debts, bank loans, professional services, and government contracts) | **Indicate if claim is contingent, unliquidated, or disputed** | **Amount of unsecured claim** If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| 1 | BANNER COUNTY NEBRASKA TREASURER PO BOX 6 HARRISURG, NE 69345 | | BANK | | | | $135.00 |
| 2 | WELLS FARGO VENDOR FINANCIAL SERVICES, LLC PO BOX 650073 DALLAS, TX 75265-0073 | | BANK | | | | $ 8,505.00 |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| ELK PETROLEUM, INC., | § | Case No. 19-_______ (___) |
| | § | |
| Debtor. | § | |
| | § | |

## CORPORATE OWNERSHIP STATEMENT

Elk Petroleum, Inc. (the "Debtor") hereby submits, pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following list of corporations that directly or indirectly own 10% or more of any Debtor.

| Debtor | Direct Owner(s) |
|---|---|
| Elk Petroleum, Inc. | Elk Petroleum, Ltd. (100%) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| ELK PETROLEUM, INC., | § | Case No. 19-________ (___) |
| | § | |
| Debtor. | § | |
| | § | |

**LIST OF EQUITY SECURITY HOLDERS**

Elk Petroleum, Inc. hereby submits, pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, the following list of equity security holders.

| Name and address of interest holder | Percentage of Interest Held |
|---|---|
| Elk Petroleum, Ltd.<br>1700 Lincoln, Suite 2550<br>Denver, CO 80203 | 100% |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| ELK PETROLEUM, INC., | § | Case No. 19-_______ (___) |
| | § | |
| Debtor. | § | |
| | § | |

**CERTIFICATION OF CREDITOR MATRIX**

Pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the above captioned debtor (the "Debtor") hereby certifies that the *Creditor Matrix* submitted herewith contains the names and addresses of the Debtor's creditors. To the best of the Debtor's knowledge, the *Creditor Matrix* is complete, correct, and consistent with the Debtor's books and records.

The information contained herein is based upon a review of the Debtor's books and records as of the petition date. However, no comprehensive legal and/or factual investigations with regard to possible defenses to any claims set forth in the *Creditor Matrix* have been completed. Therefore, the listing does not, and should not, be deemed to constitute: (1) a waiver of any defense to any listed claims; (2) an acknowledgement of the allowability of any listed claims; and/or (3) a waiver of any right or legal position of the Debtor.