**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| ELK PETROLEUM, INC., *et al.*, [1] | § | Case No. 19-11157 (LSS) |
| | § | |
| Debtors. | § | Joint Administration Pending |
| | § | |

**DECLARATION OF SCOTT M. PINSONNAULT**
**<u>IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS</u>**

I, Scott M. Pinsonnault, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Restructuring Officer ("<u>CRO</u>") of Elk Petroleum, Inc. ("<u>EPI</u>") and the above-referenced, affiliated, debtors and debtors in possession (collectively, the "<u>Debtors</u>") and non-debtor subsidiaries of EPI (collectively, the "<u>Company</u>").

2. I am a Senior Managing Director of Ankura Consulting Group, LLC, the Company's financial advisor since January 5, 2019. At the time of our engagement, I was appointed CRO of the Company. As a result of my tenure with the Company, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3. I submit this declaration (the "<u>Declaration</u>") to assist this Court and parties in interest in understanding the Debtors' business and the circumstances that compelled the commencement of these Chapter 11 Cases, as well as to provide evidentiary support for (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers (if required) follow in parentheses): Elk Petroleum, Inc. (8606); Elk Petroleum Aneth, LLC (4449); Resolute Aneth, LLC (0729); and Elk Operating Services, LLC (3197). The address of the Debtors is 1700 Lincoln, Suite 2550, Denver Colorado 80203.

§§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") and (ii) the emergency relief the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

4. The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill duties as debtors and debtors in possession. I have reviewed the First Day Motions and the facts and descriptions set forth therein are true and correct to the best of my knowledge and are incorporated herein by reference. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in bankruptcy with little disruption or loss of productivity and value.

5. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Company's operations and finances, my discussions with other members of the Debtors' management team and advisors, information learned from my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience concerning the Company's operations and financial condition and my knowledge of the oil and gas industry. I am over 18 years of age, and I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently as to the facts stated herein.

6. To familiarize the Court with the Debtors and the relief sought on the first day of these Chapter 11 Cases, this Declaration is divided into five sections. Section I provides an introduction. Section II provides an overview of the Company's business operations and corporate structure. Section III provides an explanation of the Debtors' prepetition capital

structure. Section IV provides a description of the events leading to bankruptcy, and Section V provides facts in support of the First Day Motions.

## I. INTRODUCTION

7. The Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") on May 22, 2019 (the "Petition Date") after reaching an agreement on a consensual restructuring of the funded debt obligations owed to the senior secured creditors of Elk Petroleum Aneth, LLC ("EPA") and Resolute Aneth, LLC ("Resolute Aneth," and together with EPA, the "Plan Debtors"). This agreement is documented in a Restructuring Support Agreement (as amended, the "RSA"), a true and correct copy of which is attached hereto as **Exhibit A**. The negotiations that led to the RSA, and the RSA itself are each discussed more fully herein.

8. Prior to the Petition Date, and in furtherance of the RSA, the Plan Debtors solicited votes on the *Joint Plan of Reorganization of Elk Petroleum Aneth, LLC and Resolute Aneth, LLC* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2] More specifically, the Plan Debtors solicited votes to accept or reject the Plan from (i) the Holders of Claims in Aneth and Resolute Aneth Class 3 (Revolving Facility Credit Agreement Claims) and (ii) the Holders of Claims in Aneth and Resolute Aneth Class 4 (First Lien Credit Agreement Secured Claims), the only Classes and Interests entitled to vote on the Plan.

9. The Deadline to vote on the Plan was May 21, 2019 at 8:00 p.m. (ET) (the "Voting Deadline"). Prior to the Voting Deadline, the Holders of Claims in Aneth and Resolute Aneth Class 3 (Revolving Facility Credit Agreement Claims) and the Holders of Claims in Aneth

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or, if not defined in the Plan, in the *Disclosure Statement for Joint Plan of Reorganization of Elk Petroleum Aneth, LLC and Resolute Aneth, LLC* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").

and Resolute Aneth Class 4 (First Lien Credit Agreement Secured Claims) submitted their Ballots accepting the Plan and, therefore, the Plan was unanimously accepted by each Holder entitled to vote on the Plan. The following chart summarizes the voting results.

| **Plan Class** | **Amount Accepting Plan** (% of Amount Voted) | **Amount Rejecting Plan** (% of Amount Voted) | **Number Accepting Plan** (% of Number Voted) | **Number Rejecting Plan** (% of Number Voted) |
|---|---|---|---|---|
| Aneth Class 3 (Revolving Facility Credit Agreement Claims) | 100% | 0% | 100% | 0% |
| Aneth Class 4 (First Lien Credit Agreement Secured Claims) | 100% | 0% | 100% | 0% |
| Resolute Aneth Class 3 (Revolving Facility Credit Agreement Claims) | 100% | 0% | 100% | 0% |
| Resolute Aneth Class 4 (First Lien Credit Agreement Secured Claims) | 100% | 0% | 100% | 0% |

10. The Plan implements the balance-sheet restructuring (the "Restructuring") outlined in the RSA.

11. Given the prepetition solicitation of votes and the unanimous support for the Plan, the Plan Debtors have requested that the Court schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan within thirty-five (35) days from the Petition Date.

## II. OVERVIEW OF THE COMPANY'S BUSINESS

### A. The Company's Business Operations

12. The Company, headquartered in Denver, Colorado, operates an oil and natural gas business that specializes in applying established enhanced oil recovery ("EOR") technologies to

mature oil fields, focused primarily in the Rocky Mountain region. The Company's business focuses on the secondary and tertiary recovery phases of oil and gas production, which involves rejuvenating and redeveloping mature oil fields by using well-established EOR technologies to extend the commercial life of an otherwise depleted oil reservoir. The various EOR technologies consist of: water injection, gas injection, chemical injection, thermal processes, and other less conventional methods. In addition to waterflood techniques, the Company uses gas injection EOR technology to inject carbon dioxide ("CO2") into an oil reservoir at such pressure and temperature conditions where the CO2 and remaining oil become miscible with each other and act as one phase. This enables previously immobile oil reserves to flow again, possibly producing oil at levels obtained from the reserve in the primary phase of a field's development. This method of oil production produces half the national EOR production (approximately 5% of total oil produced). The Company's three core oil and natural gas assets are the Greater Aneth Oil Field, the Madden/Lost Cabin Gas Plant, and the Grieve Oil Field Project. The only operations conducted by a Debtor are those at the Greater Aneth Oil Field.

13. The Company's fields are the result of various, consolidated units of mineral or leasehold interests to unify the development, production, and operation for that area. Accordingly, each field is an amalgamation of numerous oil and gas leases. In order to ensure the efficient production, operation, and management of each field, the relevant entities are parties to unit operating agreements (each a "UOA") with the relevant working interest owners for each field.

## B. The Company's Corporate Structure

14. The following chart illustrates the Company's corporate ownership structure.




i. Elk Petroleum, Inc.

15. EPI is an independent energy holding company incorporated under Delaware law, whose operations are conducted through its various wholly-owned subsidiaries. EPI is wholly-owned by Elk Petroleum, Limited ("EPL"), a non-debtor that is an Australian entity publicly traded on the Australian Securities Exchange (the "ASX"). As noted in paragraph 27, EPI also issued a total of $65,000,000 in preferred equity.

16. On May 15, 2019, EPL commenced a voluntary administration, Australia's version of a chapter 11 process, by appointing two administrators to assess EPL (the "Administrators"), its operations, and the appropriate strategy going forward. The Debtors' advisors have been in communication with the Administrators regarding the process set forth herein. Importantly, notwithstanding the appointment of the Administrators, the Debtors' officers and directors, including the Debtors' two independent directors, remain in their respective

positions with respect to the Debtors and are in control of the Debtors' operations as of the Petition Date.

ii. The Plan Debtors

17. EPA, a Debtor, is a Delaware limited liability company and wholly-owned subsidiary of EPI. EPA's primary asset is its 100% ownership interest in its wholly-owned subsidiary, Resolute Aneth, a Delaware limited liability company.

18. Resolute Aneth, in turn, owns an approximate 63% operating working interest in the Greater Aneth Oil Field, one of the largest CO2 EOR projects in the Rocky Mountains. The Greater Aneth Oil Field, discovered in 1956, is comprised of three contiguous operating units: the McElmo Creek Unit, the Aneth Unit, and the Ratherford Unit. The Greater Aneth Oil Field, which covers over 48,000 acres on Navajo Nation lands in southeastern Utah, is the largest oil field in the Paradox Basin and produces oil and small amounts of gas from carbonate reservoir rocks in an extensive stratigraphic trap from the Desert Creek zone of the Pennsylvanian (Carboniferous) Paradox Formation. The remaining working interest in the Greater Aneth Oil Field is primarily held by Navajo Nation Oil and Gas Company, with a number of third parties holding nominal working interests. The Debtors maintain a positive and cooperative working relationship with Navajo Nation Oil and Gas Company and the Navajo Nation concerning the ongoing operations of the Greater Aneth Oil Field and intends to continue this positive relationship during and after the proposed restructuring.

19. Resolute Aneth acquired the rights to the Greater Aneth Oil Field from Resolute Energy Corporation, Hicks Acquisition Company I, Inc., and Resolute Natural Resources Company, LLC (collectively, "REC") on or about November 6, 2017.

iii. EOS

20. Elk Operating Services, LLC, a Delaware limited liability company and wholly-owned subsidiary of EPI, provides operating services only to the Plan Debtors and provides certain other non-operating services EPI's non-debtor subsidiaries. All of the Debtors' employees are employed by EOS and there are no non-debtor employees employed by EOS. EOS is also the operator of record for each individual unit that makes up the Greater Aneth Oil Field pursuant to three separate UOAs assigned to EOS as a part of the purchase of the working interest in the Greater Aneth Oil Field. EOS will not transfer any funds on behalf of non-debtor parties without prior order from the Court.

iv. The Non-Debtor Subsidiaries

21. In addition to EPA, EPI wholly owns the following non-debtor subsidiaries:

a. **Elk Grieve Project, LLC** (the "Project Company"), a non-debtor, is a Delaware limited liability company with an approximate 49% non-operating working interest in the CO2 EOR project at the Grieve Unit in Natrona County, Wyoming (the "Grieve Oil Field Project"). The Grieve Oil Field Project includes 24 active wells, 10 oil production wells, 10 CO2 or water injection wells, three dual purpose wells, two injector wells, one production well, and one water source well. The Grieve Oil Field Project redevelopment cost was part of a fixed price turnkey project agreement between the Project Company and its joint venture partner and operator Denbury Onshore, LLC ("Denbury"). The Grieve Oil Field Project was commissioned and began production on April 17, 2018.

