UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 19-11157(LSS) |
| ELK PETROLEUM, INC., et al, | . |  |
|  | . | Courtroom No. 2 |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . . | . | Tuesday, July 30, 2019 |

TRANSCRIPT OF DEBTORS' MOTION FOR AN ORDER
(I) MODIFYING CONFIRMATION DEADLINES, (II) ESTABLISHING
BIDDING PROCEDURES AND GRANTING RELATED RELIEF,
AND (III) APPROVING THE SALE OF ASSETS)
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:            Matthew P. Ward, Esq.
                           Morgan L. Patterson, Esq.
                           WOMBLE BOND DICKENSON US, LLP
                           222 Delaware Avenue, Suite 1501
                           Wilmington, Delaware 19801

                           Shivani Shah, Esq.
                           John N. Schwartz, Esq.
                           NORTON ROSE FULBRIGHT US, LLP
                           2200 Ross Avenue, Suite 3600
                           Dallas, Texas 75201

For the U.S. Trustee:      Jaclyn Weissgerber, Esq.
                           OFFICE OF THE U.S. TRUSTEE
                           844 North King Street
                           Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by Michael Miller, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the AB Parties:              Paul N. Heath, Esq.
                                 Amanda R. Steele, Esq.
                                 RICHARDS, LAYTON & FINGER, PA
                                 One Rodney Square
                                 920 North King Street
                                 Wilmington, Delaware 19801

                                 Sarah Schultz, Esq.
                                 AKIN, GUMP, STRAUSS, HAUER
                                  & FELD, LLP
                                 2300 North Field Street
                                 Suite 1800
                                 Dallas, Texas 75201

For the Equity Committee:        Gregory W. Werkheiser, Esq.
                                 Joseph C. Barsalona, II, Esq.
                                 MORRIS, NICHOLS, ARSHT
                                  & TUNNELL, LLP
                                 1201 North Market Street
                                 16th Floor
                                 Wilmington, Delaware 19899

For BSP Agency, LLC:             L. Katherine Good, Esq.
                                 POTTER, ANDERSON & CORROON, LLP
                                 Hercules Plaza
                                 1313 North Market Street
                                 6th Floor
                                 Wilmington, Delaware 19801

For the Conflicts Committee
for EPI:                         Mark Desgrosseilliers, Esq.
                                 CHIPMAN, BROWN, CICERO
                                  & COLE, LLP
                                 Hercules Plaza
                                 1313 North Market Street
                                 Suite 5400
                                 Wilmington, Delaware 19801

For Riverstone Credit
Partners:                        Jessica C. Peet, Esq.
                                 VINSON & ELKINS, LLP
                                 666 Fifth Avenue, 28th Floor
                                 New York, New York 10103

(Appearances Continued)

APPEARANCES VIA TELEPHONE:

For the Debtors:                Eric C. Daucher, Esq.
                                Kristian W. Gluck, Esq.
                                Greg Wilkes, Esq.
                                NORTON ROSE FULBRIGHT US, LLP

For BSP Agency, LLC:            Emanuel Grillo, Esq.
                                BAKER BOTTS, LLP

For Riverstone Credit
Partners:                       Patrick Jackson, Esq.
                                DRINKER, BIDDLE & REATH, LLP

                                James Longhofer, Esq.
                                David S. Meyer, Esq.
                                Jeremy Reichman, Esq.
                                VINSON & ELKINS, LLP

For the United States
of America:                     Kevin P. Van Landingham, Esq.
                                U.S. DEPARTMENT OF JUSTICE

INDEX

                                                    Page

PRESENTMENT/ARGUMENT BY MR. WARD                      5

OBJECTION BY THE UNITED STATES OF AMERICA
     Argument                                        11
     Court Decision                                  19

PRESENTMENT/ARGUMENT BY MR. WARD (Continued)         22

COMMENTS BY MS. SCHULTZ                               24

COMMENTS BY MS. PEET                                  32

COMMENTS BY MR. WERKHEISER                            33

FURTHER COMMENTS AND COLLOQUY                         37

COURT DECISION                                       38

1          (Proceedings commence at 11:04 a.m.)

2                    THE COURT:  Please be seated.

3                    MR. WARD:  Good morning, Your Honor.

4                    THE COURT:  Mr. Ward.

5                    MR. WARD:  Your Honor, there were two items listed

6     on the agenda for today; the one is the examiner motion,

7     which we've agreed with the parties to postpone until, I

8     believe, a September hearing date.

9              The other item on the agenda is the bidding

10    procedures motion, Your Honor.

11                   THE COURT:  Yes.

12                   MR. WARD:  We filed this motion on July 25th.  We

13    worked with counsel for the equity committee to have to have

14    this heard as quickly as possible, Your Honor, and we

15    appreciate Your Honor's willingness to hear it on such an

16    expedited time frame.

17             Your Honor, we have made significant progress with

18    the parties, including in particular the Sovereign Navaho

19    Nation, regarding comments to this form of order.  We

20    understand that the form of order that we filed, I believe

21    this morning, and a cumulative black-line against what was

22    attached to the motion, that form, Your Honor, is agreeable

23    to AB, it's agreeable to Riverstone.  BSP has not provided

24    comments.  We ran some changes also by BP, which is

25    agreeable.  The United States Trustee's Office has provided

1    no comments.  We also got to an agreement with the Sovereign

2    Navaho Nation.  Unfortunately, Your Honor, we did get some

3    comments from the equity committee Sunday night, and

4    yesterday, Monday, the equity committee filed an objection

5    with respect to the bidding procedures.

6         What I would propose, Your Honor, is if we could

7    walk through the black-line, and I can explain or answer any

8    questions that you have with respect to the comments

9    reflected in that black-line.  And then there's a couple

10   additional changes that I believe now resolve the equity

11   committee's comments with respect to the Sovereign Navaho

12   Nation.

13            THE COURT:  Okay.

14            MR. WARD:  So do you have a copy of the black-line,

15   Your Honor --

16            THE COURT:  I do.

17            MR. WARD:  -- in front of you?

18         So, as we flip through the first changes on Page 3

19   with respect to the confidentiality agreement, I believe this

20   was a comment that was requested by the equity committee, but

21   it's -- we are certainly agreeable, and I don't think anybody

22   disagreed with that language.

23         The same on Page 5, with the possibility of, you

24   know, one or more sale transactions, to provide flexibility

25   with the bidding.  We did also change from two to three days

1    for the service deadline.