b. **Grieve Pipeline, LLC** (the "Pipeline Company," and with the Project Company, the "Grieve Companies"), a non-debtor, is a Wyoming limited liability company that is a 100% owner and operator of a 32-mile, eight-inch diameter steel oil pipeline (the "Grieve Pipeline") that extends from the Grieve Oil Field Project to a receiving station at the Platte Pipeline Company, LLC oil storage facility near Casper, Wyoming. Denbury and the Pipeline Company entered into an oil transportation agreement to use the pipeline to transport its share of the Grieve Oil Field Project oil to Casper at a rate of $3 per barrel on 100% production.

c. **Elk Petroleum Madden Gas & CO2, LLC** ("Elk Madden"), a non-debtor, is a Delaware limited liability company with a non-operating working interest in the Madden Deep Unit, better known as the Madden/Lost Cabin Gas Plant

("Madden"). Madden produces natural gas, sulfur, and CO2 which is primarily transported by rail to supply the fertilizer market in Tampa, Florida with the remainder transported to a local fertilizer plant located in southwestern Wyoming. Burlington Resources Oil & Gas, a limited partnership of ConocoPhillips, is the operator of record for Madden.

d. **Elk Operating Company, LLC** ("EOC"), a non-debtor, is a Nebraska limited liability company with no assets.

e. **Singleton EOR Project, LLC** ("Singleton"), a non-debtor, is a Delaware limited liability company with no assets.

f. **North Grieve, LLC** ("North Grieve," together with EPL, the Grieve Companies, Madden, EOC, and Singleton, the "Non-Debtors"), a non-debtor, is a Wyoming limited liability company that is the owner of the non-operating North Grieve pipeline.

## III. THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### A. The Aneth Secured Debt and Related Agreements

22. To fund the purchase price to acquire the Greater Aneth Oil Field from REC, EPI, and EPA entered into a series of debt and equity transactions, as described more fully below.

#### i. The Aneth Term Loan Credit Agreement

23. On November 6, 2017, EPA entered into a Term Loan Credit Agreement (as amended, supplemented, restated and otherwise modified from time to time, the "Aneth Term Loan Agreement"), with HPS Investment Partners, LLC, as administrative agent ("HPS"), to obtain a fully secured loan in an aggregate principal amount of $98,000,000 secured by all property of EPA, whether real, personal or mixed, or tangible or intangible, owned at the time of execution or acquired thereafter. As a condition precedent to the execution of the Aneth Term Loan Agreement, EPI executed a Limited Recourse Guaranty Agreement ("EPI Term Loan Guaranty") to satisfy the liabilities and obligations incurred under the Aneth Term Loan Credit Agreement. Recourse pursuant to the EPI Term Loan Guaranty is limited to foreclosure of EPI's equity interest in EPA, except that EPI is liable without limit for any loss, damage, cost, or

expense resulting from EPI's fraud or willful misconduct and for enforcement costs resulting therefrom. Finally, through the execution of the Guaranty and Collateral Agreement and certain mortgages, deeds of trust, or other collateral documents ("Aneth Term Loan Security Documents" and together with the Aneth Term Loan Agreement and the EPI Term Loan Guaranty, the "Aneth Term Loan Facility"), Resolute Aneth provided a guarantee as well as a security interest in all of its present and after-acquired assets.[3]

24. On June 13, 2018, HPS funded an additional $24,000,000 of loans under the Aneth Term Loan Agreement pursuant to the First Amendment thereto. The additional $24,000,000 funded was to be used in strict accordance with Schedule 7.22 to the First Amendment, as described below. As of the Petition Date, AB Elk Holdings LLC ("AB") is the current administrative agent under the First Lien Credit Agreement. As of the Petition Date, approximately $114,000,000 in principal is outstanding under the Aneth Term Loan Facility.

ii. The Aneth Revolver Loan Agreement

25. In addition to the Aneth Term Loan Facility and PSA, EPA entered into the Senior Revolver Loan Agreement dated November 6, 2017 (as amended, supplemented, restated and otherwise modified from time to time, the "Aneth Revolver Loan Agreement," and together with the Aneth Term Loan Agreement, the "Credit Agreements"), with CrossFirst Bank ("CrossFirst") establishing a senior secured first out revolving line of credit in the maximum principal amount of $20,000,000 secured by a first priority mortgage lien, pledge of and security interest in the value of the producing oil, gas, and other leasehold and mineral interests of EPA with respect to the Greater Aneth Oil Field.

26. Similar to the Aneth Term Loan Facility, as a condition precedent to the execution of the Aneth Revolver Loan Agreement, EPI provided a guarantee to satisfy the liabilities and

[3] EPA's obligations under the Aneth Term Loan Agreement are also guaranteed on an unlimited basis by EPL.

obligations incurred under the Aneth Revolver Loan Agreement. Recourse pursuant to the EPI Revolver Loan Guaranty is limited to foreclosure of EPI's equity interest in EPA, except that EPI is liable without limit for any loss, damage, cost, or expense resulting from EPI's fraud or willful misconduct and for enforcement costs resulting therefrom. Finally, through the execution of the Guaranty and Collateral Agreement dated November 6, 2017 and certain mortgages, deeds of trust, or other collateral documents ("Aneth Revolver Loan Security Documents" and together with the Aneth Revolver Loan Agreement and EPI Revolver Loan Guaranty, the "Aneth Revolver Loan Facility"), EPA and Resolute Aneth provided a guarantee as well as a security interest in all their present and after-acquired assets.[4] AB is the current lender of record under the Aneth Revolver Loan Facility, having acquired the debt from CrossFirst. Approximately $14,500,000 in principal is outstanding under the Aneth Revolver Loan Facility as of the Petition Date.

iii. The Preferred Stock Purchase Agreement

27. Finally, EPI entered into the Preferred Stock Purchase Agreement dated November 6, 2017 (the "PSA") with AB, pursuant to which EPI issued and sold preferred stock (the "Preferred Stock") to fund the remaining portion of the purchase price for acquiring the Greater Aneth Oil Field. AB purchased shares of Series A Preferred Stock for an aggregate purchase price of $15,000,000 and shares of Series B Preferred Stock for an aggregate purchase price of $40,000,000. LIM Asia Special Situations Master Fund Limited ("LIM") also purchased shares of Series A Preferred Stock for an aggregate purchase price of $10,000,000. Thereafter, on December 20, 2017, pursuant to the Preferred Stock Issuance and Repurchase Agreement, AB sold $5,000,000 of the Series B Preferred Stock it had purchased to EPI, which, in turn, issued and sold $5,000,000 of the Series A Preferred Stock to ACR Multi-Strategy Quality Return

[4] EPA's obligations under the Aneth Revolver Loan Agreement are also guaranteed on an unlimited basis by EPL.

(MQR) Fund, A Series of Investment Management Series Trust II ("ACR") and Fulcrum Energy Capital Fund II, LLC ("Fulcrum"). A total of $65,000,000 in preferred equity was raised by EPI in connection with EPA's acquisition of the Greater Aneth Oil Field.

iv. BP ISDA

28. As permitted under the Aneth Term Loan Facility and the Aneth Revolver Loan Facility, EPA and BP Energy Company ("BP") executed ISDA Master Agreement dated November 6, 2017 (as amended and supplemented from time to time, the "BP ISDA"). The BP ISDA provided EPA with the ability to hedge future sale prices and basis differentials on production. All of the obligations arising in connection with the BP ISDA are secured obligations of the Plan Debtors pursuant to the EPA Revolver Loan Security Documents and the Pari Passu Intercreditor Agreement (the "Pari Passu Intercreditor Agreement") and the Swap Intercreditor Agreement (the "Swap Intercreditor Agreement"). As of May 21, 2019, the mark to market value of outstanding hedge obligations owed to BP is approximately $29,190,234.

**B. EPI Guaranty Obligations**

29. In order to finance the construction, development, and commission of the Grieve Oil Field Project, BSP Agency, LLC ("BSP"), as administrative agent, provided secured term loans to certain of EPI's non-debtor subsidiaries, Elk Grieve Project, LLC and Grieve Pipeline LLC, (the "Grieve Credit Facility") in an aggregate principal amount not to exceed $58,000,000. EPI agreed to guarantee the Grieve Credit Facility through the execution of the Guaranty Agreement dated August 5, 2016. As of the Petition date, approximately $54,375,000 in an initial principal amount is outstanding under the Grieve Credit Facility.

30. As noted above, EPI has also guaranteed the Aneth Term Loan Facility and the Aneth Revolver Loan Facility.

### C. Other Unsecured Debt Obligations

31. On February 11, 2019, pursuant to the Exchange Agreement, dated February 8, 2019 (the "Exchange Agreement"), by and among EPI, EPA, AB and AB Co-Invest Elk Holdings LLC (together with AB, the "AB Parties"), the AB Parties exchanged their Series A and Series B Preferred Stock for warrants to purchase common stock of EPI (the "Warrants") and a new unsecured term loan at EPA (the "Unsecured Term Loan"). As of the Petition Date, approximately $54,987,794.24 in principal amount is outstanding.[5]

32. Furthermore, as of the Petition Date, the Debtors estimate that approximately $4,973,650 in unsecured trade obligations, including lease operating expenses, are outstanding. The Debtors have been paying trade vendors in the ordinary course of business and are substantially current with respect to the Debtors' trade obligations.

## IV. EVENTS LEADING TO BANKRUPTCY

### A. The Inherent Risk in the Oil and Gas Industry and EOR Projects

33. The Company's ambitious endeavors to acquire multiple oil and gas assets outpaced the Company's balance sheet, and in certain respects, performance of the operated and non-operated assets failed to meet initial expectations. The acquisition of the Greater Aneth Oil Field over-levered the Debtors' assets, resulting in the need to refinance almost immediately. The Debtors' Credit Agreements contractually limit the amount of cash flow that could be used to fund general and administrative expenses at EPL, EPI, and other non-Plan Debtors. While

[5] Following the closing of the transactions contemplated by the Exchange Agreement, LIM, ACR, and Fulcrum were the holders of all outstanding shares of Series A Preferred Stock (and no shares of Series B Preferred Stock were outstanding). EPI prepared and provided to LIM, ACR, and Fulcrum, preliminary draft transaction documents regarding a potential exchange of the remaining shares of Series A Preferred Stock on substantially the same terms as contained in the Exchange Agreement and the parties engaged in good faith negotiations. Ultimately, EPI did not finalize and enter into a definitive agreement on terms of the proposed exchange, or consummate an exchange transaction. As a result, none of the other holders of Series A Preferred Stock were exchanged. On May 20, 2019, LIM, ACR, and Fulcrum filed a suit in the Delaware Chancery Court against EPI, Bradley William Lingo (former director of EPI), David Evans (current director of EPI), James Piccone (former director of EPI), and the AB Parties requesting relief, including, but not limited to, specifically enforcing the never consummated exchange transaction, voiding the Exchange Agreement with the AB Parties, or for damages in an amount to be proven at trial.