2              On the next page, Page 6, the equity committee

3    wanted to clarify that, to the extent that the parties agreed

4    to postponement of the deadline, that that would be

5    acceptable and appropriate, and we are certainly fine with

6    that.

7              We had to define "consultation parties" in this

8    document because, whereas it was defined in the motion, it

9    did not include conflicts counsel, so we have added that.

10    That was a request made by Mr. Desgrosseilliers.

11              There was a -- there was a couple of minor changes

12    that we've already discussed and some other procedural

13    changes.

14              I think the next substantive change is over on Page

15    14, Your Honor, and this relates to the Sovereign Navaho

16    Nation, which I believe their counsel is appearing

17    telephonically.

18              Your Honor, just to be clear, the Sovereign Navaho

19    Nation would have, under Navaho law, 120 days to exercise the

20    right of first refusal with respect to a transaction.  To

21    help bring finality to this process, we approached the Navaho

22    Nation to ask for that time period to be truncated.  The

23    equity committee also wanted it to be truncated in order to

24    bring this process to conclusion.

25              The Sovereign Navaho Nation agreed to reduce their

1    hundred-and-twenty-day right of first refusal down to five

2    days.  And that would allow us to have a decision by the time

3    of the sale hearing as to whether or not the Sovereign Navaho

4    Nation is exercising that right.  To us, Your Honor, that was

5    a huge, a pivotal concession --

6            THE COURT:  Uh-huh.

7            MR. WARD:  -- to bring finality to this process, to

8    get a sovereign nation with multiple entities within it to

9    act within five days.  Your Honor, we greatly appreciated

10   that concession.

11           The other thing that the Navaho Nation did was,

12   with respect to the approval process of a sale transaction

13   within the -- under Navaho law, there typically are multiple

14   levels of approval that need to be obtained in order for the

15   transaction to move forward.  And what the Navaho Nation has

16   agreed to do is reduce those levels of approvals down to two

17   levels, which would be the Minerals Department and the

18   President.  And we think, Your Honor, with those concessions,

19   as well, that the approval process will move much more

20   quickly than might otherwise be the case.

21           Paragraph 33 here, the addition is to reflect the

22   fact that they have agreed to exercise their right of first

23   refusal within the five days.  That, coupled with their

24   willingness to reduce the approval process down to two

25   levels, Your Honor, we were happy with the deal that we

1    struck with Navaho Nation.  And you know, in the spirit of

2    preserving the good will with Navaho, we left it at that.

3    And my understanding is that equity counsel -- equity

4    committee counsel has had some further discussions with

5    Navaho, but that's where we stood from the debtors'

6    perspective.

7              THE COURT:  Okay.

8              MR. WARD:  Paragraphs 34 and 35 are simply to

9    provide for when the closing would occur, whether with

10   respect to the successful bidder or the backup bidder, in

11   Paragraph 34 and 35 respectively.

12             Then the bidding procedures come next.  The first

13   substantive change -- or requested substantive change, Your

14   Honor, was with respect to Footnote 3.  The equity committee

15   requested that the last sentence of Footnote 3 be deleted.

16   This black-line does not reflect the deletion, Your Honor,

17   because the debtors did not agree to it.  For the reasons

18   that we discussed, we think we already got as much out of

19   Navaho as was necessary.

20             Your Honor, approximately a week ago, we did put

21   equity committee counsel in touch with Navaho Nation's

22   counsel, in order to negotiate their additional comments to

23   bidding procedures.  My understanding is that equity counsel

24   and Navaho's counsel have had further discussions, and now

25   the equity committee is agreeable to leave Footnote 3 as is,

1    subject to additional changes that we'll discuss.

2              The next changes are over on Page 5, Your Honor,

3    some changes there to (h).  And then, towards the end of (h)

4    is language that the equity committee here, again, has

5    requested, which the debtors were agreeable to, as it

6    pertains to BP.  We have run those changes by BP's counsel,

7    who has confirmed that the changes are agreeable.  I don't

8    know if BP's counsel is on the phone, but they confirmed with

9    me yesterday that they are agreeable.

10             THE COURT:  Okay.

11             MR. WARD:  Similarly, Footnote 6 was another change

12   that the equity committee had that the debtors agreed to with

13   respect to this cite to the Navaho Code.  The Code says what

14   it says, it's available, it's in the data room.  We -- you

15   know, the equity committee didn't feel the need to set it

16   forth in these documents, and we agree.

17             On the next page, at the top of 7, the equity

18   committee has requested the deletions listed there in (i)

19   through (iv).  These pertain to federal regulations and

20   requirements surrounding a transaction with a buyer.

21             Your Honor, in our view -- and DOJ's counsel is on

22   the phone -- I -- one of the open items is with the

23   Department of Justice.  And I don't know if Ms. Sleights is

24   in the room.  I believe one of their attorneys is on the

25   phone.

1    The position that the debtors are taking to resolve

2    the equity committee's concerns here regarding chilling of

3    bidding is we will put these provisions -- nobody is trying

4    to skirt federal law here.  We will put these provisions in

5    the APA.  Buyers will receive the form APA.  And I can

6    represent to Your Honor that these paragraphs will be in the

7    APA.  If a buyer wants to tinker with that language, Your

8    Honor, it's a sale hearing issue --

9         THE COURT:  Uh-huh.

10         MR. WARD:  -- it's not a bidding procedures issue.

11    So, you know, we've conceded with the committee to

12    remove those comments; the DOJ disagrees.  Your Honor, again,

13    we don't, per se, disagree with the language.  It's just a

14    matter of putting it in the APA, to us, seems sufficient, and

15    we'll raise it at the sale hearing.

16    I don't know if DOJ's counsel wants to speak now on

17    that issue, and we can resolve that one open item.

18         MR. VAN LANDINGHAM:  (Via telephone) Your Honor,

19    this is Kevin Van Landingham from the Department of Justice

20    on behalf of the United States.  And I can speak to that

21    matter now, if you would like.

22         THE COURT:  That's fine.

23         MR. VAN LANDINGHAM:  Okay.  So I guess we'll start

24    with a little bit of background of what this language was

25    intended to address.

1          A substantial number of leases held by the debtors

2     are leases on tribal land that is held in trust by the United

3     States for the benefit of the Navaho Nation.  These oil and

4     gas leases on that land are governed by federal statute and

5     regulations.  The broad ones we address in this language we

6     had requested, and the debtor had agreed to last Thursday,

7     but is omitting in the draft filed this morning is -- they're

8     addressing three primary obligations that are defined in

9     federal law:

10          One is the obligation to make royalty payments to

11     the United States on behalf of the Navaho Nation.