EPL repeatedly assured the Debtors it would obtain and provide the Debtors the necessary capital contribution to adequately supplement these expenses such funding was never received.

34. In an effort to achieve more predictable cash flows and reduce exposure to downward price fluctuations, the Company entered into hedge obligations under the BP ISDA to hedge future sales prices and basis differentials on production. However, the Debtors were unable to capture the financial benefits of the improving commodity price environment due to their hedge obligations under the BP ISDA. Pursuant to the BP ISDA, the Debtors hedged eighty (80) percent of the projected proved developed reserves (the "PDP") at a price much lower than subsequent realized spot and settlement prices as depicted in the following chart:




Therefore, the Debtors only obtained the benefit of increased oil prices from volumes above eighty (80) percent of forecasted PDP, the unhedged volumes. Additionally, impacting revenues, production shortfalls in the second and third quarter of 2018 meant that highly profitable unhedged production fell short of expectations. As of the Petition Date, the Debtors' estimated fair value of their commodity derivative contracts was a negative asset of approximately $29,190,234, thus offsetting almost all benefit an improved oil pricing environment may have provided.

35. The Debtors believed that the commission of the Grieve Oil Field Project would provide cash flow to help offset the general and administrative liabilities incurred. Unfortunately, the Grieve Oil Field Project has not yet produced at the projected levels. As of the Petition Date, costs of operations continue to exceed revenues, requiring continual funding instead of providing cash flow. The Grieve Oil Field Project contributed to the Debtors growing liquidity problems.

36. The Debtors' overly complex capital structure and lack of timely refinancing efforts limited and, ultimately, prevented any opportunity to refinance the various debt obligations. In the fall of 2018, EPL engaged RBC Capital Markets ("RBC") to source a reserve-based loan to reduce the Aneth Term Loan Agreement obligation. Due to the complex balance sheet and current debt load, EPL and RBC's efforts were to no avail. In February 2019, in conjunction with the Unsecured Term Loan, Stephens Investment Bank, the AB Parties' financial advisors, assisted the Debtors in their renewed efforts to source a reserved-based loan. Of the fifty potential loan parties approached, fifteen parties expressed interest. Again, however, the expressed interest failed to materialize into a new facility due to the Debtors' complex balance sheet and debt load.

**B. The Debtors' Defaults Under Their Secured Debt Obligations**

37. On December 10, 2018, HPS notified EPA of the occurrence of certain "Events of Default" under the Aneth Term Loan Agreement, including an "Event of Default" resulting from EPA's entry into transactions with affiliates in violation of the Aneth Term Loan Agreement. Given this allegation by HPS, EPA retained Opportune LLP ("Opportune") to perform a cash flow forensic analysis review to reconcile historical cash transfers between the Debtors. EPI, EOS, and Resolute Aneth, from the initial funding of the Aneth Term Loan Agreement on November 6, 2017, and December 2018. Opportune's analysis indicated that through November 30, 2018, approximately $19,600,000 of EPA payments to affiliates, including EPI,

were made in violation of the Aneth Term Loan Agreement, including a $3,600,000 cure payment to BSP for debt violations under the Grieve Credit Facility.

38. On January 17, 2019, CrossFirst notified EPA of the occurrence of certain "Events of Default" under the Aneth Revolver Loan Agreement, including an "Event of Default" resulting from EPA's entry into transactions with affiliates in violation of the Aneth Revolver Loan Agreement.

39. On January 18, 2019, AB acquired one hundred percent of HPS's rights, title, interests, and obligations under the Aneth Term Loan Facility. On the same day, EPL, EPI, the Plan Debtors, and AB, as administrative agent for the lenders, entered into that certain Forbearance to Term Loan Credit Agreement, pursuant to which EPL, EPI, and the Plan Debtors acknowledged the occurrence and continuation of the certain "Events of Default" under the Aneth Term Loan Agreement and AB temporarily forbearing from accelerating the maturity of the Aneth Term Loan Agreement, foreclosing on any collateral, or any other exercise of default remedies through January 31, 2019. Those "Events of Default" include, among others: (i) EPA's entry into transactions with affiliates; (ii) EPA's designation of EOS as operator of the Greater Aneth Oil Field instead of Resolute Aneth; and (iii) EPA's use of the $24,000,000 funded by HPS for purposes other than those listed on Schedule 7.22 to the First Amendment. This period of forbearance was later extended through March 31, 2019, and expired according to its terms on that date.

**C. The Restructuring Support Agreement**

40. As the Debtors' liquidity position progressively tightened, the Debtors engaged in extensive arms' length discussions with Riverstone Credit Partners – Direct, L.P., Riverstone Credit Partners II – Direct, LP, Riverstone Strategic Credit Partners S, L.P., and Riverstone Strategic Credit Partners A-2 AIV, L.P. (collectively, "Riverstone") and the AB Parties

(collectively, the "Supporting Holders," and together with the Debtors, the "RSA Parties") around the terms for an agreed upon path, either through a comprehensive out of court Recapitalization (as defined in the RSA), or through a formal in-court restructuring process. EPL led the Recapitalization efforts on behalf of the Debtors that, if successful, could have resulted in the out-of-court restructuring and recapitalization of the Debtors and the Non-Debtors. Pursuant to the RSA, the terms of the Recapitalization were required to be acceptable to the Supporting Holders and the Debtors, each in their sole discretion. To provide initial liquidity to EPL to assist its efforts to facilitate a Recapitalization, notwithstanding the events of default under the Credit Agreements with respect to the Plan Debtors, on or about April 18, 2019, the AB Parties permitted the transfer of $250,000 from Aneth to EPL pursuant to an intercompany loan.

41. On May 10, 2019, the RSA Parties executed the RSA. That same day, the AB Parties provided EPL and the Debtors with a Filing Notice (as defined in the RSA) that EPL failed to provide the AB Parties with documentation demonstrating that sufficient progress has been made with respect to the Recapitalization and declining to permit Aneth to loan any further amounts to EPL in respect of the Recapitalization. As a result of the issuance of the Filing Notice, the amended RSA required the Debtors to initiate the Chapter 11 Cases no later than May 22, 2019.

42. Notwithstanding the lack of success of the Recapitalization, the RSA provides for a comprehensive restructuring of the Plan Debtors that significantly de-levers the Plan Debtors' balance sheet through the consensual equitization of the Supporting Holders' senior secured debt on the terms and conditions set forth in the RSA, which otherwise could not be accomplished under section 1129(b) of the Bankruptcy Code. The Debtors' obligations under the RSA are subject to their fiduciary obligations to the estates in the event a higher and better offer,

including the Recapitalization, materializes. The RSA also embodies the settlement of significant claims between the Plan Debtors and the AB Parties, including, subject to confirmation of the Plan, the waiver of distributions by the AB Parties of more than $60,000,000 in unsecured claims of the AB Parties. Finally, the RSA also includes commitments by the Supporting Holders to provide no less than $10,000,000 in debtor in possession financing to fund the Debtors' obligations during these Chapter 11 Cases.

43. Specifically, the RSA provides the following: [6]

a. The Debtors' Chapter 11 Cases will be funded with the consensual use of cash collateral, in accordance with interim and final orders of the Bankruptcy Court in accordance with the Approved budget (as defined below);

b. The equitization or repayment in full, as the case may be, of the Plan Debtors' Revolving Facility Credit Agreement Claims and First Lien Credit Agreement Claims (including a waiver by the AB Parties of any deficiency claims arising thereunder);

c. Other Secured Claims, including claims under the BP ISDA, will be Unimpaired;

d. General Unsecured Claims at Resolute Aneth will be Unimpaired; and

e. Holders of Unsecured Term Loan Claims and any deficiency claim with respect to the First Lien Credit Agreement claims will waive any distribution on account of such claims.

44. The RSA also contains various milestones (the "Milestones") that the Debtors must satisfy. The Milestones include: (a) commencing these Chapter 11 Cases on or before May 22, 2019; (b) within two (2) business days of the Petition Date, the entry of an interim DIP order, in form and substance acceptable to the Supporting Holders; (c) within three (3) days of the Petition Date, the Debtors file the Plan and Disclosure Statement; (d) within thirty (30) days of the Petition Date, the entry of a final DIP order, in form and substance acceptable to the Supporting Holders; (e) subject to the availability of the Court, within forty (40) days of the

[6] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the RSA.

Petition Date, the entry of an order approving the Disclosure Statement, in form and substance acceptable to the Supporting Holders and an order, in form and substance acceptable to the Supporting Holders, confirming the Plan; and (f) within fifteen (15) days of the Confirmation Order, the Plan Effective Date shall occur. Furthermore, the DIP Loan contains an event of default if the Plan is not confirmed on or before forty (40) days from the Petition Date.

45. The Debtors believe that a protracted bankruptcy proceeding will significantly and detrimentally impact the Company's relationships with customers, employees, financing counterparties and vendors. Accordingly, the Debtors (and the Company) will suffer detrimental consequences if the Plan cannot be completed expeditiously, which militates in favor of a swift emergence from chapter 11. The chapter 11 cadence in the RSA, therefore, properly balances the need to move these Chapter 11 Cases along expeditiously to reduce the administrative costs of a chapter 11 proceeding with the need to provide the Debtors' creditors with sufficient time to analyze the proposed Plan. The Debtors are hopeful that they will build further consensus around the Plan that the RSA contemplates. Absent further consensus, the RSA provides the Debtors with the means to prosecute a confirmable chapter 11 plan for the Plan Debtors.

46. In accordance with the terms of the RSA, although not set for approval at the hearings with respect to the First Day Motions, the Plan and Disclosure Statement filed by the Plan Debtors on the Petition Date is supported by 100% of the creditors of the Plan Debtors' impaired classes that are entitled to vote, and provides for a comprehensive restructuring and deleveraging of the Plan Debtors' balance sheet, while preserving claims and certain causes of action for the benefit of general unsecured creditors.

47. While EPI is not a plan proponent under the Plan proposed by the Plan Debtors, EPI continues to engage with its stakeholders, including BSP, with respect to a consensual restructuring of its obligations.

## V. FACTS IN SUPPORT OF FIRST DAY MOTIONS[7]

48. Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects of the commencement of the chapter 11 case, facilitate the efficient administration of the chapter 11 case, and expedite a swift and smooth liquidation of the Debtors' assets. I have reviewed each of the First-Day Motions. I believe the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Motions follows.