12          The second is that these oil and gas leases are

13     subject to numerous safety and environmental obligations,

14     including proper decommissioning of oil and gas wells.

15          And third, that federal law governs the transfer of

16     federal tribal leases like these.  And specifically to assume

17     or assign a federal lease like these, you have to submit an

18     application with the secretary of the Department of Interior

19     and prove that you are qualified to hold a federal lease,

20     that you can post adequate bond, and have that application

21     approved before you can take a transfer of that lease.

22          We think -- first off, I think it seems that the

23     parties, including the equity committee, do not dispute that

24     federal law will apply to these assets.  It's a concern that

25     raising this language now is unusual and would chill bids.  I

1    can dispel that idea.  This is standard language we ask for,

2    and it was included in a recent bidding procedures order that

3    was approved by this Court in a case, In Re Venoco, Number

4    17-10828, just two years ago in nearly identical form.  And

5    so it is industry standard language that I don't think would

6    chill any bids.

7         But the importance of including this is so that

8    bidders are made aware that federal law will apply to some of

9    these assets, that there may be further steps they would have

10   to take to implement the transfer of these assets, and that

11   they would have to make sure they are qualified under the

12   federal law to hold these assets, and that it would simply be

13   a waste of estate resources if we allowed people who cannot

14   meet those qualifications to submit bids that we would later

15   have to object to.  So that's our position, simply put.

16        I would say that we could certainly say a lot more

17   about this and have case law that we could demonstrate to

18   Your Honor, but we are cognizant that all the other parties

19   are moving quickly, and we are trying to accommodate that.

20   And so I am -- I'm happy with what I've stated now, but there

21   would obviously be a lot of case law and stuff I could

22   demonstrate to Your Honor.  And we could file a motion, if

23   Your Honor would like, within a couple of days time to

24   address these issues further.

25        THE COURT:  Okay.  Thank you.

1          MR. WARD:  Can I respond, Your Honor?

2          THE COURT:  Yes.

3          MR. WARD:  So with respect to this, again, to the

4   extent that buyers need to be put on notice, it's going to be

5   in the APA.  I don't think this is the appropriate time to

6   dictate what federal laws do and don't apply.  The language

7   says "to the extent that the federal laws are applicable."

8   That will be provided to buyers in the form of APA and all of

9   these issues will be resolved at the sale hearing.  And if a

10  buyer wants comfort with the federal regulators, I'm sure

11  they will be in communication throughout the bidding process

12  regarding what will be necessary in order to get to a

13  conclusion of the process.

14          MR. VAN LANDINGHAM:  And Your Honor, if I may --

15          MR. WERKHEISER:  Your -- I'm sorry.

16          MR. VAN LANDINGHAM:  -- answer that --

17          MR. WERKHEISER:  Your Honor?

18          THE COURT:  Let me hear from the equity committee

19  first, and then I'll let you answer all the comments that are

20  made.

21          MR. VAN LANDINGHAM:  Okay.  Thank you, Your Honor.

22          MR. WERKHEISER:  Your Honor, for the record,

23  Gregory Werkheiser, Morris, Nichols, Arsht & Tunnell, on

24  behalf of the equity committee.

25          Your Honor, unfortunately, this was an argument we

didn't need to have today.  We embarked upon preparing these

bidding procedures and this bidding procedures motion, we

thought, in partnership with the debtors, the lenders, and

the other settlement parties.  I would remind everyone that

the settlement -- planned sale settlement that everybody

executed and Your Honor approved last Thursday indicated that

the parties agree to work in good faith to resolve any issues

with respect to the proposed bid procedures.

Part of the reason this language made it into the

motion, Your Honor, is because we were not even apprised of

the existence of communications on this topic by the DOJ

until approximately an hour before the debtors indicated that

they wanted to file the motion.  We were requested to allow

the motion to be filed under full reservation of rights, sign

unseen as to this and certain other issues related to the

Navahoes, which we agreed to, in order to make sure that we

were able to keep to the schedule.

So I understand why Department of Justice counsel

is maybe frustrated by how this played out, and it's

unfortunate.  And I want to provide assurances that it is not

our intention to shirk federal regulations or other federal

law or to encourage bidders to do so.  But we are mindful of

what are already, in our view, highly unusual bidding

procedures; highly detailed, in terms of potential regulatory

hurdles and other hurdles and other impediments to somebody

1  potentially being able to consummate a transaction that they

2  will have to comply with.

3          And we'll be having an argument shortly about

4  another term that the AB parties and Riverstone insist going

5  into these bid procedures that is also at risk of chilling

6  bidding.

7          So I appreciate that federal law is what it is and

8  that, to consummate a transaction at the end of the day,

9  parties will have to comply with it.  And we're not trying to

10  hide the ball from anybody.

11          And had we been included the process -- in the

12  process of discussing this issue with the DOJ, we might have

13  made the suggestion that I can make now, what I -- which I

14  hope might resolve this issue, which is that I think it would

15  be entirely appropriate, if the DOJ wants to, to provide a

16  statement of what they think the obligations are that any

17  bidder would have to comply with, in terms of federal

18  regulations, to transfer leases and so on, and to make that

19  available in the data room for anyone who's considering a

20  transaction.

21          What we are concerned about is perception becoming

22  a reality.  And when you put all of this stuff into a set of

23  bidding procedures, you can't tell how many people you

24  actually don't even get to talk to or hear from because they

25  are put off by the complexity and the uncertainty surrounding

the potential sale process.  And so our intention is to try

to streamline the bidding procedures as much as possible and

give this contemplated sale process a chance to succeed, Your

Honor.

THE COURT:  Thank you.

Mr. Van Landingham, let me hear a response --

MR. VAN LANDINGHAM:  Thank you --

THE COURT:  -- from you.

MR. VAN LANDINGHAM:  Thank you, Your Honor.

So the -- I guess I -- a couple of suggested

alternatives here.  One was to include language like we had

drafted in the form purchase agreement.  That would be -- I

think that could be an acceptable solution, but we don't have

that agreement yet, and I understand we won't have that for

another week or so.  And so I can't agree to it unseen and I

don't -- and I guess I'm not sure whether -- what the equity

committee's view on that would be, and so I couldn't agree to

that, unless all parties had.  But that could be a potential

solution, if we get that drafted and include this language in

there, and agree to include this language in it.