### A. Administrative and Procedural Motions

*i. Motion of Debtors for an Order (I) Directing Joint Administration Pursuant to Bankruptcy Rule 1015(b); and (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)*

49. By this motion, the Debtors seek an order consolidating, for procedural purposes only, the administration of these Chapter 11 Cases with Debtor EPI as the lead debtor, pursuant to Bankruptcy Rule 1015. In addition, the Debtors request that the Clerk make an entry on the docket of each Debtor's case, other than with respect to EPI, stating that an order has been entered directing joint administration of these Chapter 11 Cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made on the EPI docket.

[7] All capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the corresponding First Day Motion.

50. The Debtors are all affiliates and have all filed petitions in the same court. I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and parties in interest. Many applications, motions, orders, hearings, and notices will be made in these Chapter 11 Cases that will affect all of the Debtors. Joint administration will keep all parties informed of matters related to these Chapter 11 Cases without the inconvenience and confusion of reviewing separate dockets. As the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be harmed.

51. I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Court's resources. Therefore, I believe that these Chapter 11 Cases should be jointly administered for procedural purposes only.

*ii. Motion of Debtors for Order Authorizing the Filing of a Consolidated Mailing Matrix*

52. By this motion, the Debtors request authorization to file a consolidated mailing matrix. The Debtors are comprised of four (4) affiliated companies that maintain their books and records on a consolidated basis with one accounts payable system. There are hundreds of creditors and other parties in interest in these Chapter 11 Cases, and there may be potential for confusion and/or overlap regarding creditor obligations. Given these circumstances, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix. The consolidated mailing matrix will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

53. I believe that authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor will promote efficiency and conserve the Debtors' resources. Therefore, I believe that the Debtors should be authorized to file a consolidated mailing matrix.

*iii. Application of the Debtors Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for an Order Appointing Bankruptcy Management Solutions d/b/a/ Stretto as Claims and Noticing Agent for the Debtors Effective Nunc Pro Tunc to the Petition Date*

54. By this application, the Debtors request authority to employ Stretto as their claims and noticing agent with respect to these Chapter 11 Cases and to provide services in connection with claims, noticing, and other administrative issues with regard to chapter 11 cases.

55. Stretto is a claims agent and provider of restructuring administrative services. The professionals at Stretto are well-qualified to advise the Debtors in these bankruptcy proceedings, as they have substantial experience providing restructuring administrative services in bankruptcy cases similar in size and complexity to these Chapter 11 Cases. Prior to the Petition Date, the Debtors obtained proposal from three entities that provide such services, and given the nature of these Chapter 11 Cases, the proposal from Stretto was the most reasonable.

56. I believe such experience and knowledge will be valuable to the Debtors during these Chapter 11 Cases. Accordingly, the Debtors wish to retain Stretto to provide such assistance during these Chapter 11 Cases.

*iv. Motion of Debtors for an Order Pursuant to Bankruptcy Rule 1007 Granting An Extension of Time for Filing Schedules and Statements of Financial Affairs*

57. By this motion, the Debtors request the entry of an order extending the deadline to file (a) a schedule of assets and liabilities, (b) a statement of financial affairs, (c) a schedule of current income and expenditures, and (d) a statement of executory contracts and unexpired leases (collectively, the "Schedules and Statements") an additional fourteen (14) days to June 19, 2019.

58. The automatic extension of time to file such Schedules and Statements provided by Local Rule 1007-1(b) is not applicable to these Chapter 11 Cases. The current deadline to file Schedules and Statements is June 5, 2019. Although the Debtors have commenced preparation of their schedules and statements, as a result of the complexity of these Chapter 11 Cases, at this juncture, the Debtors estimate that an extension of an additional fourteen (14) days will provide sufficient time to prepare and file the Schedules and Statements. The Debtors thus request that the Court establish June 19, 2019 as the date on or before which they must file their Schedules and Statements, without prejudice to the Debtors' right to seek any further extensions from this Court.

59. Bankruptcy Rule 1007(c) provides for an extension, for cause, of the time for the filing of Schedules and Statements. It is estimated that the Debtors will need time to close their prepetition books and for all prepetition invoices to be received by the Debtors' accounting department. The Debtors will then have to extract all necessary information from their books and records and populate such information in the Official Forms. In light of the complexity, it will take time for this process to be completed, and the Debtors therefore submit that cause exists for the requested extension.

60. I believe that there is just and reasonable cause for an additional fourteen (14) days for the Debtors to file the Schedules and Statements. Therefore, I believe the Court should grant the relief requested.

## B. Operational Motions

*i. Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming the Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance*

61. By this motion, the Debtors request the entry of interim and final orders to (a) determine that its utility providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approve the Debtors' proposed adequate assurance of a deposit of approximately 50% of one month of the aggregate cost of utility service into a segregated interest bearing account, (c) prohibit the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the final order, and (d) determine that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion.

62. In the ordinary course of business, the Debtors receive electricity, power, gas, telephone, internet, water, sewer, and trash removal services (the "Utility Services") from numerous utilities (the "Utility Providers"). A list identifying the Utility Providers with relevant accounts for these companies is attached as Exhibit A to the motion (the "Utility Provider List").[8] The Debtors pay an aggregate amount of approximately $1,262,903.00 for Utility Services on a monthly basis.

63. At all relevant times, the Debtors have attempted to remain current with regard to their utility bills. Overall, the Debtors have a long and established payment history with most of

---

[8] The listing of any entity on the Utility Provider List is not an admission that any listed entity is a utility within the meaning of section 366 of the Bankruptcy Code. The Debtors reserve all rights to further address the characterization of any particular entities listed on the Utility Provider List as a utility company within the meaning of section 366. The Debtors further reserve all rights to terminate the services of any Utility Company at any time and to seek an immediate refund of any utility deposit without effect to any right of setoff or claim asserted by a Utility Company against it. The relief requested herein is with respect to all of the Utility Companies and is not limited to only those identified in the Utility Provider List.

the Utility Providers indicating consistent payment for Utility Services with few to no material defaults or arrearages with respect to undisputed Utility Services invoices. As of the Petition Date, however, the Debtors may have had (a) prepetition accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for prepetition utility services for which the Debtors had not yet been billed.

64. I believe that uninterrupted utility services are essential to the ongoing operations of the Debtors and, therefore, to the successful resolution of these Chapter 11 Cases. Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' restructuring efforts and, ultimately, the value of creditor recoveries. It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.

65. The Debtors propose that, within thirty days after the Petition Date, they will transfer into a segregated bank account deposits equal to 50% of such Debtors' average monthly payment to the applicable Utility Provider. The Debtors do not currently have any deposits with the Utility Providers. The Debtors propose that such deposits be held for the benefit of the Utility Providers, who may assert a claim against such funds (equal to the respective amount of their deposit) in the event that the Debtors fail to make any postpetition utility payments. The Debtors are concurrently seeking approval of postpetition financing. Thus, they expect to have funds available for payment to the Utility Providers.

66. Further, the Debtors propose to protect the Utility Providers by establishing the procedures provided in this motion, whereby any Utility Provider can request additional

adequate assurance in the event that it believes there are facts and circumstances with respect to its providing post-petition services to the Debtors that would merit greater protection.

67. Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in this motion should be granted.

*ii. Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Continue (A) Existing Insurance Programs and (B) Prepetition Surety Bonds, and Pay Obligations Arising Thereunder, and (II) Related Relief*

68. By this motion, the Debtors seek authorization to (a) maintain existing insurance policies and pay all obligations arising thereunder, (b) maintain financing of their insurance premiums and pay all obligations in connection therewith, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment.

69. The Debtors maintain numerous liability and property insurance policies with multiple insurers (collectively, the "Insurance Carriers"). Those policies include business automobile liability, commercial lines package, pollution liability, workers' compensation liability, general commercial liability, energy package, loss load and excess liability, directors and officers liability (and excess liability), employment practices liability, kidnap and ransom liability, workplace violence liability, fiduciary liability, and commercial crime liability, as identified in Exhibit A to the motion (collectively, the "Insurance Programs"). Continuation of the Insurance Programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability.

70. The Debtors are required to pay premiums under the Insurance Programs based upon rates established by the applicable Insurance Carriers. For the 2018/2019 policy period, the annual premiums for the Insurance Programs totaled $1,804,233.06 in the aggregate. The Debtors pay premiums in full directly to the Insurance Carriers at the commencement of the respective policies or on a prorated basis with the exception of the energy package policy with

Lloyds. The policy with Lloyds was financed by FIRST Insurance Funding ("First Insurance"). As of the Petition Date, the Debtors owe approximately $72,024.48 to First Insurance for a financed premium. Some of the Insurance Programs will expire following the Petition Date, and the Debtors may be required to pay premiums in connection with the renewal of such Insurance Programs. To the extent that the Debtors need Court approval to amend, extend, or renew the Insurance Programs or pay any associated premiums in connection with such amendment, extension, or renewal, they hereby seek such authority herein.

71. Some of the Insurance Programs require the Debtors to pay a per-incident deductible (the "Deductibles"). Generally, if a claim is made against the Insurance Programs, the Debtors' applicable Insurance Carrier will administer the claim and make payments in connection therewith. The Deductible, if any, is offset against such payments. The Debtors seek authority, but not direction, to continue honoring any Deductibles that may exist currently or arise under the Insurance Policies in the ordinary course of business and to ensure uninterrupted coverage under the Insurance Programs.

72. In addition to the Insurance Programs, the Debtors' are obligated by various state, federal, and Navajo Nation agencies to maintain surety bonds with respect to identifiable risks related to the Debtors' operations (collectively, the "Surety Bonds"). A list of the Surety Bonds is attached to the motion as Exhibit B and is incorporated herein by reference.[9] The Surety Bonds are issued in the aggregate face amount of approximately $29,870,300 and guarantee the Debtors' performance of obligations owing to federal and state governmental departments and other third parties. In many instances, the Surety Bonds are required by applicable law.

[9] Although Exhibit B is intended to be comprehensive, and the Debtors request relief with respect to all Surety Bonds, regardless of whether such Surety Bond is specifically identified on Exhibit B.

73. The Debtors pay annual premiums on account of the Surety Bonds (the "Surety Bond Premiums"). By their terms, however, the Surety Bonds may require the Debtors to provide certain credit support to the issuer in order to maintain the bonds. As of the Petition Date, no remaining balances are due and owing on the Surety Bond Premiums. Moreover, no renewal payment on account of such Surety Bond Premiums is due until August 2019. By this Motion, the Debtors request authority, in their discretion, to continue or renew the Surety Bonds, including to provide any credit support required to maintain the Surety Bonds, and to pay any prepetition amounts that may be owed on account of the Surety Bond Premiums in the ordinary course of business without additional approval from the Court.