I think part of the problem of simply throwing

everything in the data room is we don't have a purchase

agreement.  We also don't have a list of assets at this

point.  And I understand the desire to make this as

streamlined as possible.  But I think this bankruptcy -- I

1      don't think I'm going out on a limb to say that there is some

2      irreducible complexity in the debtors' business here.  And we

3      have four different debtors, two are handled by a plan, two

4      are not.  I am -- we haven't yet seen a list of assets.  And

5      which entities own which federal assets could be a complex

6      issue.

7              And so I couldn't create in advance a list of the

8      federal issues until I see all of that data, and bidders also

9      won't be able to, which is why we included the general

10     language that begins with "to the extent required by federal

11     law," merely to put bidders on notice that they can't assume

12     these things are free and clear of any obligations, and that

13     federal law will apply to the federal leases.

14             MR. WARD:  Your Honor, if I may --

15             MR. VAN LANDINGHAM:  And again, I'm -- just a final

16     point, Your Honor, again, that this is not -- this is not

17     language that would, in my experience, surprise experienced

18     bidders.  Again, this is nearly verbatim to language we've

19     included in other bid procedures orders, including one before

20     this Court.

21             MR. WARD:  Your Honor, with respect to the APA, the

22     APA will be coming out in a week or two.  I can represent to

23     Your Honor that we can put this language in there.  I would

24     say, with respect to Items 2 and 4, we would want to say

25     federal law "to the extent applicable," we'll put it in the

1   APA.  Counsel for the DOJ has had access to the schedules and

2   SOFAs and can see the assets that are up for sale.

3        And to my point earlier, Your Honor, it's unclear

4   what bidders will do which transactions.  The equity

5   committee has raised a good point, that there could be a

6   combination of sale transaction.  These are the reasons why

7   it's inappropriate for this to go into bidding procedures

8   because we don't know what bids will come in, in what form

9   and on what assets.  And it's appropriately raised in the

10  context of a sale hearing, coupled with bidders getting

11  notice through the form of the APA and a statement in the

12  data room.

13       THE COURT:  Okay.  I'm not going to require the

14  language that was in the bid procedures as drafted, with

15  respect to federal law to be included as a requisite for a

16  qualified bid.  But it's clear to me that, depending on what

17  assets a particular buyer wants to purchase, that they may

18  very well have to get approval and meet the requisites that

19  are set forth here.

20       And to me, it's a notice issue more than a

21  qualified bid issue because we may have assets that are

22  subject to these requirements listed here because they are

23  leases that are on tribal land, held in trust for the benefit

24  of the Navaho Nation.  And then we may have other leases that

25  are not -- do not fit within that category.

1          So the debtor has offered to put it into the asset

2     purchase agreement, which I will require the debtor to do.

3     And I suggest you work with Mr. Van Landingham on any changes

4     to this language.

5          I will also permit, if the Government wishes, for

6     them to put in any statement that they want to put in with

7     respect to the requirements for purchasing or taking an

8     assignment of any of the leases on tribal land, held in trust

9     for the benefit of the Navaho Nation.  And that can go in, in

10    my view, at any point in time into the data room, whenever

11    that is available, if, in fact, the U.S. Government wants to

12    put in a statement.

13         I will also observe that it would surprise me that

14    people interested in these leases have no knowledge of the

15    requirements that the Government is going to put on them.

16    And I -- if some bidder comes forward who's unaware, I would

17    think I would pause in going too far down the tracks with

18    them, without explaining to them the issues that arise here.

19         So I'm not quite sure if it will -- would chill the

20    bidding to have this language in the bid procedures, but I

21    don't know that it's necessary to.  And I do, as I said, view

22    it more of a notice, buyer beware, there are leases that may

23    be subject to these federal requirements, and if you want to

24    take them, you're going to have to comply with them.  So

25    that's where I come down on this issue.

1          For my benefit, are these leases that are on the

2     tribal land and have in trust for benefit of the Navaho

3     Nation different leases than the Navaho Nation itself --

4          MR. WARD:  These are the --

5          THE COURT:  -- has concerns regarding or no?

6          MR. WARD:  The Navaho Nation has some language in

7     here in the footnotes regarding 365 and, to the extent that

8     365 is applicable, compliance with 365.  Your Honor, we're

9     comfortable with the language as it stands.  I understand

10    that Navaho Nation is, as well as the equity committee is.

11         THE COURT:  Yeah.  My question was more:  Are these

12    the same leases or are there two subsets of leases?  Do I

13    have leases that are on tribal land, held in trust for the

14    benefit of the Navaho Nation and -- which the DOJ has raised

15    concerns about, and another set of leases that the Navaho

16    Nation itself, but not the Federal Government, has concerns

17    about, or are they the same leases?

18         MR. WARD:  I believe all of Aneth assets are in the

19    Navaho Nation.  I --

20        (Participants confer)

21         MR. WARD:  Yeah, we believe that they're the same -

22    -

23         THE COURT:  Okay.

24         MR. WARD:  -- one and the same.

25         THE COURT:  Okay.

1    MR. WARD:  Thanks, Your Honor.  I'll work with Mr.

2    Van Landingham regarding the language for the APA.

3    At the bottom of 7, there is also another change by

4    the equity committee, which we were fine with.

5    On the next page, again, we added Mr.

6    Desgrosseilliers as a consultation party.

7    There is some language at the bottom of 8

8    regarding, now that DOJ is addressed, the one remaining open

9    item, which is qualification of a bid and issues pertaining

10   to AB and Riverstone.  There's no need to digest this

11   language now, Your Honor.  When I'm finished here, I'll turn

12   the podium over to Ms. Schultz, who also will speak in favor

13   of the bidding procedures as a whole, and I believe has some

14   proposed language that AB and Riverstone would like to see in

15   the bidding procedures.

16   THE COURT:  Okay.

17   MR. WARD:  The next change looks to be over on Page

18   12, which, again, is regarding the deadline for closing.

19   And then, in the confidentiality agreement, the

20   equity committee wanted to broaden the scope of the

21   professionals to which it applied, so we accommodated that

22   change and clarified that this is only for nonpublic,

23   proprietary, or confidential information.  That, again, was a

24   change by the equity committee that the debtors agreed to.