74. In connection with the Insurance Programs, the Debtors employ the services of Alliant Insurance Services Houston LLC and JLT Specialty Insurance Services Inc. (the "Insurance Brokers") to assist them with the procurement, placement, and negotiation of their Insurance Programs and also provides the Surety Bonds that are referenced herein. The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner possible and enables the Debtors to obtain policies on advantageous terms and at competitive rates.

75. The Insurance Broker charges brokerage fees (the "Brokerage Fees"), which are typically paid by the applicable Insurance Carrier. The Debtors' records indicated that, as of the Petition Date, no prepetition Brokerage Fees are due and owing; however, fees or commissions (or both) may become due to the Insurance Broker in connection with policy renewals.

76. I believe that payment of the obligations owing in connection with the Insurance Policies financing agreements and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies as needed in the Debtors'

business judgment are necessary to protect and safeguard the Debtors' ongoing operations, to preserve the value of the Debtors' business, property and assets, and ensure compliance with the United States Trustee Guidelines. The Debtors' operations involve substantial risk, and having appropriate insurance coverage is a core part of that effort. Also, failure to pay amounts related to the Insurance Policies as and when they come due may harm the Debtors' estates, including because, among other reasons, Insurance Companies may terminate coverage and may result in conversion or dismissal of the Chapter 11 Cases or a failure to comply with the United States Trustee Guidelines. Importantly, while the Non-Debtors are covered by the Insurance Policies maintained by the Debtors, all amounts owing with respect to the Non-Debtors will be paid in the ordinary course of business to the relevant Insurance Carrier by such Non-Debtors.

77. Therefore, I believe that the relief requested in this motion is in the best interest of the estates and should be granted.

*iii. Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Employee (A) Wages, Salaries and Other Compensation; (B) Reimbursable Employee Expenses; and (C) Employees Benefits; and (II) Granting Related Relief*

78. By this motion, the Debtors request authorization, but not direction, to pay certain prepetition wage claims, honor employee and independent director obligations, and continue employee programs in the ordinary course of business related to employee and independent contractor compensation, payroll administration, wage deductions, government withholdings and payroll taxes, reimbursable expenses, and employee benefit programs.

79. In the ordinary course of their businesses, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services. As of the Petition Date, the Debtors' workforce consists of approximately ninety-five (95) employees (collectively, the "Employees"), of which ninety-four (94) are full-time employees.

The Debtors employ approximately twenty-seven (27) employees in Colorado, sixty-seven (67) employees in Utah, and one (1) employee in Wyoming. As of the Petition Date, the Debtors have three (3) independent contractors (the "Independent Contractors") and one (1) part-time temp (the "Temp"). All Employees are employed by EOS. During the six (6) months leading up to the Petition Date, the Debtors reduced the number of the Employees by six (6) people. Therefore, the Debtors are currently operating a lean business (with an efficient core of personnel in place), and the Debtors must therefore maintain their current level of employment and not create disincentives which would cause any of the Employees to leave.

80. Currently, EPI's board of directors includes David Evans, Eugene Davis, and Patrick Bartels. David Evans became a director on October 15, 2018. Although not required to, the Debtors added two independent directors (the "Independent Directors") prior to the Petition Date. Specifically, on April 12, 2019 Eugene Davis became a director and on April 17, 2019, Patrick Bartels became a director. The Independent Directors are each paid a monthly fee of $20,000 for their services.

81. The Employees perform a variety of critical functions for the Debtors' businesses, including, without limitation, accounting, administration, engineering, production, operations, geology, finance, human resources, information technology, project management, and sales. Their skills and specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with partners, vendors, and other third parties, are essential to the Debtors' continuing operations and to their ability to successfully reorganize. Pursuant to this Motion, the Debtors request authority to pay the Employee Obligations incurred prior to the Petition Date, in an amount not to exceed $12,850 to any single Employee, plus any

outstanding claims for unreimbursed business expenses and payments due on certain credit cards used by Employees for business expenses.

**Debtors' Payroll Obligations**

82. The Debtors seek an order authorizing them to honor all of their outstanding prepetition payroll obligations. Every two weeks, in the ordinary course of business, the Debtors pay the Employees and the Temp one week in arrears. The Independent Contractor is paid as billed and in the ordinary course of business.

83. The most recent payroll for the Employees and the Temp was paid on May 20, 2019[10] and covered compensation for the Employees and the Temp for the period April 27, 2019 through May 10, 2019. The Debtors' next scheduled payroll date for the Employees and the Temp is June 3, 2019 and will be for the period beginning May 11, 2019 and ending on May 24, 2019. The Debtors use ADP, LLC ("ADP") for their third-party payroll-processing services.[11]

84. As of the Petition Date, the Debtors estimate that approximately $319,500 in unpaid salary, wages, and other compensation is owing to the Employees. Given the critical role of the Employees in the Debtors' business operations, the Debtors seek authority to honor their salary, wage, and bonus obligations by paying, in the ordinary course, any prepetition amounts owed to the Employees for services within 180 days of the Petition Date. The Debtors' records indicate that none of the Employees will be owed more than the $12,850 priority limit on account of prepetition salaries or wages under section 507(a)(4) of the Bankruptcy Code, and the Debtors are therefore seeking to pay all of the Employees the entirety of their individual prepetition salaries or wages.

[10] The Debtors wire the payroll funds to ADP on every other Friday, and payroll is deposited into the Employees' accounts on the following Monday.

[11] The Debtors do not use ADP to pay the Independent Contractor.

85. As of the Petition Date, the Debtors estimate that the Independent Contractors are owed approximately $11,400. The Debtors seek authority to honor their obligations to pay the Independent Contractor any prepetition amounts in the ordinary course. The Independent Contractor will not be owed more than the limit under section 507(a)(4) of the Bankruptcy Code.

**The Debtors' Obligation to Reimburse Personnel's Business Expenses**

86. Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed their personnel for certain business expenses incurred in the scope of their employment, including, without limitation, expenses for business travel, meals, lodging, and parking (collectively, the "Reimbursable Expenses"). Although the Debtors' policy is that the Employees should use their corporate MasterCard credit cards for such expenses, which is the subject of a separate motion before this Court, individuals will occasionally need to be reimbursed for Reimbursable Expenses that were purchased with their personal credit cards. All Reimbursable Expenses, which do not include amounts incurred on any corporate credit card, were incurred on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the understanding that such expenses would be reimbursed.

87. The Debtors estimate that, as of the Petition Date, the Debtors do not owe any amounts on account of Reimbursable Expenses and none of the Employees are owed more than the $12,850 limit under section 507(a)(4) of the Bankruptcy Code on account of Reimbursable Expenses and prepetition salaries or wages. Accordingly, the Debtors seek authority to honor the Reimbursable Expense obligations by paying, in the ordinary course, any prepetition Reimbursable Expenses owed to the Employees.

**Employee Benefits**

88. In the ordinary course of the Debtors' business, and as is customary for most companies, the Debtors provide the Employees with various benefits (collectively, the "Employee Benefits Programs").[12] The Debtors seek authority to pay and/or honor their unpaid prepetition obligations under the Employee Benefits Programs that arose from services rendered before the Petition Date (the "Prepetition Benefits"). The Debtors anticipate that any payments on account of the Prepetition Benefits will not exceed the limits set forth in section 507(a)(5) of the Bankruptcy Code.

Health Insurance (Medical, Prescription, Dental, and Vision)

89. The Debtors provide the Employees with medical, dental, and vision insurance through third-party providers. A portion of all health insurance related premiums are paid by the Employees.

90. The Debtors offer medical insurance to full-time Employees through a partially self-funded plan provided by Cigna with a $50,000 stop-loss limit per participant and a stop-loss limit of 120% of the aggregate claims. The total medical premium and prescription payments for insurance payable by the Debtors under the medical plan is approximately $126,300 per month on average but may fluctuate in any given month since premiums are based on the number of participants.

91. The Debtors provide dental insurance to full-time Employees through a plan provided by Cigna. The monthly premiums are partially paid by the Employees, and the total premium for insurance payable by the Debtors under the dental plan is approximately $6,100 per

[12] The Employees are eligible for the various Employee Benefits Program upon the first day of the month following their hire date.

month on average but may fluctuate in any given month because premium amounts are calculated based on the number of participants.

92. The Debtors provide vision insurance to Employees through a plan provided by Vision Services Plan. The premiums are partially paid by the Employees, and the total premium for insurance payable by the Debtors under the vision plan is approximately $1,150 per month on average but may fluctuate in any given month since premiums are based on the number of participants.

93. The Debtors seek authority to pay, in the ordinary course of business, any unpaid premiums relating to the foregoing medical, dental, and vision insurance that arose from services rendered prior to the Petition Date (the "Prepetition Health Benefits").

Life, Accidental Death and Dismemberment, Short- and Long-Term Disability Insurance

94. The Debtors provide basic life, accidental death and dismemberment, and short- and long-term disability insurance to all of the Employees. The total premium paid by the Debtors for this insurance is approximately $13,000 per month on average. In addition, eligible individuals can enroll in a supplemental life insurance plan, and all premiums for supplemental life insurance plans are paid by the Employees that elect such insurance.

95. The Debtors seek authority to pay, in the ordinary course of business, any outstanding unpaid premiums, deductibles, and prepetition claims relating to life and long-term disability insurance that arose before the Petition Date (the "Prepetition Life & Disability Benefits").

401(k) Plan

96. The Debtors offer eligible Employees an opportunity to participate in a 401(k) plan (the "401(k) Plan") through Fidelity Investments.[13] Currently, there are 120 active, termed and retired participants in the 401(k) Plan.

97. As described below, the Debtors deduct their Employees' specified 401(k) Plan contribution amounts from the Employees' paychecks. As of the Petition Date, the Debtors have not deducted the participants' 401(k) Plan contributions for the prepetition pay period. The Debtors believe that such 401(k) Plan contribution deductions total approximately $27,100. The Debtors match 100% of the first 6% the Employees' contribution which totals approximately $15,600. The Debtors seek authority to pay over to Fidelity these 401(k) Plan contribution deductions.

Other Health Benefits Funded by the Debtors

98. The Debtors also contribute to the Employees' health savings accounts on a quarterly basis. The average quarterly amount is approximately $19,200. In addition, the Debtors' provide the Employees access to virtual health care services through HealthiestYou which costs $8 per individual per month. The Debtors' monthly fee totals approximately $750.