25   We added a new Paragraph 9 regarding collusion,

1    stating that bidders won't collude.  And we took out the

2    remainder of that language, again, at the equity committee's

3    request.

4         So, Your Honor, that takes us through the document

5    that we filed this morning.  Other than the DOJ and the

6    AB/Riverstone issue, there were some open issues with respect

7    to Navaho Nation.  We understand that those have now been

8    resolved through the incorporation of two more paragraphs,

9    which I can hand up to Your Honor.

10        THE COURT:  Okay.

11        MR. WARD:  So, first, on this, Page 15, the equity

12   committee has requested the addition of these two paragraphs:

13   The first relating to sovereign immunity, and the second

14   pertaining to the applicability or non-applicability of

15   Section 365.  Simply, that issue is reserved; 365 says what

16   it says.  We didn't intend to say that it applied, but you

17   know, we've made clear that that is an open issue, which will

18   be addressed at a sale hearing.

19        THE COURT:  Okay.

20        MR. WARD:  And then, if Your Honor flips to the

21   bidding procedures a few pages later, on Page 5, here is

22   another change that the equity committee has requested from

23   the Sovereign Navaho Nation, which we understand the

24   Sovereign Navaho Nation has agreed to, just simply stating

25   their position with respect to the audits.

1          THE COURT:  Okay.

2          MR. WARD:  So that's what I have, Your Honor.  I do

3     know that Ms. Schultz -- and there may be others that want to

4     speak in favor of the bidding procedures, and also raise the

5     last open issue.  And my understanding is that Mr. Werkheiser

6     may want an opportunity to respond.

7          THE COURT:  Okay.  Ms. Schultz.

8          MR. WARD:  Thanks, Your Honor.

9          MS. SCHULTZ:  Good morning, Your Honor.  For the

10    record, Sara Schultz, Akin, Gump, Strauss, Hauer & Feld, on

11    behalf of AllianceBernstein as the pre-petition lender, DIP

12    lender, and as the DIP and pre-petition agent.

13         Your Honor, we're happy to be before you today.

14    And I want to start off by saying, from our perspective, I

15    think there's been a really tremendous effort to get us to

16    where we're at today.  I think, as Your Honor noted last

17    week, we've come to a resolution that's not perfect for

18    anybody.  That's always going to be the case.  I think that's

19    how we know we've reached the right settlement, oftentimes.

20    And as a result, we're here today, at least with respect to

21    AllianceBernstein, on one, what we view os a discrete issue.

22         The equity committee noted in their objection that

23    there were two issues pertaining to AB.  The first related to

24    the relationship between the secured lenders, Riverstone and

25    AllianceBernstein.  Understand that people were moving

quickly.  I think that that was really an issue that was not

a significant issue and has been resolved between

AllianceBernstein and Riverstone, with some additional

language that's been added on the bid procedures in Section

(o), which is titled "AB as a Qualified Bidder."  I think

it's on Page 8, Your Honor, but I may be holding a different

redline than you are in my hand.

And let me start by saying that there -- last

night, when the agreement that was reached between

AllianceBernstein and Riverstone was incorporated, there were

a couple of things that were not incorporated here.  This

provision was intended to provide parity.  So what I mean by

that is the title of it, instead of reading "AB as a

Qualified Bidder" should read "AB or Riverstone as a

Qualified Bidder."  And in the instances in the first couple

of sentences where it references "AB," it should referenced

"AB or Riverstone."  And the idea is that either AB or

Riverstone could elect to have the plan that's currently on

file, as may be modified by these provisions, treated as a

qualified bid.

The agreement that we've reached to resolve -- to

solve for one party dragging the other party along -- which

was the concern between the parties --

THE COURT:  Uh-huh.

MS. SCHULTZ:  -- is that, if AllianceBernstein

1    says, we want the plan to be treated as a qualified bid, then

2    the plan must either provide for cash payment in full to

3    Riverstone, or Riverstone has to consent, and vice-versa.

4         The committee raised a concern that that plan may

5    look different than the plan that was -- that's on file.

6    That was not our intention.  And so we've agreed to include

7    language that provides that:

8              "If AB or Riverstone elect for the plan, as may be

9              modified by this provision" --

10        And that's to provide for the payment in full that

11   I just discussed.

12             THE COURT:  Uh-huh.

13             MS. SCHULTZ:  "-- or such other bid that meets the

14             requirements of a qualified bid under the bid

15             procedures, to be treated as a qualified bid, then

16             it's deemed to have submitted it timely."

17        So that's always what we intended, Your Honor.  We

18   didn't intend to just show up and say, surprise, we're going

19   to give you something that's not at all what the plan says,

20   it's something completely different, and it doesn't meet the

21   bid qualifications, but we're still a qualified bid.  We're

22   just adding some language to clarify that.

23             THE COURT:  Okay.

24             MS. SCHULTZ:  So I think that's really the first

25   issue.  And my understanding is, subject to seeing these

1    words that I've scribbled on the side of the page in

2    typewritten form, that that was agreeable to the equity

3    committee.

4        The second issue, Your Honor, relates to timing; it

5    relates to when the secured lender may determine to

6    participate in the auction process, if they so desire.  As

7    currently drafted, the bid procedures provide that the

8    secured parties can, at any time prior to the closing of the

9    auction, exercise their 360(c) -- 363(k) rights to bid and to

10   have a plan or a modified version treated as the bid, as

11   we've just discussed.  Until the time that the secured party

12   makes that election, they're a consultation party.  If they

13   make the election, they take off their consultation party hat

14   and they put on their bidding procedures hat.

15       I think important, as you consider this, Your

16   Honor, is that none of the consultation parties have consent

17   rights with respect to the process.  And each of the

18   consultation parties, including the equity committee, have

19   identical consultation rights under the bidding procedures.

20   So this means that, at all times, the debtors are going to be

21   talking to the consultation parties.  And the debtors,

22   exercising their fiduciary duties, are going to be making the

23   ultimate decisions.  Nobody else has the right to put their

24   thumb on the sale -- the scale and say no.  It -- that right

25   lives solely with the debtors.

1           The equity committee argues that this proposal

2     that's put forward in the bid procedures is -- and they say:

3                "The equity committee is aware of no precedent in

4                this Court or elsewhere for such an extraordinary

5                procedure."

6           Contrary to their statements, Your Honor, these

7     provisions live -- they are not only unprecedented, but

8     they've been approved on numerous occasions in this

9     jurisdiction.  In the Weinstein Company Holdings:

10               "The DIP agent and the pre-petition agent shall be

11               entitled to credit bid at or prior to the auction."