**Payroll Taxes and Other Withheld Amounts**

99. The Debtors deduct insurance premiums, flex spending contributions, 401(k) contributions, union dues and other miscellaneous amounts from their Employees' paychecks (collectively, the "Employee Deductions"). As of the Petition Date, thirty-three (33) Employees are members of the United Steelworkers' Union, of which twenty-five (25) Employees pay dues. The Employee Deductions are not property of the estate—they comprise property of the Employees and are forwarded by the Debtors to the appropriate third-party recipients at varying

[13] Employees are eligible to enroll in the 401(k) plan upon the first day of the month following their hire date.

times. As of the Petition Date, approximately $68,800 in Employee Deductions are currently in the Debtors' account and are not separated into a trust account. Accordingly, the Debtors seek authority to remit the Employee Deductions in the ordinary course. Absent such authority, the Debtors expose their officers and directors to personal liability, which could be highly disruptive to the Debtors' reorganization efforts.

100. The Debtors are required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, social security and Medicare taxes, garnishments, child support payments, etc. (the "Payroll Taxes") and remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtors' Payroll Taxes, including both the Employees' and the Debtors' portion, for a typical payroll total approximately $110,000. Accordingly, the Debtors seek authority to pay and/or remit the Payroll Taxes to the applicable Taxing Authorities. Absent such authority, the Debtors expose their officers and directors to personal liability, which could be highly disruptive to the Debtors' reorganization efforts.

**Paid Vacation Policy**

101. The Debtors offer paid vacation ("Vacation") to eligible Employees.[14] The rate at which Employees earn Vacation varies per pay period by the position of the individual employee, and Employees may carry over up to their individual maximum allotment of Vacation hours each year but may not cash out any accrued but unused Vacation. All of the Debtors' Vacation policies are referred to collectively as the "Vacation Policy."

102. The Debtors estimate that the accrued, outstanding amount of unused time under the Vacation Policy, if it were payable in cash, is approximately $432,500 as of the Petition Date. The Debtors seek authorization, in their sole discretion, for the Debtors to continue honoring the

[14] As of the Petition Date, there are ninety-four (94) Employees eligible for Vacation.

Vacation Policy. The Debtors will seek further authorization, in their sole discretion, if the Debtors determine a need to make cash payments for unused Vacation that has accrued post-petition upon the termination of an Employee, which is in accordance with the Vacation Policy, as it existed before the Petition Date.

**Administrative Service Provider**

103. The Debtors utilize a third-party provider to administer employee benefit plans and payroll services, ADP. The continued support of the ADP is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors estimate that the average monthly cost of these services is approximately $3,000. To the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized, but not directed, to pay such amounts.

**Miscellaneous Employee-Related Obligations**

104. The Debtors may determine that there are additional *de minimis* prepetition obligations, which have not been identified in the Motion. Consequently, the Debtors request authority to pay any such additional obligations up to an aggregate amount of $5,000, upon five business days' prior written notice to counsel to any statutory creditors' committee appointed herein, counsel to their prepetition secured lenders (or such lenders representative under the applicable loan documents), and the Office of the United States Trustee, setting forth the nature and amount of the additional obligation sought to be paid. If an objection is interposed within such five-day period, and such objection is not resolved consensually, the Debtors will seek authority from this Court to make such payment. The Debtors also reserve the right to seek authority from the Court to pay any obligations in excess of the above-referenced limit during

the postpetition reorganization process. I believe the continuation of these programs is essential to the success of the Debtors' reorganization.

105. I believe that any delay in paying prepetition employees and personnel will adversely impact the Debtors' ability to maintain their relationship with their Employees, and will irreparably impair the employees' morale, dedication, confidence, and cooperation in the chapter 11 process when the Employees' support is critical. Additionally, imposing such hardship on the Employees could undermine the Debtors' stability, perhaps irreparably, because it could cause otherwise loyal individuals to seek other employment alternatives. At this early stage in these Chapter 11 Cases, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from failure to pay wages, salary, benefits and other similar items.

*iv. Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) An Extension of Time to Comply with Bankruptcy Code Section 345(b) and Local Rule 4001-3 and (IV) Related Relief*

106. By this motion, the Debtors request authorization to the continued use of the Debtors' existing Cash Management System and business forms and to maintain the Debtors' existing Bank Accounts and Corporate Payment Cards.

107. In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") through which funds are received, consolidated, and disbursed to pay various business-related expenses. The Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Among other benefits, the Cash Management System permits the Debtors to accurately monitor cash availability at all times and also permits the Debtors to manage and track

the collection and transfer of funds, including intercompany transfers, thereby reducing administrative burdens and expenses.

108. The Debtors process large numbers of transactions through the Cash Management System. In doing so, the Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between bank accounts by various methods, including by check, automated clearing house transfer, and electronic funds transfer. The Debtors maintain current and accurate records of all transactions processed through the Cash Management System, including intercompany obligations. All intercompany transactions and intercompany claims incurred after the Petition Date will be documented in the Debtors' books and records through their ordinary course accounting process.

109. Due to the nature of the Debtors' oil and gas business, the Debtors process a large number of transactions through the Cash Management System on a weekly basis. Accordingly, the Debtors maintain four accounts (collectively, the "Bank Accounts") at three banks that are FDIC insured: (a) three bank accounts at CrossFirst Bank ("CrossFirst"); (b) one bank account at First Interstate Bank ("FIB"); and (c) one bank account at U.S. Bank, N.A. ("U.S. Bank" and with CrossFirst and FIB, the "Banks"). A list of the Bank Accounts is attached to the motion as Exhibit A, and a diagram showing these accounts is attached to the motion as Exhibit B. The Bank Accounts serve the following purposes –

- EPA has two operating accounts for collections and disbursements (Acct. No. XXXXXX4339 and No. XXXXXX5996) at CrossFirst. Both accounts are subject to a Deposit Account Control Agreement (each a "DACA") in favor of AB Elk Holdings LLC. Once a month, EPA's operating account receives revenues from the sale of production of the Greater Aneth Oil Field. In accordance with the DACA for this account, the Debtors compile check requests on a weekly basis and submit those requests to the AB Parties for review and approval. Once the AB Parties approve these requests, the corresponding funds are transferred from EPA's operating account to the operating account of debtor EOS, as discussed below, so that EOS can satisfy the weekly obligations.

- The operating account of EOS (Acct. No. XXXXXX3051) is also with CrossFirst. As discussed above, this account is used to satisfy all operating services (including payroll, insurance, and any other general and administrative costs) of EPA. As the operator under the various oil and gas leases in the Greater Aneth Oil Field in which Resolute Aneth, LLC holds a working interest, EOS is also responsible for administering all lease operating expenses attributable to such interests, as well as associated revenues and Royalty Payments (as defined below).

- EPI has a collections and disbursement account (Acct. No. XXXXXX1830) at FIB.

- The Debtors' account at U.S. Bank (Acct. No. XXXXX2000), which is in the name of Resolute Aneth, is a restricted cash escrow account that holds funds for future plugging and abandonment liabilities related to the Greater Aneth Oil Field. The Debtors are required to fund this account on an annual basis, as required under the agreements relating to the Greater Aneth Oil Field acquisition.

110. All three banks are FDIC insured. U.S. Bank is designated as an authorized depositary by the United States Trustee for the District of Delaware. The Debtors will work with FIB and CrossFirst to execute Uniform Depository Agreements with the Office of the U.S. Trustee following the Petition Date. In the event that the Debtors are unable to execute the agreements in time, the Debtors will either seek authority to extend the deadline or will open new accounts with an authorized depositary. Accordingly, I believe that the funds held in the accounts with all of the Debtors' financial institutions are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary in these Chapter 11 Cased. All three banks are financially stable banking institution with FDIC insurance up to the applicable limit per account. To the extent that funds in the accounts at these institutions exceed the FDIC insured limit. I believe that the risk associated with the uninsured funds is *de minimis* considering these institutions' overall strength and stability.

111. On the other hand, the costs associated with strict compliance with section 345(b) are substantial. Absent the requested waiver, the Debtors' depository banks would comply with section 345(b)(2) by purchasing and depositing securities in an amount sufficient to collateralize

the amounts on deposit at such accounts. The Debtors understand that the cost of compliance with section 345 of the Bankruptcy Code would be substantial and, in my view, outweigh the limited risk associated with maintaining these funds in their current accounts without the proposed bonding.

112. The Debtors incur periodic services charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees"). The Debtors pay their depository banks an aggregate of approximately $100 per month in Bank Fees, which are generally due and payable monthly. As of the Petition Date, the Debtors estimate that they do not owe any unpaid Bank Fees. The Debtors seek authority to continue to pay the Bank Fees, including any prepetition Bank Fees that may exist, in the ordinary course of business on a postpetition basis, consistent with historical practices and any Bank Fees associated with opening new accounts as required by U.S. Trustee Guidelines.

113. Finally, in addition to the Bank Accounts, the Debtors' maintain a corporate MasterCard account that is necessary on account of the Debtors' large field operations. Through this account, the Debtors have issued twenty-three (23) corporate credit cards (the "Corporate Payment Cards") for general and administrative employees. The Corporate Payment Cards' balance is paid directly to MasterCard and as of the Petition Date the outstanding balance is $7,082.72. The Corporate Payment Cards are subject to strict limitations, are only to be used for approved travel, lodging, fuel, and other necessary expenses, and are essential to the ability of the Debtors' field employees to conduct the day-to-day business of the Debtors.

114. The Debtors also request that the Court authorize applicable financial institutions, when the Debtors so request, to receive, process, honor and pay any and all checks or electronic

payment requests in the ordinary course of the Debtors' business and, in particular, with respect to the First Day Motions before the Court.

*v. Motion of Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Sales and Use Taxes*

115. By this Motion, the Debtors seek the entry of an order authorizing Debtors to: (i) remit and pay certain sales and use taxes in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date; and (ii) granting related relief.

116. In the ordinary course of business, the Debtors: (a) incur and/or collect sales and use taxes in the operation of their businesses; (b) remit such sales and use taxes to various taxing, licensing, and other governmental authorities (each, an "Authority" and, collectively, the "Authorities"). The Debtors pay the taxes monthly, quarterly, or annually, in each case as required by applicable laws and regulations.

117. The Debtors incur, collect, and/or remit certain sales and use taxes to the State of Utah (the "Sales and Use Taxes") to operate their businesses in Utah. Utah assesses Sales and Use Taxes on a transaction-by-transaction basis. Sales and Use Taxes are trust fund taxes – the buyer pays the tax to the seller and the seller holds the tax in trust for the State of Utah until it is paid to the Utah Tax Commission. Sales and Use Taxes paid monthly, quarterly, or annually, in each case as required by applicable laws and regulations. If the Sales and Use Taxes are not collected, truthfully accounted for, and paid over to the State of Utah on time, the Debtors, as well as the Debtors' directors and officers, shall be liable for a penalty equal to the total amount of the tax not paid over.