12               In Scooter Store Holdings, Inc.:

13               "The DIP agent and the pre-petition secured agents

14               are qualified bidders and shall have the right, but

15               not the obligation to submit a credit bid at or

16               before the auction."

17               In Enduro Resources, we see similar language.

18               In Aerogroup, we see language that says:

19               "The DIP lender and the pre-petition term agent may

20               each participate in the auction and, to the extent

21               set forward in the final DIP order, may credit bid

22               at any time up to and including the auction" --

23               "the conclusion of the auction."

24          While every situation is different, Your Honor, we

25     believe this demonstrates that this language is far from

1    unprecedented.

2          Further, contrary to the equity committee's

3    contention, we think allowing the secured lenders to credit

4    bid both at and prior -- prior to and during the auction can,

5    frankly, only serve to drive value.  This is a unique

6    situation.  As the equity committee notes, we will only find

7    ourselves at an auction if a third party comes forward with a

8    bid that proposes a bid that satisfies all of the secured

9    debt.  By definition, to top that bid, we've got to give

10   something more, we've got to drive value, right?

11         And so I'm sure that brings up the question:  Well,

12   why would you ever do that, Ms. Schultz?  You're going to get

13   paid in full.  Why would your client want to do that?  And

14   Your Honor, I think the answer is simple, I think it's

15   certainty.

16         I can envision a situation where there are bidders

17   who are prepared -- proposed to pay the secured debt in full,

18   but where we think that there is execution risk.  And there

19   might be value to one or more of the secured lenders in

20   having certainty, to putting something more on the table that

21   provides certainty to the process in their mind.  And to say

22   that they can't, at that point -- something that we can't

23   predict before the auction, that they can't step in and offer

24   that, I think is, frankly, detrimental both to, you know, the

25   secured lenders, but to all stakeholders, Your Honor.

1          THE COURT:  Is the --

2          MS. SCHULTZ:  So --

3          THE COURT:  Is the question whether or not you can

4     decide to credit bid during the auction process or whether or

5     not you can have that right to determine to credit bid during

6     the auction process, as well as be a consultation party?

7          MS. SCHULTZ:  So the question is:  Can we decide to

8     credit bid during the auction process?  I think -- and I

9     don't want to put words in the equity committee's mouth.  But

10    what they have said in their papers is, by virtue of being a

11    consultation party until we determine to credit bid, that

12    that chills the process.  And frankly, Your Honor, because

13    these procedures are set up so that the debtor is the sole

14    keeper of the keys, we think that does not chill the bidding

15    process.

16          They're going to listen to all of us, they're going

17    to consult with all of us.  And they're -- and we're -- we

18    are not going to have any more of an ability to put a thumb

19    on the scale than the equity committee will, than BP will,

20    than any other party will, frankly.

21          THE COURT:  Well, I'm not sure I've approved a bid

22    procedures where a party has consent rights, as opposed to

23    consultation rights.  So I'm not sure that there's any

24    situation in which the decision is taken out of the debtor's

25    hands.

1          But I guess the question is -- I'll hear from the

2     equity committee.  I guess the question is:  Vis-a-vis

3     bidders, as opposed to vis-a-vis the debtor and consult and

4     consultation rights, should -- if the secured lenders are

5     going to bid, should they make up their mind that it's a

6     possibility that they want to reserve before we head into the

7     auction?  So that, if they decide they want to reserve that,

8     okay, you're not a consultation party.  If you decide, you

9     know, I've seen the bids -- because you will have seen the

10    bids ahead of time -- and I'm comfortable with all these

11    people, maybe I don't want to reserve that right and I'll be

12    a consultation party.

13          MS. SCHULTZ:  Right.  And I think that's a valid

14    point, Your Honor.  I think the concern we have is we've all

15    seen auctions that unroll in ways that we don't expect.  And

16    if we get to the conclusion of the auction and we're not a

17    bidder, the plan is no longer a possibility, but we think

18    there is tremendous execution risk, we may -- it may be

19    beneficial to all parties for us to put a little more on the

20    table to eliminate that execution risk.  And frankly, if we

21    go with the construct that I think the equity committee is

22    asking for, we eliminate that possibility, which I just don't

23    think is value-maximizing, frankly.

24          THE COURT:  Because we eliminate that possibility

25    because the secured lenders aren't going to make that choice

1    before the auction starts?

2              MS. SCHULTZ:  Well, if the secured lenders have

3    opted not to be a bidder before the auction starts, and then

4    this is what unrolls, we find ourselves in a place of great

5    uncertainty.

6              THE COURT:  Okay.

7              MS. SCHULTZ:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              Mr. Werkheiser.

10             MR. WERKHEISER:  Your Honor, just before I respond,

11   I wanted to inquire if Riverstone --

12             THE COURT:  Ah.

13             MR. WERKHEISER:  -- had a position they wanted to

14   state on this.

15             THE COURT:  Fair enough.

16             MS. PEET:  I'll just quickly say, first of all, you

17   know, a lot of hard work in getting here so quickly, and

18   appreciate the time and the fast schedule; agree with what

19   Ms. Schultz said.  And in particular, as you might imagine

20   from my statements last week, our focus was on if a plan is

21   put forward and we're not opposing it, if AB is, it's

22   modified so that it's -- it provides for payment in full on

23   the closing date of the transaction.

24             Similarly, if Riverstone isn't the party or AB

25   isn't the party that's advancing, the remaining party is kind

1    of separated; it's not -- just for the avoidance of doubt,

2    it's not both together.  It provides for either party to take

3    that step.  That's all I'd say here.  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              MR. WERKHEISER:  Thank you, Your Honor.  For the

6    record again, Gregory Werkheiser.

7              Your Honor, just to retreat back to the first issue

8    that Ms. Schultz described, the resolution of -- on the

9    record.  I think her description of how we've come to address

10   that is generally accurate.  I would just clarify that the

11   qualified bid status is not presumed in that scenario.  It is

12   still subject to the debtors' determination, acting in

13   consultation with the other consultation parties, that the

14   bid that has been put forward by AB or Riverstone in that

15   scenario is, in fact, a qualified bid.

16             THE COURT:  The bid that's not the plan.

17             MR. WERKHEISER:  Correct.  And what -- if they put

18   forward a bid that is not the plan, with such modifications

19   as necessary to improve the economics of it.