118. On May 21, 2019, the Debtors received a Notice of Lien and Intent to Levy on account of Sales and Use Taxes due and owing and accruing penalties and interest for

September, October, and November 2018 (collectively, the "Notices") from the Utah State Tax Commission. If the outstanding amounts are not paid in full by May 31, 2019, the Utah State Tax Commission has expressed its intent to levy the Debtors' accounts. As of the Petition Date, the total prepetition balance for Sales and Use Taxes (including penalties and interest) per the Utah Tax Commission website is $185,200.00.

119. The failure to pay the Sales and Use Taxes could adversely affect their business operations because, among other things: (a) the Authorities could audit the Debtors or prevent the Debtors from continuing their businesses, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process; (b) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability – even if such a failure to pay such Sales and Use Taxes was not a result of malfeasance on their parts –which would undoubtedly distract those key individuals from their duties related to the Debtors' restructuring. Accordingly, the Debtors must continue to pay the Sales and Use Taxes as they become due to ensure that their officers and directors remain focused during these chapter 11 cases on operating the businesses and implementing a successful restructuring.

*vi. Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay or Honor (A) Obligations to Holders of Oil and Gas Interests and (B) Lease Operating Expenses and (II) Granting Related Relief*

120. By this motion, the Debtors request the entry of interim and final orders authorizing the Debtors to pay or honor any and all obligations to holders of oil and gas interests and lease operating expenses in the ordinary course of business (the "Oil and Gas Obligations"), whether such obligations were incurred prepetition or will be incurred postpetition.

121. A key property right underlying the oil and gas industry is the mineral interest. A mineral interest generally consists of a real property interest in the oil and gas in place under a parcel of property and the exclusive right to explore, drill, produce, and otherwise capture such oil and gas from the land. Through a written agreement (the "Oil and Gas Lease") owners of mineral interests lease or otherwise convey their exclusive rights to capture oil and gas ("Working Interest") to a third party (a "Working Interest Owner") in exchange for either a share of production or payments.

122. The nature of the interest retained by owners of mineral interests creating payment obligations can take many forms including royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and production payments (collectively, the "Royalty Interests"). Each of the Royalty Interests represents a share of the oil and gas produced from the property, or the revenue derived from the sale of such production, subject to the corresponding Oil and Gas Lease. Through the Oil and Gas Lease owners of Working Interests and Royalty Interests receive an upfront payment, a share of production, and/or payments in lieu of a share of production (collectively, the "Royalty Payments").

123. Oil and Gas Leases often provide for the payment of delay rental payments, shut-in payments, lease extension payments, minimum royalty payments, and similar payments. In each case, owners of Royalty Interests (the "Royalty Interest Owners") typically are not obligated to pay any of the costs associated with exploration or production of oil and gas. Royalty Interest Owners are only entitled to receive the Royalty Payments, either in cash or in kind, on account of their Royalty Interests, after the production of oil, gas, or both has begun.

124. Royalty Payments are commonly governed by state and federal statutory frameworks that set strict payment deadlines and contain enforcement mechanisms, including

interest, fines, lien, and recovery of costs. Failure to make such payments can also result in actions seeking the forfeiture, cancellation, or termination of the Oil and Gas Leases.

125. With respect to the Royalty Payments, the Debtors generally issue checks to the Royalty Interest Owners when the amounts payable accrue to greater than $100. Any payments that have yet to reach this threshold are held in minimum suspense until additional amounts accrue. As of the Petition Date, the Debtors hold approximately $70,611.67 in minimum suspense (the "Minimum Suspense Obligations") on account of accrued Royalty Interests.

126. The Debtors have certain funds on hand that are subject to various disputes or other open commercial issues, including, without limitation, disputes over titles, incomplete documentation and inability to locate the party owed the Royalty Payment. As of the Petition Date, the Debtors hold approximately $269.93 in legal suspense (the "Legal Suspense Obligations" and together with the Minimum Suspense Obligations, the "Suspense Obligations"). Legal Suspense Obligations are accrued but unpaid liabilities of the Debtors. As of the Petition Date, the Debtors estimate that they hold approximately $70,881.60 in Suspense Obligations accrue prepetition, of which approximately $70,611.67 will come due within the first thirty days of these Chapter 11 Cases.

127. As of the Petition Date, the Debtors estimate that they owe approximately $6,187,700 in Royalty Payments accrued prepetition, of which approximately $6,183,950 will come due within the first thirty days of these Chapter 11 Cases.[15]

[15] Though the number of Royalty Payments per month is subject to variation due to many factors, the Debtors generally make approximately forty-six (46) Royalty Payments per month. These payments generally are remitted by the Debtors during the last week of each month. Because certain Royalty Payments are made in cash and due to the time required to market and sell the oil and gas production and the significant accounting process required each month to accurately disburse the resulting proceeds, the Debtors have historically made Royalty Payments approximately one to two months in arrears.

128. In addition, the Debtors contract with certain midstream vendors (the "Midstream Vendors") to market their production by gathering, treating, processing, storing, and transporting the production through a network of gathering systems, storage tanks, processing facilities, pipelines, and trucks—known in the oil and gas industry as "midstream" services. Without these services, the Debtors would not be able to operate, because the Midstream Vendors are the sole means for the Debtors to deliver their production to the end use markets. The cost of these midstream services (the "Marketing Expenses") is based on the Debtors' production. The Debtors pay the Marketing Expenses by netting the cost against the proceeds of the sold production. If the Debtors fail to provide the Marketing Expenses, the Debtors do not have an alternative means for production to reach end use consumers costing the Debtors revenue and cash flow. As of the Petition Date, after netting, the Debtors do not owe any accrued prepetition Marketing Expenses.

129. For each of the Oil and Gas Leases that make up the Greater Aneth Oil Field, the Debtors explore, drill and produce the oil and minerals directly. As a result of their role as operator of the Greater Aneth Oil Field, the Debtors incur lease operating expenses, general expenses related to operating field offices, and other exploration and production-related obligations, including, but not limited to, production related taxes and fees (collectively, the "Lease Operating Expenses") to third parties (the "Lease Operating Vendors"). The Lease Operating Vendors provide services and materials in connection with drilling, equipping, and operating the wells to facilitate the continued safe and efficient operation of the Debtors' business. For example, some Lease Operating Vendors provide equipment rentals, equipment and vehicle maintenance, well and production related supplies, and chemicals used for production.

130. The Lease Operating Vendors also provide services that enable the Debtors to maintain their local field offices that oversee the active wells. The Debtors' attorneys have informed me that unpaid Lease Operating Vendors may be entitled to attach and perfect liens on the Debtors' oil and gas properties and produced hydrocarbons and likely would argue that they are entitled to perfect such liens after the Petition Date, notwithstanding the automatic stay and the Debtors' avoidance powers. Accordingly, the Debtors seek authority to pay, in the ordinary course of business, the prepetition and postpetition Lease Operating Expenses due to Lease Operating Vendors that the Debtors have identified, subject to the proposed interim cap set forth below. As of the Petition Date, the Debtors estimate that they owe approximately $5,790,575 on account of Lease Operating Expenses accrued prepetition and will come due within the first thirty days of these Chapter 11 Cases. The Debtors' payments of Lease Operating Expenses are limited to those parties where a viable alternative servicer is not available in that area.

131. The Debtors may also be required to make payments pursuant to the Oil and Gas Leases including, but not limited to, shut-in royalty payments[16] and minimum royalty payments[17] (the "Lease Obligations," and together with Royalty Payments and Lease Operating Expenses, the "Oil and Gas Payments"). A failure to make any of the Oil and Gas Payments—even if only for a few days—could meaningfully detract from the Debtors' operations and further constrain liquidity.

132. In addition to the foregoing, certain claims held by Lease Operating Vendors will be entitled to priority under section 503(b)(9) of the Bankruptcy Code. Section 503(b)(9) provides for the allowance of administrative expenses for "the value of any goods received by

[16] A shut-in royalty payment requires a working interest owner to make monthly payments as a substitute for Royalty Payments to hold a lease in the secondary term where a well has been drilled on the leased property and is capable of production, but is not actually producing.

[17] A minimum royalty payment requires a working interest owner to make a minimum payment where the value of the royalty revenue is below a certain level.

the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Any Lease Operating Vendors that provided the Debtors with materials to continue ongoing operations in the twenty (20) days prior to the Petition Date may therefore have administrative expense priority claims that have to be paid in full. For this and the other reasons stated, the Debtors believe that they should be authorized, but not directed, to continue to make prepetition payments for Lease Operating Expenses.

133. To carry on their businesses without undue disruption, and thereby preserve value for stakeholders, the Debtors' must have discretion to pay or honor their Oil and Gas Obligations in the ordinary course of business. As an initial matter, I understand that many of the Debtors' Oil and Gas Obligations—including payments on account of Royalty Interests and Working Interests – constitute funds held in trust for others and therefore are not property of the Debtors' estates. These funds are not available for distribution under a chapter 11 plan and thus can be paid in the ordinary course of business without prejudice to creditors.

134. I understand that applicable state law and contractual agreements afford unpaid counterparties a variety of remedies, including the right to attach and perfect liens on the Debtors' oil and gas properties and produced hydrocarbons. While the Debtors reserve the right to contest any efforts to exercise such remedies during the Chapter 11 Cases, their ability to do so successfully, or, at least, without serious business interruption, is, in my view, doubtful.

135. Finally, even if the payments on account of Working Interests and Royalty Interests were property of the estate and not subject to liens, the relief sought in the motion is critically important to the Debtors' ongoing business. The Debtors' long-term business prospects depend upon the willingness of numerous mineral interest holders. Working Interest holders,

surface owners, Lease Operating Vendors, and others to continue dealing with the Debtors. These parties may be unwilling to transact new business with the Debtors, which is essential to the Debtors' long-term prospects, if they doubt the Debtors' ability to satisfy their accrued and ongoing Oil and Gas Obligations. Further, the work performed by Lease Operating Vendors is, in many instances, technical and requires specialized expertise that only a limited number of service providers have. Absent payment of these expenses, the Debtors may have no alternative service providers, or no service providers that will be able to perform the required services in a reasonable time period.

136. Accordingly, I believe that the relief requested in the Oil and Gas Payments Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will enable the Debtors to continue to operate their business in chapter 11 without disruption and should be granted.

*vii. Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*

137. By this motion, the Debtors request the entry of interim and final orders authorizing the Debtors to, among other things, (a) enter into a postpetition debtor-in-possession financing arrangement on an interim basis on the terms set forth in the interim order (the "Interim Order"), (b) grant senior liens and superpriority administrative expense status, (c) use Cash Collateral of the Prepetition Secured Parties, (d) grant adequate protection to the Prepetition Secured Parties, and (e) grant related relief.