20             THE COURT:  Okay.

21             MR. WERKHEISER:  On the second issue, Your Honor,

22   let me just start by saying what we're not objecting to.  So

23   we're certainly not objecting to the ability of AB or

24   Riverstone to retain the discretion to become a bidder at the

25   auction up until 24 hours after the bid deadline.  So they

1    will have received the bids at the same time as the equity

2    committee and all the other consultation parties.  They will,

3    therefore, be fully informed of what the bids consisted of.

4    There will presumably have been an opportunity for all of us

5    to confer about whether the bids are qualified bids or not.

6         And if the bids are qualified bids, that means, by

7    definition, that they meet all of the specific requirements

8    built into the bidding procedures and provide value at a

9    level that fully covers all of their secured debt, both pre-

10   petition and post-petition.  So, at that point, they're no

11   longer pure -- really credit bidding, in the sense that we

12   often see in this Court.  They are bidding in their secured

13   debt, but then would have to participate in the auction by

14   coming up with additional cash.

15        So our concern is that they really -- one is the

16   perception to the market of other bidders and how that would

17   be perceived and whether they would view this as a fair

18   process.  But two, there is this -- there are significant

19   opportunities for mischief here.

20        So, if they retained the discretion to effectively

21   parachute into the middle of the auction, after saying, no,

22   we're not going to bid, I mean, just to play out one

23   hypothetical, Your Honor, you know, consider a situation

24   where we have two other qualified bids.  One is by a well-

25   capitalized party, who could bid up -- you know, another $100

million if they wanted; the other one is by somebody who's known to be relatively thinly capitalized and will probably run out of steam relatively quickly.

Under that scenario, somebody in the position of AB or Riverstone, under the language that they proposed, could wear their consultation hat for the first half of the auction and find reasons to try to reject overbids by the well-capitalized party, who has relatively low execution risk, and then parachute back into the auction and pick up the assets that are for sale in a less-than-value-maximizing way because they know that the other party can't hang through successive rounds of bidding. I mean, there are other scenarios we can play out that could exist here, but there's plenty of opportunity to manipulate the process when somebody is participating with -- in both ways, after the auction has started.

Your Honor, I would just also add that there's really -- you know, there is no risk to AB or Riverstone from having to make a decision prior to the commencement of the auction and stick with it because the bidding procedures themselves, at Page 10, under "Terms of Overbid," explicitly specify that:

"Any overbid must comply with the conditions for a qualified bid set forth above, except for the bid deadline."

1          And all those bids have to include, not only the

2     amount and form of consideration of the overbid, a

3     description of all changes requested by the bidder to the

4     form purchase agreement, modified purchase agreement form

5     plan or modified plan, as the case may be.  So the procedural

6     safeguards already exist to ensure that they're not being

7     placed in an unacceptable execution risk position by a bid

8     that has somehow morphed in a way that would make it not a

9     qualified bid going forward.

10          They'll have -- you know, if they're not bidding in

11     the auction at that point, they still have their consultation

12     rights.  They can raise any concerns about that bid that is

13     appropriate.  Obviously, if, at the conclusion of the

14     auction, they disagree with the judgment that it was a

15     qualified bid, they have this Court as an avenue to address

16     any concerns.  I would suggest that's really just a red

17     herring, and not something that is necessary for anyone's

18     protection.

19          Your Honor, with respect to the orders that Ms.

20     Schultz referenced, I haven't -- this is the first time I

21     heard of those.  We did some of our own research in the time

22     available and couldn't come up with, certainly, any examples

23     of where the issue was actually contested, and a secured

24     lender was able to be simultaneously a bidder and maintain

25     consultation rights during an auction.  I suspect that, if we

1    go back and look at these cases, the request was not opposed

2    by any party, and so whatever value they have as precedent

3    for what this Court does or does not do would be

4    extraordinarily limited.

5            And so, you know, I think this is largely, at the

6    end of the day, a common sense and fairness issue to all

7    parties involved, and also an issue of perception to

8    potential bidders who would potentially be part of the

9    auction process, but may not be if they had a sense that it's

10    not going to be fair.  Thank you, Your Honor.

11            THE COURT:  Thank you.

12            Ms. Schultz.

13            MS. SCHULTZ:  Thank you, Your Honor.  I'll be

14    brief.

15            I just wanted to clarify.  I think Mr. Werkheiser

16    said -- and perhaps this was inadvertent -- that I was

17    arguing that, somehow, we could maintain our ability to be a

18    consultation party while, at the same time, being a bidder.

19    And I wanted to be clear that is not what we are suggesting.

20    That's not what those orders that I referenced stand for.

21    They stand for the proposition that you can be a consultation

22    party until you elect to become a bidder, and that's what

23    we're suggesting here today.

24            MR. WERKHEISER:  If I was --

25            THE COURT:  Thank you.

1          MR. WERKHEISER:  -- imprecise with my words, I'm

2     sorry.  I -- the intent was that the auction would have

3     started and they would still have optionality.

4          THE COURT:  Yeah.  I had this issue recently in one

5     of my cases.  I don't remember which one.  And I think I'm of

6     the same view, although I'm always interested in hearing the

7     arguments because I do change my mind sometimes.

8          But I think the lender has to make a choice, and I

9     think the lender has to make a choice prior to the auction.

10    I'm not going to say within 24 hours of the bids.  I think

11    you have up to the auction, and I think you have to announce

12    at the beginning of the auction are you a potential bidder or

13    are you not.  And if you're not, you can be a consultation

14    party during the auction, and if you are, you cannot, and I

15    think the lender has to make that choice.

16         And I say that because I think it's more of a

17    perception issue and a fairness issue to the other bidders

18    who are in the process to know that a potential bidder is not

19    being consulted by the debtors as to the debtors' decision.

20    And I know the debtor can speak to whomever they want to

21    speak to during the auction, including every bidder.  And

22    obviously, they do speak with the bidders who can spin their

23    bids the way they want to and can speak about another

24    person's bid and comment, to the extent they want to, on

25    execution risk or whatever they want to speak to the debtors

1    about.

2         But I think that a secured lender who wants to

3    credit bid, or quite frankly, any party who wants to be a

4    consultation party -- or any party who wants to be a bidder

5    needs to announce that ahead of time, so that everyone in the

6    room knows it because that's part of the fairness of the

7    process, too, is knowing who the potential other bidders are,

8    but not being scared off by somebody who's not going to be --

9    who's not bidding, but may be a consultation party and can

10   drop in halfway through the auction.  I don't think that's

11   right.