138. The proposed financing consists of a delayed draw superpriority term loan facility with a fully committed aggregate principal amount of up to $10,000,000 (the "DIP Proceeds"). Specifically, from the entry of the Interim Order until the date of a final order, the maximum

amount available to be drawn shall be limited to $4,000,000 subject to compliance with the DIP Facility Documents and Approved Budget (as defined below).

139. As the operator of the Greater Aneth Oil Field, the Debtors operate a cash-intensive business, requiring cash on hand and cash flow from their operations to preserve and fund their liquidity needs, to maintain ongoing day-to-day operations and fund their working capital needs. For example, for each of the Oil and Gas Leases that make up the Greater Aneth Oil Field, the Debtors explore, drill, and produce the oil and minerals directly. Consequently, as set forth in greater detail in the motion described in Section V.B.vi. (the "LOE Motion"), the Debtors incur Lease Operating Expenses owed to Lease Operating Vendors. The Lease Operating Vendors provide services and materials in connection with drilling, equipping, and operating the wells to facilitate the continued safe and efficient operation of the Debtors' business. For example, some Lease Operating Vendors provide equipment rentals, equipment and vehicle maintenance, well and production related supplies, and chemicals used for production. The Lease Operating Vendors also provide services that enable the Debtors to maintain their local field offices that oversee the active wells. To the extent that the Lease Operating Vendors go unpaid, the Lease Operating Vendors may be entitled to attach and perfect liens on the Debtors' oil and gas properties and produced hydrocarbons and likely would argue that they are entitled to perfect such liens after the Petition Date, notwithstanding the automatic stay and the Debtors' avoidance powers.

140. The Debtors have no unencumbered cash on hand and even with authority to use Cash Collateral they do not have sufficient liquidity to operate their business in the ordinary course of business without the requested financing. The Debtors' ability to maintain business relationships with vendors, suppliers and customers, to pay their employees, pay professionals

necessary for a successful chapter 11, and to otherwise fund their operations is essential to the Debtors' continued viability as they seek to maximize and preserve the value of their assets for the benefit of their estates and creditors.

141. The ability of the Debtors to obtain immediate and sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and to use Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors. If the Debtors do not obtain authorization to borrow under the DIP Facility Documents, they will be unable to maintain their business operations and they, and their estates, will suffer immediate and irreparable harm.

142. Moreover, having access to the DIP Facility, including the use of Cash Collateral, on the first day of these Chapter 11 Cases is a prerequisite for the Aneth Debtors' major stakeholders to support the Plan and is critical for the success of the Aneth Debtors' reorganization efforts. In addition to being a critical component of the RSA and the Plan, the Interim Order, if approved, will provide essential working capital that will allow the Debtors to maintain the value of their assets and provide the Debtors' various creditor and stakeholder constituencies with confidence in the Debtors' ability to maintain operations during these Chapter 11 Cases. Without access to Cash Collateral and the DIP Facility, the Aneth Debtors will not have sufficient cash on hand to maintain uninterrupted business operations, provide ongoing service to their customers, or pay their employees while they restructure their business. Such a disruption in operations would likely have a grave and immediate impact on the Aneth Debtors' business and negatively impact their restructuring efforts.

143. Accordingly, the Debtors have an immediate need to obtain the DIP Loans and to use Cash Collateral to, among other things, permit the orderly continuation of the operation of

their business, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' Estates in order to maximize the recovery to their creditors.

144. Given the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors have been unable to procure the necessary financing on terms from sources other than the DIP Secured Parties on terms more favorable than those set forth in the DIP Facility Documents. The Debtors and their advisors have solicited proposals from several institutions in an effort to secure debtor in possession financing on the best terms available. The Debtors have been unable to reasonably obtain adequate credit under ordinary course of business terms or on an unsecured basis under Bankruptcy Code section 503(b)(1) as an administrative expense.

145. The Debtors have also been unable to obtain secured credit from other sources: (a) having priority over that of administrative expenses of the kind specified in Bankruptcy Code sections 503(b), 507(a), and 507(b); (b) secured only by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien. These alternative financing options are simply not realistic under the circumstances.

146. The Debtors have, therefore, determined in their sound business judgment that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Debtors' working capital needs. Post-petition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security

interests in and the liens upon the Collateral pursuant to sections 364(c) and (d) of the Bankruptcy Code. As a result, the Debtors successfully negotiated postpetition financing from the only viable source on terms that I believe are fair and reasonable under the circumstances and represent the best financing available at this time.

147. The Interim Order also sets forth certain stipulations and agreements by certain of the Debtors regarding, among other things, (a) the validity and enforceability of certain of the Debtors' obligations under the Credit Agreements and related documents, and (b) the validity and enforceability of the liens on and security interests in certain of the Debtors' funds and property granted under the Credit Agreement and related documents. Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

148. The Debtors have provided a budget to the Supporting Holders in accordance with the RSA, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the Support Holders (the "Approved Budget"). I personally helped prepare and negotiate the Approved Budget. The Approved Budget has been formulated to provide the Debtors with the liquidity necessary to prudently meet their anticipated postpetition expenses through the applicable period. The Supporting Holders have agreed to allow the Debtors to use Cash Collateral on an interim and final basis in accordance with the Approved Budget and subject to the provisions of the proposed form of order attached to the Cash Management Motion and the RSA.

149. Subject to entry of the Interim Order, the Debtors have agreed to pay certain fees of the DIP Lenders in exchange for their agreement to provide the financing under the DIP Facility. The financing under the DIP Facility, which includes the fees payable in connection

therewith, is the only available financing under the circumstances. The Debtors therefore believe that, under these circumstances, authorization to pay such fees is warranted.

150. I believe that the arrangements for use of the DIP Proceeds and Cash Collateral for which this motion seeks approval, including the forms of adequate protection described therein are fair, reasonable, and appropriate under the circumstances.

151. I am also aware of and personally participated in the negotiations with the advisors for the Supporting Holders regarding the proposed terms and conditions associated with the DIP Facility and the requested use of Cash Collateral and believe that all negotiations with these parties were conducted at arms' length and in good faith.

152. I believe that, based on the Debtors' projections, the Debtors' proposed used of DIP Proceeds and Cash Collateral in accordance with the Approved Budget will provide the Debtors with necessary liquidity to fund the Debtors' Chapter 11 Cases and consummate the Restructuring contemplated in the RSA. Accordingly, authority to obtain postpetition financing and the use of Cash Collateral in accordance with the Approved Budget is in the best interests of the Debtors' estates and creditors and should be approved by the Court.

*viii. Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing to Consider Approval of Disclosure Statement and Confirmation of Prepackaged Plan; (II) Approving Procedures for Objecting to Disclosure Statement and Plan; (III) Approving Prepetition Solicitation Procedures and the Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief*

153. By this motion, the Plan Debtors seek an order (i) scheduling a combined hearing on (a) the adequacy of the Disclosure Statement and (b) confirmation of the prepackaged Plan; (ii) approving the Plan and Disclosure Statement objection deadline and procedures for objecting to the adequacy of the Disclosure Statement and confirmation of the Plan; (iii) approving the

solicitation procedures, including the form and manner of notice of commencement of these Chapter 11 Cases, combined hearing, and objection deadline; (iv) approving the combined notice and objection procedures for the assumption of executory contracts and unexpired leases; and (v) granting related relief.

154. In connection with the foregoing, the Plan Debtors request that the Court approve certain proposed dates and deadlines relevant to the Solicitation Procedures and Combined Hearing. For the convenience of the Court and parties in interest, the pertinent dates are as follows:

| EVENT | DATE/DEADLINE |
| --- | --- |
| Voting Record Date | May 20, 2019 |
| Plan Debtors Commence Solicitation of Plan | May 22, 2019 at 7:00 p.m. (ET) |
| Voting Deadline | May 22, 2019 at 8:00 p.m. (ET) |
| Petition Date | May 22, 2019 |
| Bankruptcy Court approves Scheduling Motion | May 23, 2019 |
| Plan Debtors Mail Notice of Combined Hearing on Disclosure Statement and Plan (and related deadlines) | May 24, 2019 |
| Plan Debtors File Plan Supplement | June 14, 2019 |
| Deadline to Object to Disclosure Statement and Plan | June 21, 2019 |
| Deadline to Object to Schedule of Cure Amounts | June 21, 2019 |
| Deadline for Plan Debtors to File Proposed Confirmation Order and Replies to Plan Objections | June 24, 2019 |
| Combined Hearing on Disclosure Statement and Plan Confirmation | June 27, 2019 |

155. On May 22, 2019, the Plan Debtors caused the Voting Agent, Stretto, to distribute the Disclosure Statement, Plan, and the appropriate Ballot (a "<u>Solicitation Package</u>") to the each Holder of a Claim in each Voting Class. The Voting Deadline was May 22, 2019 at 8:00 p.m. (ET).

156. The Ballot substantially conforms to the Official Form No. 14. Each Holder that received a Solicitation Package was directed in the Disclosure Statement and in its Ballot to follow the instructions set forth in the Ballot (and described in the Disclosure Statement) to

complete and submit the Ballot to cast a vote to accept or reject the Plan. Each Holder was explicitly informed in the Disclosure Statement and Ballot that it needed to submit its Ballot so that the Ballot was actually received by the Voting Agent on or before the Voting Deadline to be counted.

157. I understand that certain Holders of Claims or Equity Interests were not provided a Solicitation Package because such Holders are: (a) conclusively presumed to accept the Plan because claims held by such Holders are Unimpaired; or (b) deemed to reject the Plan, although such Holders could potentially receive a distribution on account of their interests under the Plan.

158. On May 22, 2019, the Holders of the Claims in Aneth and Resolute Classes 3 and 4, submitted its Ballot accepting the Plan.

159. The Plan Debtors solicited acceptance of the Plan prepetition and anticipates the near-term confirmation of the Plan and subsequent emergence from chapter 11. In furtherance thereof, I understand that this motion requests authority to implement a confirmation timeline that is in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

160. I believe that the relief requested in the Scheduling Motion is in the best interests of the Plan Debtors' estates, creditors, and parties in interest, and will enable the Plan Debtors to expeditiously accomplish its restructuring and preserve value, minimize administrative expenses of the estates and cause each interested party to be properly informed as promptly as possible of the anticipated schedule of events for confirmation of the Plan. Accordingly, the relief requested in this Motion should be granted.

## CONCLUSION

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. Pursuant to 28 U.S.C. § 1746, I declare under penalty of

perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 22nd day of May, 2019.

/s/ *Scott Pinsonnault*
Name: Scott Pinsonnault
Title: Chief Restructuring Officer