12        So my ruling here is that the -- if the lenders,

13   either one of them, want to credit bid or otherwise bid at

14   the auction, they need to make that known as the auction

15   starts, so everyone knows.  And if they do, then they're not

16   a consultation party through the whole process.  And if they

17   don't, then they can be.

18        Okay.  Do we have any other issues with respect to

19   auction procedures?

20        (Participants confer)

21        MR. WERKHEISER:  Your Honor, I want to thank the

22   Court again for your availability and your patience with us

23   as we're, again, making the sausage here.  I want to, again,

24   sort of reiterate the concerns I expressed at the outset.  We

25   have, you know, embarked upon this plan sale settlement with

1    the expectation that, while we all have somewhat different

2    interests, we are all partners in maximizing value.

3         Our concerns about that, you know, are growing,

4    especially given the way the process leading up to today's

5    hearing was handled, and including some of the statements

6    made here today.  And Your Honor, I didn't want you to be

7    left with the perception that the committee had not tried to

8    engage because I think it was suggested during Mr. Ward's

9    comments that we did not give them comments until Sunday

10   evening, but that would not be accurate.

11        I, during the hearing, had to look back over my

12   calendar and emails, and I'm looking -- and I've only gone

13   back through the 23rd, but we gave comments in writing and

14   during a call on Tuesday the 23rd.  We gave comments during a

15   call and in writing on Wednesday the 24th.  We gave comments

16   after the hearing on Thursday, the 25th, in writing, and

17   provided -- had discussions even here, outside the courtroom

18   after the hearing.

19        MR. WARD:  Your Honor, I don't know how --

20        MR. WERKHEISER:  And --

21        MR. WARD:  -- constructive this is.

22        MR. WERKHEISER:  And -- please allow me to finish

23   and then feel free to respond.  And we gave comments again on

24   Friday, in writing and in telephone calls.

25        So, again, I -- we are where we are, and we are

1    committed to working with everybody to make the best of this

2    process.  But you know, we can't do it alone.  And I, you

3    know, need to protect my record because I may very well be

4    back here in front of Your Honor before mid-September, saying

5    this has failed for reasons it shouldn't have failed, and

6    either seeking more time or other relief.

7             THE COURT:  Okay.

8             MR. WERKHEISER:  And so --

9             THE COURT:  Well, I'm not going to anticipate that

10   the process is going to fail.  I'm going to anticipate that

11   the parties are going to work cooperatively together.  I

12   think you have.  I mean, the fact that we had some open

13   issues doesn't particularly concern me.

14            This is -- this case is moving, it's moving at

15   pace.  Parties may have different views on things, that's

16   what I'm here for.  But I don't view this as a more

17   contentious case than any other case that I have.  And I

18   think these couple of issues that were left open, I can

19   understand the parties' positions, and I just picked a side.

20            MR. WERKHEISER:  Yeah.

21            THE COURT:  So I think the parties, from what I can

22   see here, are working together, recognizing that they have

23   different points of view.  And to the extent that anybody has

24   a process -- a problem with the process, it is -- as it

25   unfolds, I do expect I will hear about it.  And again, that's

1      what I'm here for, as well.

2              But let's see how the process works out.  Let's not

3      anticipate that it's not going to work.  But if it doesn't,

4      I'm here --

5              MR. WERKHEISER:  Understood, Your Honor.

6              THE COURT:  -- and I'll decide it.

7              MR. WERKHEISER:  I'm sorry.  I didn't mean to speak

8      over you.  But understood, Your Honor.  Just our concern is

9      that, you know, we continually try to engage and we are not

10     getting reciprocal engagement from the other parties.  And

11     not until, at the very last moment, and then the parties came

12     to court today and created a picture as if we had waited to

13     provide them comments, so I --

14             THE COURT:  I actually didn't really hear it that

15     way, so don't be concerned about that.

16             MR. WERKHEISER:  Thank you, Your Honor.

17             THE COURT:  It's just the way it works.

18             MR. WARD:  Your Honor, I'm going to attack every

19     statement.  I will stated that, largely, the comments dealt

20     with the Sovereign Nation of Navaho, which we were very

21     pleased to negotiate with and get to what we consider to be a

22     very favorable resolution, from the debtors' perspective.

23     And it was a week ago that we turned Mr. Werkheiser over to

24     their counsel to resolve those comments.

25             What I will say, Your Honor, is that we are pleased

1    to have worked with a multitude of parties, which, as I noted

2    at the start of the hearing, include AB, Riverstone, BSP, BP,

3    the United States Trustee's Office, the Sovereign Nation of

4    Navaho, the DOJ, and the equity committee, along with our

5    conflicts counsel, and have been able to present to Your

6    Honor a bidding procedures order with bidding procedures and

7    confidentiality agreement.  They are largely consensually.

8            And now we're pleased with Your Honor's blessing to

9    move forward with the transaction that will market-test a

10   plan in hopes of maximizing value for all constituents.

11           THE COURT:  That's great.

12           Let me make one comment.  To the extent that we do

13   get to a sale hearing and there is any issues related to the

14   governmental approvals that are needed or the Navaho -- the

15   rights of the Navaho Nation, I have not had to deal with

16   those before, so I really will need the legal authority on

17   those issues.  Hopefully, it won't get to that.  But to the

18   extent that there are issues, I will need the legal authority

19   to be able to rule on those issues.  And don't treat it as

20   routine because, for me, it won't be routine.

21           MR. WARD:  Thanks, Your Honor.

22           THE COURT:  Okay.  Anything else?

23       (No verbal response)

24           THE COURT:  Okay.  Thank you very much.

25           MR. WERKHEISER:  All right.  Thank you, Your Honor.

1          THE COURT:  I will expect a revised form of order,

2     right?

3          MR. WARD:  Yes, we'll submit that under

4     certification of counsel.

5          THE COURT:  Okay.  Thank you very much.  We're

6     adjourned.

7          MR. WARD:  Thanks, Your Honor.

8          COUNSEL:  Thank you.  Thank you, Your Honor.  Thank

9     you, Your Honor.

10       (Proceedings concluded at 12:01 p.m.)

11                           *****

1                        CERTIFICATION

2           I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9

10

11     _____     July 30, 2019

12     Coleen Rand, AAERT Cert. No. 341

13     Certified Court Transcriptionist

14     For Reliable